## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RYAN W. ZIMMERMAN
      Plaintiff,

           v.

AL JAZEERA AMERICA, LLC, AL
JAZEERA MEDIA NETWORK,  AL
JAZEERA INTERNATIONAL (USA) INC.,
LIAM JAMES COLLINS, and DEBORAH
DAVIES,
      Defendants.

Case No. 1:16-cv-13-KBJ

**DEFENDANTS AL JAZEERA MEDIA NETWORK,**
**AL JAZEERA INTERNATIONAL (USA), INC., AL JAZEERA AMERICA, LLC,**
**AND DEBORAH DAVIES' MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**MOTION TO DISMISS THE COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................ 1

STATEMENT OF FACTS ..................................................................... 4

    A.    The Parties ........................................................................... 4

    B.    Performance Enhancing Substances in Professional Sports ................................. 5

    C.    Preparation of the Documentary ..................................................... 9

    D.    Sly's Recorded Statements about Plaintiff ........................................... 15

    E.    Al Jazeera's Pre-Broadcast Contact with Plaintiff and Other Persons Mentioned in the Documentary ..................................................... 16

    F.    Charlie Sly's "Recantation" ....................................................... 17

    G.    Broadcast of The Documentary and Publication of Follow-Up News Stories ............................................................................ 18

ARGUMENT ................................................................................ 19

I.    THE DOCUMENTARY AS A WHOLE IS NOT REASONABLY CAPABLE OF the DEFAMATORY MEANING ALLEGED BY PLAINTIFF AND DEFENDANTS HAVE NOT MADE ANY FALSE STATEMENT OF FACT ........... 19

II.    PLAINTIFF HAS FAILED TO PLAUSIBLY PLEAD THE REQUIRED ELEMENT OF ACTUAL MALICE ..................................................... 23

    A.    The Twombly-Iqbal Plausible Pleading Requirement for Complaints ................ 23

    B.    Matters That May be Considered on a Motion to Dismiss ................................. 24

    C.    The Elements of Plaintiff's Defamation and False Light Claim......................... 25

    D.    Plaintiff is a Public Figure Who Must Allege and Prove Actual Malice............ 27

    E.    Plaintiff Fails To Plausibly Allege that Defendants Acted With Actual Malice ................................................................................ 28

        1.    The Alleged False Defamatory Statements and Plaintiff's Denials......... 28

        2.    Absence of Allegations Permitting a Plausible Evidence of Actual Malice ......................................................................... 29

        3.    Plaintiff's Other Insufficient Allegations................................. 33

            a)    Conclusory Assertions ................................................. 33

            b)    Irrelevant Allegations.................................................. 33

            c)    Inconsequential Errors ................................................. 34

            d)    Denials By Plaintiff's Attorneys ........................................ 35

            e)    Alleged Failure to Corroborate or Obtain Further Details........... 36

            f)    Sly's Alleged Self-Interest............................................. 36

i

## TABLE OF CONTENTS
(continued)

**Page**

F.   Al Jazeera's Reporting of Plaintiff's Denials and Sly's Disavowals
     Negates Actual Malice ............................................................................. 37

CONCLUSION .......................................................................................................... 39

ii

## TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant: small-caps;">CASES</span>

*Abbas v. Foreign Policy Grp., LLC,*
   975 F. Supp. 2d 1 (D.D.C. 2013), *aff'd,*
   783 F.3d 1328 (D.C. Cir. 2015) ...............................................................21, 23, 34

*Agee v. Muskie,*
   629 F.2d 80 (D.C. Cir. 1980) ...........................................................................4

*Arpaio v. Obama,*
   797 F.3d 11 (D.C. Cir. 2015) ...........................................................................24

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ...........................................................................23, 24, 27, 33

*Basilius v. Honolulu Pub. Co.,*
   711 F. Supp. 548 (D. Haw. 1989), *aff'd sub nom.,*
   *Polycarp Basilius v. Honolulu Pub. Co.*, 888 F.2d 1394 (9th Cir. 1989) ...............................22

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007) ...........................................................................23, 24, 27

*Biro v. Conde Nast,*
   807 F.3d 541 (2d Cir. 2015) ...........................................................................26, 27

*Blodgett v. Univ. Club,*
   930 A.2d 210 (D.C. 2007) ...........................................................................25

*Bose Corp. v. Consumers Union of United States, Inc.,*
   466 U.S. 485 (1984) ...........................................................................37

*Cepeda v. Cowles Magazine & Broadcasting Co.,*
   392 F.2d 417 (9th Cir. 1968) ...........................................................................28

*Chapin v. Knight-Ridder, Inc.,*
   993 F.2d 1087 (4th Cir. 1993) ...........................................................................20

*Chuy v. Philadelphia Eagles Football Club,*
   595 F.2d 1265 (3d Cir. 1979) ...........................................................................27

*Fudge v. Penthouse Int'l, Ltd.,*
   840 F.2d 1012 (1st Cir. 1988) ...........................................................................24

*Green v. CBS Inc.,*
   286 F.3d 281 (5th Cir 2002) ...........................................................................21

*Gustave–Schmidt v. Chao*,
   226 F. Supp. 2d 191 (D.D.C. 2002) .......................................................................24

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
   491 U.S. 657 (1989) ...............................................................................................35, 36

*Hoffman v. Washington Post Co.*,
   433 F. Supp. 600 (D.D.C. 1977) ...........................................................................35

*Howard Univ. v. Watkins*,
   857 F. Supp. 2d 67 (D.D.C. 2012) .........................................................................24

*Islamic Am. Relief Agency v. Gonzales*,
   477 F.3d 728 (D.C. Cir. 2007) ...............................................................................24

*Janklow v. Newsweek, Inc.*,
   759 F.2d 644 (8th Cir. 1985) .................................................................................22

*Knievel v. ESPN*,
   393 F.3d 1068 (9th Cir. 2005) ...............................................................................24

*Liberty Lobby, Inc. v. Anderson*,
   Civ. Act. No. 81-2240, 1991 WL 186998 (D.D.C. May 1, 1991) ...........................36

*Lohrenz v. Donnelly*,
   223 F. Supp. 2d 25 (D.D.C. 2002), *aff'd*, 350 F.3d 1272 (D.C. Cir. 2003) ................26, 35, 38

*Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*,
   674 F.3d 369 (4th Cir. 2012) .................................................................................26

*McDonald v. Wise*,
   769 F.3d 1202 (10th Cir. 2014) .............................................................................26

*McFarlane v. Sheridan Square Press*,
   91 F.3d 1501 (D.C. Cir. 1996) ...............................................................................35, 36, 38

*Michel v. NYP Holdings, Inc.*,
   No. 15-11453, 2016 WL 860647 (11th Cir. Mar. 7, 2016) .......................................26, 27, 38

*Moldea v. N.Y. Times Co.*,
   22 F.3d 310 (D.C. Cir. 1994) .................................................................................19

*Moldea v. New York Times Co.*,
   15 F.3d 1137 (D.C. Cir. 1994) ...............................................................................25

*New York Times v. Sullivan*,
   376 U.S. 254 (1964) ...............................................................................................25, 27, 37

iv

*Ollman v. Evans*,
   750 F.2d 970 (D.C. Cir. 1984) ........................................................................24

*Oparaugo v. Watts*,
   884 A.2d 63 (D.C. 2005) ...............................................................................19

*Parisi v. Sinclair*,
   845 F. Supp. 2d 215 (D.D.C. 2012) ...............................................................25

*Pippen v. NBCUniversal Media, LLC*,
   734 F.3d 610 (7th Cir. 2013) .........................................................................26

*Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*,
   507 F.3d 117 (2d Cir. 2007) ...........................................................................24

*Price v. Viking Penguin, Inc.*,
   881 F.2d 1426 (8th Cir. 1989) .......................................................................22

*Reuber v. Food Chem. News, Inc.*,
   925 F.2d 703 (4th Cir. 1991) (en banc) ........................................................37

*Schatz v. Republican State Leadership Comm.*,
   669 F.3d 50 (1st Cir. 2012) ...........................................................................27

*Secord v. Cockburn*,
   747 F. Supp. 779 (D.D.C. 1990) ....................................................................37

*St. Amant v. Thompson*,
   390 U.S. 727 (1968) ...................................................................25, 26, 30, 35

*Tavoulareas v. Piro*,
   817 F.2d 762 (D.C. Cir. 1987) (en banc) ...........................................26, 27, 33

*The Washington Post v. Robinson*,
   935 F.2d 282 (D.C. Cir. 1991) .........................................................................4

*Time, Inc. v. Johnston*,
   448 F.2d 378 (4th Cir. 1971) .........................................................................28

*Weyrich v. New Republic, Inc.*,
   235 F.3d 617 (D.C. Cir. 2001) .......................................................................25

*White v. Fraternal Order of Police*,
   707 F. Supp. 579 (D.D.C. 1989),
   *aff'd in relevant part*, 909 F.2d 512 (D.C. Cir. 1990) ...................................20

*White v. Fraternal Order of Police*,
   909 F.2d 512 (D.C. Cir. 1990) .................................................................19, 20

## OTHER AUTHORITIES

Clean Sports Act, S. 1114, 109th Cong., 1st Sess. ...................................................................6

Designer Anabolic Steroid Control Act of 2014, H.R. 4771, 113th Cong., 2d Sess. ......................8

Drug-Free Sports Act, H.R. 1982, H.R. 3084, 109th Cong., 1st Sess. ...........................................6

Fed. R. Civ. P. 12(b)(6).................................................................................................................1, 23

GEORGE J. MITCHELL, REPORT TO THE COMMISSIONER OF BASEBALL OF AN INDEPENDENT
   INVESTIGATION INTO THE ILLEGAL USE OF STEROIDS AND OTHER PERFORMANCE
   ENHANCING SUBSTANCES BY PLAYERS IN MAJOR LEAGUE BASEBALL (2007).....................7, 8

George W. Bush, 2004 State of the Union address, available at http://georgewbush-
   whitehouse.archives.gov/news/releases/2004/01/print/20040120-7.html ...............................6

*Restoring Faith in America's Pastime: Evaluating Major League Baseball's Efforts to
   Eradicate Steroid Use: Hearing Before the H. Comm. on Gov't Reform*, 109th Cong. ...........6

*The Mitchell Report: The Illegal Use of Steroids in Major League Baseball: Hearing
   Before the H. Comm. on Gov't Reform*, 110th Cong. ...............................................................6

Defendants Al Jazeera Media Network ("AJMN"), Al Jazeera International (USA), Inc. ("AJI"), Al Jazeera America, LLC ("AJAM") (collectively, "Al Jazeera"), and Deborah Davies ("Davies") (collectively, "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the complaint of Plaintiff Ryan Zimmerman ("Zimmerman"), pursuant to Fed. R. Civ. P. 12(b)(6).

## PRELIMINARY STATEMENT

This case involves an important example of investigative journalism done in the public interest, and a misguided attempt by Plaintiff Ryan Zimmerman to punish the journalists for their path-breaking work.  The Court should dismiss this suit now, as the First Amendment requires.

Zimmerman attacks the documentary *The Dark Side: Secrets of the Sports Dopers* (the "Documentary"), created by Al Jazeera's news organization and broadcast in December 2015. The Documentary addresses a topic of pervasive public interest: the continuing use of banned performance-enhancing substances ("PES") in professional sports, and how those drugs get into the hands of athletes.  Every professional sports league and amateur sports organizations such as the Olympics have banned PES.  PES use in sports has also been the subject of Congressional investigation, legislation and criminal prosecution, and thousands of news stories.  Hundreds of professional and amateur athletes have been disciplined, disqualified, or stripped of medals and records due to PES use.  Yet athletes in search of a performance advantage still seek out and use PES, and dozens are caught each year through drug testing or otherwise.

Al Jazeera sought to find out why this problem continues and to expose the facts to the public.  It realized that athletes cannot get PES without the help of a network of doctors, pharmacists, nurses and other medical professionals.  These professionals can prescribe drugs that are legal for other purposes but are banned in sports due to their ability to enhance performance.  They also act as a pipeline for "designer steroids" created by illegal chemists.

1

These medical suppliers of PES hide in the shadows and would never knowingly talk to reporters.

To penetrate this underground network and expose how these suppliers operate, Al Jazeera enlisted Liam Collins, a British track star, to act as an undercover investigator who would film his transactions with a hidden camera and microphone. Collins' cover story to the PES suppliers would be that he was trying to qualify for the Rio Olympics and needed the edge that PES could provide.

Over a period of months, Collins made his way through the network to the man that one of the doping professionals said has "taken smart drugs to a whole new level." Collins met this man – a pharmacy expert named Charlie Sly – in Texas, and filmed many days of conversations with Sly. What Collins saw was eye-opening. Sly had a refrigerator full of drugs. He designed a regimen of illegal and legal drugs for Collins, offering him a new and banned steroid called Delta 2. A professional baseball player visited Sly while Collins was present, talked openly about his use of PES, and left with a bag, apparently containing PES, that Sly gave him. Sly talked knowledgably about PES use, and much of what he said was later verified by Al Jazeera.

Sly also talked openly about the professional athletes that he said he was supplying with PES. One of the athletes was Plaintiff Zimmerman, whom Sly said he had worked with for about six years and had supplied with Delta 2. Sly's statement about Plaintiff, recorded by the hidden camera and microphone, was included in the Documentary, which Al Jazeera broadcast and posted on the internet.

Plaintiff Zimmerman has sued Al Jazeera, Collins, and an Al Jazeera reporter, Deborah Davies. His First Amended Complaint ("FAC") alleges that the inclusion of Sly's recorded claim about Plaintiff in the Documentary defamed him and cast him in a false light. However,

Zimmerman has failed to meet the initial pleading burden of a federal plaintiff, which is to allege facts that plausibly establish each element of his causes of action, and his First Amended Complaint should be dismissed.

A defamation plaintiff must plausibly allege that the defendant made a false statement of fact about him.  But the allegations of the FAC (which by reference include the substance of the entire Documentary) do not meet this requirement.  Defendants do not assert any statement of fact about Zimmerman.  The Documentary simply relays *Sly*'s recorded assertions about Plaintiff, which Al Jazeera characterizes as a "claim[]" by Sly.  Al Jazeera does not endorse the truth of what Sly said; it does no more than state that Sly's claims raise questions of importance. The viewer is left to decide those questions for herself.

Another requirement of both defamation and false light tort is that the defendant must have published a challenged statement with fault – and the level of fault that must be alleged and proven depends on the status of the plaintiff.  As a famous sports hero and local idol, Zimmerman has the legal status of a "public figure."  He cannot prevail on his claims unless he plausibly alleges and proves that the Defendants published Sly's statement about him with "actual malice" – that is, with subjective knowledge that what Sly said was false or with reckless disregard of indications of likely falsity.  This is an onerous requirement, mandated by the First Amendment and fifty years of Supreme Court and D.C. Circuit precedent, and makes it extremely difficult for a public figure plaintiff to win a defamation case.

The sparse factual allegations in the Complaint do not plausibly make out actual malice. Plaintiff shows no obvious reasons for Al Jazeera to have believed that what Sly said about Plaintiff was false, or to have doubted his overall veracity.  Plaintiff leans heavily on the fact that once Sly learned that his statements had been recorded on hidden camera and would be

exposed to the public and authorities, he sent statements to Al Jazeera attempting to recant everything he ever said to Collins and claiming that all of his own words were lies.   It was not reckless, however, for Al Jazeera to discount this last-minute recantation as patently self-serving and to conclude that Sly's earlier candid statements had the ring of truth and were deserving of publication.

## STATEMENT OF FACTS

The following facts are either (1) alleged in the FAC and are to be taken as true for purpose of this motion only, (2) are seen or heard in the Documentary, and other documents incorporated in the FAC or on which the FAC relies, or (3) are facts of general knowledge in existence as of the time the Documentary was published and are not subject to reasonable dispute.  The Court may take judicial notice of the latter category of facts.  *See, e.g.*, *The Washington Post v. Robinson*, , 935 F.2d 282, 291 (D.C. Cir. 1991) (taking judicial notice of newspaper articles to ascertain whether a fact was within public knowledge); *Agee v. Muskie*, 629 F.2d 80, 81 n.1, 90 (D.C. Cir. 1980) (taking judicial notice of facts generally known as a result of newspaper articles).

### A.      The Parties

Plaintiff Ryan Zimmerman is a professional baseball player who plays first base for the Washington Nationals, a Major League Baseball ("MLB") team.  (FAC ¶ 2.)  He has played for the Nationals, with great success, for his entire 11-year baseball career, becoming a "hometown hero and fan favorite."  He is known to the public as a celebrity and engages in various charitable activities.  (FAC ¶¶ 14, 18-24.)

Defendant AJAM is a news organization based in New York City.  (FAC ¶ 3.)  At all times relevant to this action AJAM operated "Al Jazeera America," a news and information channel carried on United States cable and satellite television networks.  (*Id.*)  Al Jazeera

America has been broadcasting since August 2013, but AJAM announced that Al Jazeera America will cease operations in April 2016.  (FAC ¶ 31.)

Defendant AJMN is the parent of AJAM, and is based in Qatar, but has a bureau in Washington, D.C.  (FAC ¶ 5.)  AJMN is an international news organization that gathers news and produces news stores and video documentaries, and then supplies them to its subsidiary news organizations for dissemination.  (FAC ¶ 6.)  AJMN operates a public Internet website, www.aljazeera.com (the "Website"), which features many Al Jazeera news stories, and where the public can view some of AJMN's documentaries and other video reports.  AJMN also provides a news service to other Internet websites.  (*Id*.)  Among its other activities, AJMN operates an Investigative Unit, which conducts investigative journalism on a range of topics of public interest and produces documentaries that are then aired on Al Jazeera broadcast stations and on Al Jazeera's Website.  (*Id*.)  Defendant AJI is a United States-based subsidiary of AJMN.  (FAC ¶¶ 4, 5.)  Defendant Deborah Davies is alleged to be a "reporter jointly employed, upon information and belief, by Al Jazeera America and Al Jazeera Media Network in Washington, D.C."  (FAC ¶ 7.)

Defendant Liam James Collins is a citizen of the United Kingdom.  Collins had been a former star track and field athlete and continued to compete in senior track and field events, often called "masters" events.[1]

### B.    Performance Enhancing Substances in Professional Sports

For over twenty years, perhaps the most serious issue in professional sports has been the widespread use by athletes of PES such as steroids and human growth hormone ("HGH"), both to improve performance and to recover more quickly from injury.  Doping, as it is commonly

---

[1]         *See* http://www.chroniclelive.co.uk/sport/athletics/liam-collins-wins-gold-sets-7792861, Sept. 18, 2014 (last accessed April 6, 2016)

known, threatens the integrity of every professional sport.  It has been the subject of concern in

Presidential speeches.[2]  Congress has investigated use of PES in sports, and introduced

legislation that would mandate drug testing.[3]

The U.S. Department of Justice has engaged in major federal grand jury investigations

and prosecutions centered on the illegal use of PES in professional sports.  The federal grand

jury investigation of the Bay Area Lab Cooperative, or "BALCO," which was conducted by the

U. S. Attorney's Office of the Northern District of California, centered on PES dealer Victor

Conte, whose clients included Olympic track and field athletes, Major League Baseball players,

and NFL players.[4]  This led to indictment and prosecution of Conte on charges of possession of

both human growth hormone and anabolic steroids with intent to distribute as well as money

laundering and related conspiracies.[5]  More recently, the U.S. Attorney's Office for the Southern

District of Florida prosecuted Anthony Bosch and others for illegal distribution of PES to Alex

Rodriguez and other MLB players through a company called Biogenesis.[6]  Bosch, who founded a

---

[2]      *See, e.g.*, George W. Bush, 2004 State of the Union address, available at http://georgewbush-whitehouse.archives.gov/news/releases/2004/01/print/20040120-7.html (last visited April 5, 2016) ("The use of performance enhancing drugs like steroids in baseball, football and other sports is dangerous, and it sends the wrong message—that there are shortcuts to accomplishment, and that performance is more important than character.")

[3]      *See Restoring Faith in America's Pastime: Evaluating Major League Baseball's Efforts to Eradicate Steroid Use: Hearing Before the H. Comm. on Gov't Reform*, 109th Cong. (2005); *The Mitchell Report: The Illegal Use of Steroids in Major League Baseball: Hearing Before the H. Comm. on Gov't Reform*, 110th Cong. (2008); Clean Sports Act, S. 1114, 109th Cong., 1st Sess. (would require leagues to impose a minimum suspension of athletes found using PES); Drug-Free Sports Act, H.R. 1982, H.R. 3084, 109th Cong., 1st Sess. (would establish federal drug-testing policy for professional sports).

[4]      Press Release, U.S. Dep't of Justice, Four Individuals Charged in Bay Area with Money Laundering and Distribution of illegal Steroid: Grand Jury Returns 42-Count Indictment Charging Individuals Associated With Bay Area Lab Cooperative (Balco) (Feb. 12, 2004)  (*available at* https://www.justice.gov/archive/opa/pr/2004/February/04_ag_083.htm)

[5]      *Id.*

[6]      Press Release, U.S. Dep't. of Justice, Biogenesis Founder Sentenced Today for his Role in Conspiracy to Distribute Testosterone and Human Growth Hormones to Underage High School and Professional Athletes (Feb. 17, 2015) (*available at* https://www.justice.gov/usao-sdfl/pr/biogenesis-founder-sentenced-today-his-role-conspiracy-distribute-testosterone-and); Jay Weaver, *Alex Rodriguez's DEA confession: Yes, I used steroids from fake Miami doctor*, MIAMI HERALD, Nov. 5, 2014 (*available at* http://www.miamiherald.com/sports/mlb/article3578762.html).

number of anti-aging clinics that acted as fronts for the distribution of PES, pleaded guilty to conspiracy to distribute testosterone and was sentenced to four years in prison.[7]

The use and abuse of PES in sports has generated many thousands of news stories in the past twenty years, indicating how important and newsworthy the subject is.[8]  In fact, the impact of PES use goes well beyond professional athletes, and concerns every American with children in high school or college sports.  As the Mitchell Report, described below, stated, "[t]he youth of this country and other countries model their behavior after prominent athletes.  Athletes are second only to parents in the extent to which they are admired by children."[9]  There have been many documented examples of young athletes who became seriously ill because they used steroids in emulation of their heroes.  According to a Zogby Analytics poll, over eight percent of males ages 18 to 25 reported that they had used anabolic steroids, and almost 28 percent reported that they knew someone who had taken PES.[10]

The major leagues and other sports organizations have themselves investigated PES use. For example, MLB commissioned Senator George Mitchell to prepare a report on illegal use of PES in baseball.  The Mitchell Report, released on December 13, 2007, found that:

> The illegal use of performance enhancing substances poses a serious threat to the integrity of the game.  Widespread use of such substances unfairly disadvantages the honest athletes who refuse to use them…The illegal use of these substances to improve athletic performance also carries with it potentially serious negative side

---

[7]       Press Release, U.S. Dept. of Justice, Biogenesis Founder Sentenced Today for his Role in Conspiracy to Distribute Testosterone and Human Growth Hormones to Underage High School and Professional Athletes (Feb. 17, 2015) (*available at* https://www.justice.gov/usao-sdfl/pr/biogenesis-founder-sentenced-today-his-role-conspiracy-distribute-testosterone-and);

[8]       *See* Deutsch Decl. ¶ 4; Exhibit C.

[9]       GEORGE J. MITCHELL, REPORT TO THE COMMISSIONER OF BASEBALL OF AN INDEPENDENT INVESTIGATION INTO THE ILLEGAL USE OF STEROIDS AND OTHER PERFORMANCE ENHANCING SUBSTANCES BY PLAYERS IN MAJOR LEAGUE BASEBALL 15 (2007) ("The Mitchell Report") (internal citation omitted) (http://files.mlb.com/mitchrpt.pdf).

[10]      DIGITAL CITIZENS ALLIANCE & THE TAYLOR HOOTON FOUNDATION, BETTER AT ANY COST: THE DANGEROUS INTERSECTION OF YOUNG PEOPLE, STEROIDS, AND THE INTERNET 3 (2013) (available at http://taylorhooton.org/steroid-abuse/how-big-is-the-youth-steroid-problem/ (last visited April 2, 2016)).

effects.  Steroid users place themselves at risk for psychiatric
problems, cardiovascular and liver damage, drastic changes to their
reproductive systems, musculoskeletal injury, and other
problems.[11]

In recent years, the major leagues and other professional and amateur sports

organizations have developed strict rules that require athletes to undergo random testing.  They

also impose serious penalties, including suspension for first offenses and expulsion for repeated

offenses.[12]  Each league employs its own team of investigators.  In addition, doping at the

Olympic and college level is combatted by the World Anti-Doping Agency and the United States

Anti-Doping Agency.[13]

As scrutiny and testing have grown, illegal laboratories have sought to evade these rules

by creating "designer steroids" that are not on the list of banned substances and cannot be

detected by current tests.  The leagues have responded by amending their list of banned PES and

improving their testing techniques.[14]  Congress has also acted to close the loophole, enacting the

Designer Anabolic Steroid Control Act of 2014, H.R. 4771, 113th Cong., which was signed into

law by President Obama on December 18, 2014.[15]  This Act amended the Controlled Substances

Act to authorize the U.S. Attorney General to add new substances to the list of banned steroids

and to impose increased criminal penalties for possessing or trafficking in anabolic steroids.[16]

Despite increased enforcement, many professional athletes are still caught every year

using PES and have been suspended or banned from their sports.  Over one hundred players who

---

[11]  The Mitchell Report, at SR-8 (http://files.mlb.com/mitchrpt.pdf).

[12]  *See, e.g.,* http://mlb.mlb.com/pa/pdf/jda.pdf (last visited April 4, 2016); https://www.nflpa.com/active-players/drug-policies (last visited April 4, 2016).

[13]  *See, e.g.,* https://www.wada-ama.org/en/what-we-do (last visited April 4, 2016).

[14]  *See supra*, note 12.

[15]  H.R. 4771 — 113th Congress, 2d Sess.: Designer Anabolic Steroid Control Act of 2014 (available at: https://www.govtrack.us/congress/bills/113/hr4771 (last visited April 4, 2016)).

[16]  *Id.*

are or have been on MLB rosters have been suspended for PES use, including such All-Stars as Ryan Franklin, Ryan Braun, Alex Rodriguez (suspended for the entire 2014 season), Rafael Palmeiro, Manny Ramirez and Manuel Tejada.[17]  Many NFL players have likewise received suspensions.[18]  Some famous athletes, once discovered to have been doping, have had records and medals stripped by sports organizations, such as Lance Armstrong and Marion Jones.[19]

### C.     Preparation of the Documentary

One of the most important questions raised by the persistent presence of PES in sports is: how do professional athletes continue to procure steroids and other substances, despite the increase in league surveillance and criminal enforcement?  The answer has become clear over the years.  Professional athletes don't buy from back alleys.  Rather, there is a host of medical professionals and physical therapists – doctors, pharmacists, nurses, chiropractors, and others, sometimes working individually, but often as a network – who are willing to supply PES to athletes, and to assist the athletes in avoiding detection by authorities.  Criminal and league investigators have exposed some of these groups, like BALCO, which supplied Barry Bonds, Jason Giambi, Marion Jones and others; and Biogenesis, which supplied Alex Rodriguez, Nelson Cruz, Jhonny Peralta and other MLB players.[20]

---

[17]     *See* Wikipedia, https://en.wikipedia.org/wiki/List_of_Major_League_Baseball_players_suspended_for_performance-enhancing_drugs (last accessed April 4, 2016).

[18]     *See* Bloomberg News, Baseball's Drug War (April 13, 2015), available at http://www.bloombergview.com/quicktake/baseballs-drug-war (last accessed April 4, 2016);  Wikipedia, https://en.wikipedia.org/wiki/List_of_suspensions_in_the_National_Football_League (Suspensions for violating the substance policies) (last accessed April 4, 2016).

[19]     UNITED STATES ANTI-DOPING AGENCY, REASONED DECISION OF THE UNITED STATES ANTI-DOPING AGENCY ON DISQUALIFICATION AND INELIGIBILITY (2012) (*available at* http://d3epuodzu3wuis.cloudfront.net/ReasonedDecision.pdf); INTERNATIONAL OLYMPIC COMMITTEE, RECOMMENDATIONS REGARDING MS MARION JONES BORN ON 12 OCTOBER 1975, UNITED STATES OF AMERICA (2007) (*available at* http://www.olympic.org/documents/reports/en/en_report_1260.pdf)

[20]     *See supra* notes 4-7.

Despite increased league and anti-doping enforcement in the past decade, including greater professional and criminal sanctions, many athletes are still getting caught using PES.[21] This indicates that the underground network of medical suppliers of PES continues to prosper. In 2015, Al Jazeera's Investigative Unit decided to try to penetrate one of these secretive networks and expose the truth.  The resulting documentary took eight months to prepare.  (Ex. A at 1.)[22]

The Investigative Unit decided that the only effective way to gain the trust of these professional suppliers was to use a known sportsman with a cover story, who would have a plausible reason for seeking out PES.  They contacted Liam Collins, a citizen of the UK.  Collins had been a top British hurdler when younger and was a successful hurdler in senior competitions.[23]  Collins had other ventures besides sports, including dancing on a British television show, and running a property scheme which went bankrupt and led to Collins owing large sums to creditors and being banned by British authorities from directing companies in the UK.  (The latter problem was in fact reported by Al Jazeera in the Documentary).  (Ex. A at 5.)

According to the Documentary, Al Jazeera began its investigation with Tim Montgomery, a former U.S. Olympic track star who set a world record in the 100-meter dash, but whose records were voided when Montgomery told the U.S. Anti-Doping Agency that he obtained steroids and HGH from the BALCO lab.  (Ex. A at 2-4.)  While filming Montgomery, who confessed on screen to having searched out "the dark side" of PES the world over (Ex. A at 2-3), Al Jazeera met Collins, who was writing a book about Montgomery's life.  (Ex. A at 4.)  Al

---

[21]      *See supra* at 6-9, notes 4-17.

[22]      A video copy of the Documentary (the "Video") is Exhibit L to the FAC.  A true and complete transcript of the Documentary and description of its graphics is Exhibit A to the accompanying Declaration of Andrew L. Deutsch.

[23]      *See* http://www.chroniclelive.co.uk/sport/athletics/liam-collins-wins-gold-sets-7792861, Sept. 18, 2014 (last accessed April 6, 2016).

Jazeera asked Collins if he would act as an undercover investigator to "[h]elp us to investigate doping in sport," and Collins accepted.  (Ex. A at 5.)  Collins' cover story to PES suppliers would be that he was "an athlete desperate to qualify for the Rio Olympics."  (Ex. A at 5.)  Collins would use hidden cameras and microphones to record his conversations with suppliers of PES.  The entire investigation spanned several countries, as Collins met with and recorded conversations with doctors, pharmacists, athletes and others, in Vancouver, the Bahamas, Florida, New York and Texas.  (FAC ¶ 40; Ex. A at 1, 4, 6, 9, 14, 18, 22, 24, 27-30, 34-35.)

Initially, Collins tested his cover story with a doctor in the Bahamas that had supplied Montgomery with PES.  The doctor said "I don't do the banned stuff anymore," (Ex. A at 6), but referred Collins to another physician in the Bahamas that the first doctor described as "aggressive." (Ex. A at 6-7.)  Collins next met with the second doctor who was recorded saying he could get EPO (erythropoietin), a hormone that is used as a PES (the doctor later claimed that he had lied to Collins and could not get banned drugs, a statement disclosed in the documentary). (Ex. A at 8.)

Once Al Jazeera's Investigative Unit was comfortable that Collins' cover story would work, they put out feelers to people with possible connections to PES suppliers.  (Ex. A at 8-9.) Eventually, they were led to Vancouver, Canada, where Collins first met with a pharmacist named Chad Robertson.  (Ex. A at 10-14.)  Robertson candidly admitted his involvement in supplying PES to athletes, saying on camera "I'm not going to lie.  Have I doped people?  Oh yeah . . . And no one's got caught because the system is so easy to beat.  And it still is, that's the sad fact.  I can take a guy with average genetics and I can make him world champion."  (Ex. A at 9.)  Robertson developed a protocol of legal and illegal PES for Collins.  (Ex. A at 10-11.)

Robertson also introduced Collins to his partners in a start-up called ProMed, which was to cater to athletes who did not want to rely on team doctors, and already had contacted U.S. football players to participate.  Robertson said that he hoped that Collins could introduce ProMed to European soccer stars.  (Ex. A at 11.)  The first partner Collins met was Brandon Spletzer, a naturopath in Vancouver with the ability to write prescriptions.  Collins traveled to Vancouver where Spletzer wrote him a prescription for hcG, a fertility drug with known performance-enhancing properties—and whose use could be explained away if Collins was questioned by authorities.  (Ex. A at 12-13.)

Spletzer and Robertson then put Collins in touch with another partner in ProMed, Charlie Sly, whom Robertson described as follows:  "If I ever die, that's who I'd want you to go to. He's the only guy I trust . . . He flies to people's homes like Mike Tyson.  He takes care of Mike and a few other big, like really big athletes . . . He still to this day built the best NFL athlete that ever existed athletically."  (Ex. A at 13-14.)  Spletzer echoed Robertson's statements regarding Sly's competence as a doping expert, saying about Sly:  "He's so bright, it's scary . . . He's taken smart drugs to a whole new level."  (Ex. A at 14.)

Following introductions from Robertson and Spletzer, Collins (secretly accompanied by the Investigative Unit) traveled to Texas so that Collins could meet Sly in person.  (FAC ¶¶ 41-44; Ex. A at 14-18.)  These meetings, recorded by Collins, took place over seven days, in various locations around Texas, including cafes, hotel rooms, Sly's apartment, and during several lengthy car trips.  During these meetings, Sly explained to Collins the depth of his knowledge of PES and his work supplying PES to professional athletes.  (Ex. A at 1, 14-18, 26-32.)

The following statements and actions by Sly were recorded by the hidden cameras and microphones while Collins was meeting with Sly and were shown in the Documentary:

- In Sly's apartment, Collins saw a refrigerator full of drugs, which he photographed with a hidden camera. (Ex. A at 14-15; Video at 19:44-19:52.)

- The refrigerator contained a half-filled syringe that Sly offered to Collins for immediate use. (Ex. A at 15; Video at 19:50-19:55.) Sly said that the syringe contained a designer steroid called Delta 2 (also referred to as "D2"). (Ex. A at 15.)

- Sly told Collins that Delta 2 "was recently added to the MLB banned list." (Ex. A at 14.) Sly was telling the truth: Delta 2 was added to the MLB banned substances list prior to the beginning of the 2015 baseball season.[24]

- Sly explained that if Collins were to take Delta 2, he would "notice a bump up in strength . . . within a week you should notice like a 10-15% increase in strength." (Ex. A at 15.)

- On October 30, 2015, while Sly was with Collins in Sly's Austin, Texas apartment, Taylor Teagarden, a Major League Baseball player, came to the apartment. (Ex. A at 22-24.) While being secretly recorded, Teagarden told Collins that he had played for the Chicago Cubs and three other MLB teams, that he had used Delta 2 and peptides (another PES) while playing but was not caught by MLB testing. He told Collins how MLB's steroid policies had changed over the years. (Ex. A at 22-23.) In the meeting, Sly provided Teagarden with a bag that appeared to contain PES.[25] (Ex. A at 23.)

- In the context of discussing HGH with Collins, Sly explained that "GH [growth hormone] is one of the few drugs . . . it's really the only drug that you cannot

---

[24]     *See* http://mlb.mlb.com/pa/pdf/prohibited-substances.pdf  (last visited April 4, 2016).

[25]     On April 1, 2016, MLB announced that Taylor Teagarden has been banned for 80 games as a result of his violation of its drug policy (http://m.mlb.com/news/article/170093498 (last visited April 2, 2016)).

prescribe off label . . . it has three indications."  (Ex. A at 32.)  Sly was telling the

truth:  as explained in the Documentary by Dr. Alan Rogol, an endocrinologist, HGH

is indicated only for a confirmed deficiency of growth hormone, short bowel

syndrome and HIV wasting and its use for any other purposes is a violation of law.

(Ex. A at 33.)

As shown in the Documentary, Sly, in the course of his numerous meetings with Collins,

volunteered information about other professional athletes, in addition to Teagarden, to whom Sly

claimed to have provided and/or recommended PES.  (Ex. A at 16-18, 26-30, 31-32.)  Plaintiff

was among the players that Sly claimed to have supplied .  (*Id.*)  Sly told Collins the specific

PES or the class of drugs he provided/recommended to these athletes, and details regarding how

the drugs were provided or the effect they produced.  The details Sly provided appeared to come

from his personal knowledge.

For example, Sly claimed that he had grown up with Dustin Keller, who became a NFL

player, and provided Keller with Delta 2 and testosterone, among other PES.  Sly claimed that he

worked with Keller to avoid detection of banned PES prior to the NFL Combine (a key scouting

event for NFL hopefuls).[26]  (Ex. A at 15-17.)  Keller is said to have given one of the best

performances ever at the NFL Combine in 2008.[27]  Sly also claimed that he provided Ryan

Howard, a professional baseball player, with Delta 2 "in bags" and that Howard noticed "some

more explosiveness" in his hitting as a result of taking Delta 2.  (Ex. A at 26-27.)  And during a

car trip with Collins, Sly said that he had received a text message from Clay Matthews, a

professional football player who plays for the Green Bay Packers along with Mike Neal and

---

[26]  *See* http://www.nfl.com/combine (last visited April 2, 2016).

[27]  *See* http://nflcombineresults.com/nflcombinedata.php?year=2008&pos=&college= (last visited April 2, 2016) http://articles.chicagotribune.com/2008-02-25/sports/0802240493_1_scout-offensive-linemen-illinois-rashard-mendenhall (last visited April 2, 2016).

Julius Peppers.  (Ex. A at 30.)  Matthews, Sly claimed, was looking for some Toradol (a

"powerful anti-inflammatory," as Sly correctly said) for his ankle, but mentioned as well that

Matthews used the hormone iPamorelin, and had once used HGH (human growth hormone).[28]

(Ex. A at 30.)  Sly claimed that he went to Green Bay for six weeks – "I set Mike [ Neal's] stuff

up" – but then Neal brought other Green Bay Packers players over, and Sly talked to perhaps "25

people there," and helped "ten of them, [or] twelve of them" to order Delta 2, while avoiding

"getting involved with it" himself.  (Ex. A at 28-29.)

       However, Sly did not claim that all professional athletes whom he advised were using

Delta 2.  For example, when asked whether Clay Matthews used Delta 2, Sly replied:  "No.  I

didn't want to push the envelope with him because he is kind of a high profile guy.  So, unless he

asks for more I'm not going to try to push it on him."  (Ex. A at 30.)

       **D.     Sly's Recorded Statements about Plaintiff**

       In the course of a car ride with Collins, Sly volunteered that he had supplied PES to

plaintiff Zimmerman.  The following statements were recorded by the hidden camera and

microphone carried by Collins (the statements are also shown in the Video in captioning):

<div style="margin-left:2em">

*Collins*:     How long have you known Zimmerman?

*Sly*:         Probably six years . . . I worked with him in the off-
               season.  That's how I get him to change some stuff.

*Collins*:     Is he on the D2 as well?

*Sly*:         Yeah.

*Collins*:     What does he think of the D2?

*Sly*:         It does the job.

</div>

---

[28]     iPamorelin is a growth hormone releasing hormone which is specifically banned by MLB (*see* http://mlb.mlb.com/pa/pdf/prohibited-substances.pdf, at 3), but not identified by name in the list of substances banned by the NFL, although HGH is banned.  (*See* https://nflpaweb.blob.core.windows.net/media/Default/PDFs/Player%20Planner/2014%20NFL%20List%20of%20P rohibited%20Substances.pdf).

> *Collins*:   Does he notice a lot more power or not?
>
> *Sly*:   Yeah, I think some guys have just kinda gotten used to it.
>
> *Collins*:   Yeah.
>
> *Sly*:   It's the new normal.

(Ex. A at 27; Video at 36:02-36:28); FAC ¶ 44.)  In the Documentary, these statements were

preceded by an audio clip of a baseball game with an announcer saying, "[t]hat's a seeing-eye

single for Ryan Zimmerman, 3 for 4 on the day," and a cartoon-like graphic of Zimmerman

hitting a pitched ball and a baseball-card stylized graphic of Zimmerman in the act of throwing.

(Ex. A at 27; Video at 35:54-36:02.)

### E.   Al Jazeera's Pre-Broadcast Contact with Plaintiff and Other Persons Mentioned in the Documentary

In early December, 2015, well before the Documentary was broadcast, Al Jazeera sent

requests to plaintiff Zimmerman, the other athletes that Sly said he had supplied with PES,

Teagarden, Sly himself, and the other medical professionals with whom Collins had met,

informing them of the upcoming story, and giving each of them an opportunity to respond.  Sly

was contacted by e-mail, letter and phone message, but did not respond until shortly before

broadcast.  (Deutsch Decl., Ex. B, at 1.)  Plaintiff Zimmerman was given an opportunity to

respond to the statements about him made by Sly and acknowledges that he was contacted about

those assertions on December 9, 2015.  (FAC ¶ 50.)

On December 18, 2015, Plaintiff's counsel responded by telling Al Jazeera's counsel that

Plaintiff "unequivocally and emphatically denied" using PES.  (FAC ¶ 50; Ex. O.)  Plaintiff's

counsel sent further denials and demands that statements about Plaintiff not be published in a

letter dated December 23, 2015 (FAC ¶ 51; Ex. P), and an e-mail dated December 26, 2015.

(FAC ¶ 52, Ex. Q.)

Al Jazeera reported Plaintiff Zimmerman's denial in the Documentary as follows: "Each of Ryan Howard, Ryan Zimmerman and James Harrison [an NFL player] emphatically denies taking Delta 2 or any PED [performance enhancing drug] and say whoever claims that is lying. James Harrison added he's never failed a test for banned substances." (Ex. A at 28-29.) During the voiceover while this statement was spoken, the screen displayed pictures of the players above their names. The words "Emphatically denies" appeared in quotes beneath their pictures, and "Never failed a test" appeared under Harrison's picture. (*Id.*; Video, 37:16-18.)[29]

## F.    Charlie Sly's "Recantation"

In response to Al Jazeera's request for comment, Sly initially made a vague denial of the statements he had been recorded as making. Al Jazeera reported this denial in its documentary, stating that "Charlie Sly said his statements about athletes were false and incorrect." (Ex. A at 35.) Shortly before the Documentary was to be broadcast, Sly sent Al Jazeera a 55-second video recorded on a smartphone camera.[30]  Visibly pale, swallowing nervously, and apparently reading from an off-screen cue card, Sly said the following:

> My name is Charles Sly. It has come to my attention that the broadcaster Al Jazeera has somehow obtained recordings or communications of me making statements concerning a number of athletes and that Al Jazeera plans to air a program about them. Any recordings of me were made without my knowledge or consent. It is my belief that an individual named Liam Collins secretly made those recordings. Liam is a reputed fraudster who was banned in his native United Kingdom from running any investment businesses. The statements on any recordings or

---

[29]    The Documentary also reported denials by other persons named in the Documentary, and noted that many players mentioned by Sly did not respond to Al Jazeera's requests for comment. (Ex. A at 17, 20, 22, 32, 36.)

[30]    A *Washington Post* news story later reported that on December 22, 2015, two men appeared at the home of Sly's parents in Indiana, wearing black overcoats, and one claimed to be a law enforcement officer but did not have a badge. The Sly family called the police on 911. These men turned out to be private investigators for Peyton Manning, another athlete named by Sly in the Documentary. The next day, the investigators met with Charlie Sly. The following day, according to a news report, Sly made his 55-second recantation, which was recorded by his father on an iPhone. https://www.washingtonpost.com/sports/inside-peyton-mannings-secret-investigation-into-al-jazeera-documentary/2016/02/04/d0da2f04-cb05-11e5-a7b2-5a2f824b02c9_story.html.

> communications that Al Jazeera plans to air are absolutely false
> and incorrect.  To be clear, I am recanting any such statements and
> there is no truth to any statement of mine that Al Jazeera plans to
> air.  Under no circumstances should any of those statements,
> recordings or communications be aired.[31]  (FAC ¶ 54.)

On December 27, the same day that Al Jazeera America broadcast the Documentary, Al Jazeera posted a parallel story about the Documentary on its Website.  This story contained a hyperlink to the Sly "recantation" video on YouTube.[32]  Sly also sent a follow-up e-mail to Al Jazeera, which was reported in Al Jazeera's December 27, 2015 Website news article, saying that when he spoke with Collins, he "was in no state of mind to be making any coherent statements as I was grieving the death of my fiancée."  (FAC, Ex. M.)

### G.   Broadcast of The Documentary and Publication of Follow-Up News Stories

On December 26, 2015, Al Jazeera provided an advance copy of the Documentary to The Huffington Post, which published  a review of the Documentary with a link to a preview of the program.  The latter was later replaced with a link to the full Documentary on YouTube.  (FAC ¶ 38, Ex. N.)  On December 27, 2015, AJAM aired the Documentary on its Al Jazeera America channel, and posted the final version of the Documentary on YouTube.  (FAC ¶ 37, Video; Deutsch Decl. Ex A (transcript of Video).)  The off-screen narrator of the Documentary was Deborah Davies of Al Jazeera's Investigative Unit.

On December 27, 2015, AJAM also posted a news story about the Documentary to its Website, which contained a link to the YouTube-posted Documentary.  (FAC ¶ 37; Ex. M.)  The original Website news story initially contained an error not appearing in the Documentary (it said that Sly's claims raised questions about whether Zimmerman "used human growth hormone.")

---

[31]      This video may be seen at: https://www.youtube.com/watch?v=sf2-8V0K3oM (last visited April 2, 2016)

[32]      http://america.aljazeera.com/articles/2015/12/27/al-jazeera-investigates-secret-world-of-sports-doping.html (last visited April 5, 2016).  The hyperlink is the word "disavowed."

(FAC ¶ 45.)  Al Jazeera corrected the error the next day, changing "human growth hormone" to "the hormone supplement Delta 2," and including a prominent correction notice.  (FAC ¶ 46.)

The Documentary became an important news story in itself, and Barbara Serra of Al Jazeera America did a follow-up video interview of Ms. Davies on December 27, 2015.  (FAC ¶ 60; Ex. V; YouTube link available at https://www.youtube.com/watch?v=QZ92cmY1JJA; transcript of the full interview attached as Exhibit B to the Deutsch Decl.)  Davies said in the interview (as hidden camera footage of Sly was shown on one side of the screen):

> As you saw, Charlie Sly now says that anything he said to us wasn't true.  We contacted Charlie Sly at the beginning of December to put all the allegations to him by e-mail, by letter and then with a phone message and we didn't hear anything from him until 48 hours ago.  And if you think that one of the justifications for undercover filming is that you are filming someone where you have evidence of wrongdoing and they're not going to talk to you openly, you have to say, well, is he lying now or was he lying during day upon day upon day of undercover filming.  Because obviously the two don't square.

## ARGUMENT

### I.   THE DOCUMENTARY AS A WHOLE IS NOT REASONABLY CAPABLE OF THE DEFAMATORY MEANING ALLEGED BY PLAINTIFF AND DEFENDANTS HAVE NOT MADE ANY FALSE STATEMENT OF FACT

To prevail on a defamation claim, the plaintiff must allege and show, among other elements, "that the defendant made a false and defamatory statement concerning the plaintiff." *Oparaugo v. Watts,* 884 A.2d 63, 76 (D.C. 2005).  Falsity and defamatory meaning are separate elements of defamation and must be separately considered.  *White v. Fraternal Order of Police*, 909 F.2d 512, 520 (D.C. Cir. 1990).

In any defamation action, the court must first determine whether the defamatory meaning urged by the plaintiff may reasonably be ascribed to the publication or broadcast at issue.  *Id.* at 518; *Moldea v. N.Y. Times Co.*, 22 F.3d 310, 316-17 (D.C. Cir. 1994).  In making this

determination, the court must evaluate the meaning of the challenged statement by looking at the entire publication or broadcast. *White*, 909 F.2d at 526 (court must "examine the entire context" of a publication to determine its meaning).[33]  In the law of defamation, the relevant inquiry is "what meaning a communication is capable of bearing," not "the inferences that can reasonably be drawn" from the communication.  The actual meaning of the communication, not possible inferences, "is the essential inquiry, under existing law, for determining whether a given communication is actionable."  *White v. Fraternal Order of Police*, 707 F. Supp. 579, 589 n.12 (D.D.C. 1989), *aff'd in relevant part*, 909 F.2d 512 (D.C. Cir. 1990).  Thus, "[i]f a newspaper accurately reported that an individual was arrested and charged with a crime, a reader could reasonably infer, *i.e.*, guess, surmise, or derive as a probability, that the individual actually committed the crime."  *Id.* at 589 n.12.  However, that inference would not be determinative of the element of a defamatory statement.  Rather, "unless the newspaper article, considered as a whole, in context, could be reasonably understood to express that the individual in fact committed the crime, the newspaper report would not be actionable, questions of privilege aside."  *Id.*  When a media organization reports that another has made a defamatory accusation, but the publisher does not vouch for the accusation's truth, and instead notes the questions that the accusation raises, the publication is not defamatory, and the publisher is not liable. Defamatory meaning for purposes of liability is determined by the article as a whole, not the accusation in isolation.

---

[33]*See also Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1100 (4th Cir. 1993), involving an article that repeated the words of a congressman who suggested that the plaintiffs had "'line[d] their pockets by playing on the sentiments of the holiday season'" at the expense of those risking their lives fighting the first Iraq War.  *Id. at* 1099-1100 (citation omitted).  Although the Fourth Circuit assumed that the congressman's statement, standing alone, could be a "defamatory charge," it nevertheless concluded that the newspaper's article, considered "as a whole," was not reasonably capable of the defamatory meaning plaintiffs attributed to it.  *Id.* at 1097-98.

A recent example of this principle is the decision in *Abbas v. Foreign Policy Grp., LLC*, 975 F. Supp. 2d 1, 7-8 (D.D.C. 2013), *aff'd*, 783 F.3d 1328 (D.C. Cir. 2015).  An article in *Foreign Policy* magazine had reported that the plaintiff, the son of Palestinian Authority president Mahmoud Abbas, had grown rich in business.  It also reported "allegations made by some in the region" against both the father and his family that they had "socked away $100 million in ill-gotten gains," and that the family dynasty "is common knowledge" in the region. The introduction of the article asked whether Abbas' sons "[a]re growing rich off their father's system" and have they "enriched themselves at the expense of regular Palestinians – and even U.S. taxpayers?"  The court looked to the context of the article and concluded that the publisher was not liable for repeating the third party allegations.  975 F. Supp. 2d at 19 ("[T]he statement is not defamatory because [the] allegation is not reported as fact, and is instead put into context, 'making it clear to the reader that [the politician's] statement [was] merely the latest in an ongoing exchange of charge and countercharge.'"  Likewise, the article's stating questions that the third party allegations raised was not defamatory.  *Id.* at 14-18.

A second statement in the same article reported that several Palestinians told the author that Abbas's family arrested journalists and citizens to quell criticism.  *Id.* at 19.  *Abbas* held that this statement also was not defamatory "because it is not an assertion of false fact, or indeed of *any fact.* [The author] is reporting on what people in the region have said to him, and does not otherwise take any position on what he has heard."  *Id.* (emphasis in original).  Many other courts have also concluded that reports of defamatory third-party statements, which are clearly not endorsed by the publisher, do not permit a finding that the publication as a whole is defamatory.[34]

---

[34] *See e.g.*, *Green v. CBS Inc.*, 286 F.3d 281, 283-84 (5th Cir 2002) (holding that "statements taken from the broadcast and identified by the Greens as defamatory are non-actionable because they merely report allegations,"

For the same reason, Defendants here may not be held liable for defamation for reporting third-party statements, including those made by Sly about Plaintiff.  The Documentary makes clear that the statements that Sly and his partners made about working with professional athletes are only "claims":

- "Medical professionals *who say* they work with top athletes."  (Ex. A at 1.)

- "We catch the chemical mastermind and hear about players *he claims* he's doped to fame."  (Ex. A at 1-2.)

- "Chad Robertson . . .  *claims* he's already worked with top athletes."  (Ex. A at 9.)

- "Back in Texas – the pharmacist Charlie Sly named more sportsmen *he claims* are linked to Delta 2 – in baseball and football." (Ex. A at 26.)

Nowhere in the Documentary or follow-up articles does Al Jazeera endorse Sly's or Robertson's claims or take a position on the truth of those assertions.  Moreover, context is key.  The overall Documentary is *not* about Plaintiff or other athletes.  It is about "the dark side"—the medical and pharmaceutical professionals who act as a pipeline for drugs that are banned in sports.  The only conclusion that Al Jazeera reaches in the Documentary has to do with the suppliers of PES, not plaintiff, stating:  "[a]s our investigation has proved, there are plenty of doctors and chemists taking doping to a whole new level."  (Ex. A at 35; FAC Ex. L at 37:09.)

---

and explaining that, "[i]n cases involving media defendants, such as this, the defendant . . . must only demonstrate that the allegations were made and accurately reported"); *Price v. Viking Penguin, Inc.*, 881 F.2d 1426, 1443 (8th Cir. 1989) (statement that others "had suspected [plaintiff's] . . . involvement in the killing" not defamatory in book concluding that plaintiff was not involved; "We do not believe that [plaintiff] can choose what meanings to attach to these statements where several are available."); *Janklow v. Newsweek, Inc.*, 759 F.2d 644, 648-49 (8th Cir. 1985) (publication of plaintiff's arrest for alleged rape not capable of bearing defamatory meaning that plaintiff actually committed rape where publication "cannot be read to imply that Newsweek espoused the validity of the rape allegation"); *Basilius v. Honolulu Pub. Co.*, 711 F. Supp. 548, 551 (D. Haw. 1989) ("The paragraph does *not* allege that these underlying allegations are true; it simply reports that the relatives did receive" an anonymous letter stating that plaintiff hired an assassin), *aff'd sub nom.*, *Polycarp Basilius v. Honolulu Pub. Co.*, 888 F.2d 1394 (9th Cir. 1989) (affirming based on court's "excellent order").

Al Jazeera disseminated what the hidden cameras recorded, and indicated that Sly's naming of Plaintiff and others raised questions about use of banned substances:  "Sly also named baseball players Ryan Zimmerman, of the Washington Nationals, and Ryan Howard, of the Philadelphia Phillies, *raising questions about* whether they use the hormone supplement Delta 2." (FAC Ex. M (emphasis added).)  But Al Jazeera left the viewer to draw his or her own conclusions on those questions.  As *Abbas* and other cases hold, a journalist's reporting of others' statements and highlighting of questions raised by the statements "is not an assertion of false fact, or indeed of *any* fact."  *Abbas*, 975 F. Supp. 2d at 19.

Accordingly, the Court should dismiss the Complaint because it fails to allege that Defendants made a false factual and defamatory statement about Plaintiff.

## II.   PLAINTIFF HAS FAILED TO PLAUSIBLY PLEAD THE REQUIRED ELEMENT OF ACTUAL MALICE

### A.   The *Twombly-Iqbal* Plausible Pleading Requirement for Complaints

Under Fed. R. Civ. P. 12(b)(6), a federal court may dismiss a complaint for failure to state a claim upon which relief may be granted.  To survive a motion to dismiss, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). The court must first "tak[e] note of the elements a plaintiff must plead to state [the] claim for relief," *id.* at 675, then determine whether the complaint pleads each element of the claim with sufficient factual support to ultimately "state a claim to relief that is plausible on its face."  *Id.* at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The plaintiff must plausibly plead facts showing the defendant's wrongful knowledge, fault, intent or purpose, where that issue is an element of the claim.  *Iqbal*, 556 U.S. at 686-87.

In analyzing a complaint's plausibility, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. The court does not assume the truth of a plaintiff's legal conclusions nor "accept inferences that are unsupported by the facts set out in the complaint." *Arpaio v. Obama*, 797 F.3d 11, 18 (D.C. Cir. 2015) (quoting *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007)). A complaint fails to cross the plausibility threshold where the pleaded facts are "merely consistent with" the defendant violating the law, *Iqbal*, 556 U.S. at 678; instead, the facts must "actively and plausibly suggest that conclusion." *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 121 (2d Cir. 2007). Such a conclusion cannot be drawn where there is an "obvious alternative explanation" for the defendant's conduct that does not give rise to liability. *Twombly*, 550 U.S. at 567.

### B.   Matters That May be Considered on a Motion to Dismiss

In conducting a plausibility analysis on a motion to dismiss, the court may consider not only the well-pleaded allegations of the complaint, but any exhibit to the complaint as well as any document relied on to support any of the claims in the complaint. *See, e.g.*, *Howard Univ. v. Watkins*, 857 F. Supp. 2d 67, 71 (D.D.C. 2012); *Gustave–Schmidt v. Chao,* 226 F. Supp. 2d 191, 196 (D.D.C. 2002). In a defamation or false light case, the court may consider not just the specific statements alleged to be injurious, but also the full broadcast or publication in which the statements appeared. *See, e.g.*, *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005); *Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1015 (1st Cir. 1988) (libel and false light claim); *Ollman v. Evans*, 750 F.2d 970, 979 (D.C. Cir. 1984) (defamation). The Court may also take judicial notice of and consider facts reported in newspaper and Internet articles that show undisputed facts that are generally known. *See supra* at 4.

### C.      The Elements of Plaintiff's Defamation and False Light Claim

For purposes of this motion, Defendants agree that the Court should apply the substantive law of the District of Columbia.  Under D.C. law, a plaintiff must allege the following elements to state a claim for defamation: (1) the defendant made a false and defamatory statement concerning the plaintiff; (2) the statement was published without privilege to a third party; (3) the defendant published the statement with fault; and (4) the statement was either *per se* libelous, so that the plaintiff does not have to allege special harm, or the publication of the statement caused special harm to the plaintiff.  *Blodgett v. Univ. Club*, 930 A.2d 210, 222 (D.C. 2007).

The First Amendment places a greater burden of proof of fault on the defamation plaintiff who is a public figure.  For the public figure plaintiff, proof of negligent publication is not enough; he or she must plausibly allege and prove that the defendant published with actual malice.  *Parisi v. Sinclair*, 845 F. Supp. 2d 215, 218 (D.D.C. 2012).  Because the same First Amendment protections apply to both defamation and false light claims, the public figure plaintiff must prove actual malice in false light claims as well. *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 628 (D.C. Cir. 2001)*; Moldea v. New York Times Co.*, 15 F.3d 1137, 1151 (D.C. Cir. 1994) ("[A] plaintiff may not avoid the strictures of the burdens of proof associated with defamation by resorting to a claim of false light invasion."); *Blodgett*, 930 A.2d at 223.

The actual malice standard requires the plaintiff to allege and prove *by clear and convincing evidence* that at the time of publication of a challenged statement, the defendant either knew that the statement was false or acted in reckless disregard of whether it was false or not.  *New York Times v. Sullivan*, 376 U.S. 254, 285-86 (1964).  The actual malice standard is subjective, not objective, and what a reasonable journalist would have done under the circumstances is not relevant to the inquiry.  *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).

25

In the absence of the rare direct admission by the defendant that it knew it was publishing falsehoods, the plaintiff cannot prevail without plausibly alleging and proving that the defendant was subjectively aware of a high probability that the challenged story was "fabricated by the defendant," or was "based wholly on an unverified anonymous telephone call," or that "the allegations are so inherently improbable that only a reckless man would have put them in circulation," or that there were "obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant*, 390 U.S. at 732; *see also Lohrenz v. Donnelly*, 350 F.3d 1272, 1283 (D.C. Cir. 2003).

The "showing that a public figure must make to hold a media defendant liable for slander or libel is very high." *Lohrenz v. Donnelly*, 223 F. Supp. 2d 25, 45 (D.D.C. 2002), *aff'd*, 350 F.3d 1272 (D.C. Cir. 2003). *See Tavoulareas v. Piro,* 817 F.2d 762, 776 (D.C. Cir. 1987) (en banc) (defendant must have "come close to willfully blinding itself to the falsity of its utterance.") While this demanding standard limits the ability of public figures to recover on defamation claims, "to insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones." *St. Amant*, 390 U.S. at 732.

A public figure defamation plaintiff must meet the *Twombly-Iqbal* standard when pleading the required element of actual malice. Unless the plaintiff pleads facts that make it plausible that the defendant published a statement with actual malice, the complaint must be dismissed. *See Michel v. NYP Holdings, Inc.*, No. 15-11453, 2016 WL 860647, at *11 (11th Cir. Mar. 7, 2016); *Biro v. Conde  Nast,* 807 F.3d 541, 544–45 (2d Cir. 2015); *McDonald v. Wise,* 769 F.3d 1202, 1220 (10th Cir. 2014); *Pippen v. NBCUniversal Media, LLC,* 734 F.3d 610, 614 (7th Cir. 2013); *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.,* 674 F.3d 369, 377 (4th

Cir. 2012); *Schatz v. Republican State Leadership Comm.,* 669 F.3d 50, 58 (1st Cir. 2012).

Defamation complaints not meeting this demanding standard should be dismissed prior to any

discovery, given the important constitutional interests at stake:

> In these cases, there is a powerful interest in ensuring that free
> speech is not unduly burdened by the necessity of defending
> against expensive yet groundless litigation. Indeed, the actual
> malice standard was designed to allow publishers the "breathing
> space" needed to ensure robust reporting on public figures and
> events. *Sullivan,* 376 U.S. at 271–72. Forcing publishers to defend
> inappropriate suits through expensive discovery proceedings in all
> cases would constrict that breathing space in exactly the manner
> the actual malice standard was intended to prevent. The costs and
> efforts required to defend a lawsuit through that stage of litigation
> could chill free speech nearly as effectively as the absence of the
> actual malice standard altogether. Thus, a public figure bringing a
> defamation suit must plausibly plead actual malice in accordance
> with the requirements set forth in *Iqbal* and *Twombly.*

*Michel*, 2016 WL 860647, at *12. *See also Biro*, 807 F.3d at 546.

### D.    Plaintiff is a Public Figure Who Must Allege and Prove Actual Malice

There is no question that Ryan Zimmerman, one of the most famous baseball players of

today, is a public figure for purposes of defamation and false light analysis.  Indeed, Plaintiff

concedes this fact: his own complaint emphasizes his renown on the playing field, in the media,

and in public charitable activity.  (FAC ¶¶ 14-22.)  He could hardly do otherwise.  Zimmerman is

the dictionary definition of a:

> well-known celebrity, his name a 'household word. [He] ha[s]
> knowingly relinquished [his] anonymity in return for fame,
> fortune, or influence. [He is] so famous that [he] may be able to
> transfer [his] recognition and influence from one field to another.
> Thus, it is reasonable to attribute a public character to all aspects of
> [his] li[fe].

*Tavoulareas,* 817 F.2d at 772 (citations and quotation marks omitted).  "[A] well-known athlete"

is among "the archetypes of the general purpose public figure." *Id.  Accord*, *Chuy v.*

*Philadelphia Eagles Football Club*, 595 F.2d 1265, 1280 (3d Cir. 1979) (starting professional

football player held a public figure as a matter of law); *Time, Inc. v. Johnston,* 448 F.2d 378, 381

(4th Cir. 1971) (professional basketball player a public figure even ten years after retirement);

*Cepeda v. Cowles Magazine & Broadcasting Co.,* 392 F.2d 417, 419 (9th Cir. 1968) ("Orlando

Cepeda . . . was and is a 'public figure'" due to ["h]is fame as an extraordinary  baseball

player.")  As a public figure, Plaintiff Zimmerman must plausibly allege actual malice in the

FAC to avoid dismissal of his complaint.

      **E.**     **Plaintiff Fails To Plausibly Allege that Defendants Acted With Actual Malice**

     None of the facts alleged in the FAC give rise to a plausible inference that Al Jazeera and

Davies published statements concerning Plaintiff in the Documentary or following news articles

with actual malice.  We begin with the challenged statements themselves (alleged at FAC ¶ 47).

         1.    The Alleged False Defamatory Statements and Plaintiff's Denials

        a)    *Deborah Davies* (off-screen narration):

> Back in Texas, the pharmacist Charlie Sly names more
> sportsmen he claims are linked to Delta 2, in baseball and
> football. He says he coached them on what to take and how
> to avoid testing positive.  In a series of conversations
> crisscrossing Texas, we primed Liam with questions to dig
> into the claims.

     Plaintiff alleges that Sly did not coach him on what to take and how to avoid testing

positive.  (FAC ¶ 47.)

        b)    *Collins*:  How long have you known Zimmerman?

           *Sly*:    Probably six years. I worked with him in the off-
                  season.  That's how I get him to change some
                  stuff.

     Interestingly, Plaintiff does not fully deny the truth of these statements, and his

allegations are very cautiously chosen.  Zimmerman *does not deny that he knows Sly*.  Rather, he

asserts that he "has not known Charles David Sly for six years."  (FAC ¶ 47.)  He does not deny

that he *worked with Sly in the baseball off-season*, but alleges only that Sly has not gotten

Zimmerman "to change some stuff." (*Id.*)

> c)  *Collins*:  Is he on the D-2 as well?
>
> *Sly*:    Yeah.
>
> *Collins*:  What does he think of the D-2?
>
> *Sly*:    It does its job.
>
> *Collins*:  Does he notice a lot of power or not?
>
> *Sly*:    Yeah, I think some guys have just kind of gotten
>        used to it. It's the new normal.

Zimmerman denies that he has taken Delta-2, human growth hormone, or other substance

banned by MLB.  (FAC ¶ 47.)

### 2.   Absence of Allegations Permitting a Plausible Evidence of Actual Malice

Plaintiff makes only one weak attempt at alleging that Al Jazeera and its reporter actually

disbelieved Sly's veracity at the time of publication of these statements.  After the Documentary

was posted on the Internet and broadcast by Al Jazeera America, Deborah Davies was

interviewed on air by an Al Jazeera America reporter.  (FAC ¶ 60; Ex. V.)  Davies made the

following statement:

> As you saw, Charlie Sly now says that anything he said to us
> wasn't true.  We contacted Charlie Sly at the beginning of
> December to put all the allegations to him by e-mail, by letter and
> then with a phone message and we didn't hear anything from him
> until 48 hours ago.  And if you think that one of the justifications
> for undercover filming is that you are filming someone where you
> have evidence of wrongdoing and they're not going to talk to you
> openly, you have to say, well, is he lying now or was he lying
> during day upon day upon day of undercover filming.  Because
> obviously the two don't square.  (Deutsch Decl., Ex. B.)

Plaintiff asserts that this was an admission by Davies that "Sly is untrustworthy."  (FAC

¶ 60.)  To the contrary, no rational viewer would interpret Davies' statement this way.  What

Davies clearly said was that Al Jazeera concluded that Sly was telling the truth during many days

of hidden camera recording, when he spoke candidly to Collins about supplying PES to Plaintiff

and other athletes in violation of league rules and the law.  She also explained that Al Jazeera

believes that Sly was lying "now," because it was only after Al Jazeera contacted Sly and he

learned that his candid statements had been recorded and would be exposed to the public eye that

he denied that anything he ever said to Collins was true.

   Plaintiff otherwise relies entirely on indirect and circumstantial allegations in contending

that Defendants published with actual malice.  However, the facts alleged in the FAC do not

come close to clearing the threshold for plausibility.  As noted above, the U.S. Supreme Court

has set forth the limited situations in which circumstantial evidence of the publisher's state of

mind may permit an inference of actual malice:

> Professions of good faith will be unlikely to prove persuasive, for
> example, where a story is fabricated by the defendant, is the
> product of his imagination, or is based wholly on an unverified
> anonymous telephone call. Nor will they be likely to prevail when
> the publisher's allegations are so inherently improbable that only a
> reckless man would have put them in circulation. Likewise,
> recklessness may be found where there are obvious reasons to
> doubt the veracity of the informant or the accuracy of his reports.

*St. Amant,* 390 U.S. at 732.

   Plaintiff has not alleged any facts that would satisfy any of these categories of

circumstantial evidence.  Sly's statements about Plaintiff were recorded on video and audio and

were presented verbatim in the Documentary, so his statements were neither "fabricated" by Al

Jazeera nor based on "anonymous" sources.  There was nothing "inherently improbable" in Sly's

statement that he supplied Delta 2 to Plaintiff or that Plaintiff used that banned steroid.

Hundreds of professional baseball players and other sports figures, including some even more

prominent than Ryan Zimmerman, have been caught and disciplined by leagues and other

organizations for using steroids and other banned substances.  *See supra* at 6-9.

Finally, Plaintiff alleges no plausible "obvious reasons" why Al Jazeera should have

doubted either Sly's general veracity or the truth of his statements about Plaintiff.  To the

contrary: many things in the Documentary supported Sly's statements that he supplied PES to

professional athletes.  He was referred to by his colleagues in Vancouver as the man who takes

care of Mike Tyson and "a few other big, like really big athletes . . . He still to this day built the

best NFL athlete that ever existed athletically."  (Ex. A at 13-14.)  Sly spoke knowledgably and

accurately about drugs to Collins.  *See supra* at 13-14.  He had a refrigerator full of drugs and

offered a syringe, claimed to contain Delta 2, to Collins.  (Ex. A at 15.)  He prescribed a regimen

of legal and illegal drugs to Collins to build his strength, and explained how hormones could be

obtained by falsely stating that Collins suffered from exhaustion and low fertility.  (Ex. A at 18.)

While Collins was with Sly, an actual MLB player, Taylor Teagarden, arrived, talked openly to

Collins about using PES of various sorts, including Delta 2, and received a bag from Sly that

appeared to contain PES.  (Ex. A at 22-24.)

Moreover, Al Jazeera checked out and verified a number of Sly's statements, which

confirmed that he was knowledgeable about PES.  For example, it confirmed that Sly had

worked at the Guyer Clinic (Ex. A at 33), which Plaintiff admits was true (FAC ¶ 58), and it

confirmed Sly's statements about HGH with Professor Alan Rogol, an expert endocrinologist.

(Ex. A at 33-34.)  Sly's statements about Delta 2 being banned by MLB were also correct.  *See*

*supra* at 13.

Plaintiff alleges that defendants acted with actual malice because they published Sly's

statements about Zimmerman after receiving Sly's denials and recantation.  (FAC ¶¶ 1, 52, 54,

61.)  However, these did not provide any obvious reason to doubt the truthfulness of Sly's earlier statements.  Sly denied his statements to Collins only after Al Jazeera contacted him for comment and he became aware that his conversations with Collins were likely recorded and would be publicly exposed.  Sly had every reason to make a self-serving denial after that point, since the conduct he admitted to could expose him to potential civil and criminal liability.

Before airing the Documentary, Al Jazeera had, on the one hand, hidden camera footage showing many meetings between Sly and Collins over the course of a full week, during which Sly was open, coherent, calm, and competent.  In addition to identifying Plaintiff and others as users of PES, Sly: showed in-depth knowledge of the uses and administration of PES; created a regimen for Collins that included PES and told him how to hide this use from authorities; offered a syringe apparently containing PES to Collins; had a refrigerator full of drugs; actually supplied PES to Taylor Teagarden, a MLB player, who talked openly with Collins about his use of PES; and made a number of specific statements about PES that Al Jazeera was able to verify.  On the other hand, Al Jazeera had Sly's blanket assertion that anything he ever said to Collins was false, which Sly sent only after he knew he would be exposed (and which itself was clearly false, since Al Jazeera had verified some of Sly's statements); Sly's nervous recantation video, in which he repeated the same vague denials and apparently mouthed someone else's characterization of Collins as a "fraudster"; and Sly's last-ditch assertion that he was distraught over the recent death of his fiancé and was "in no state of mind to be making any coherent statements" to Collins. No one viewing the hidden camera footage used in the Documentary would believe that Sly was incoherent or distraught.  Al Jazeera did not act with actual malice when it decided to believe the truth of what Sly said in the hidden camera footage and to disbelieve his later self-serving denials.

3.      Plaintiff's Other Insufficient Allegations

Plaintiff makes several other attempts at pleading actual malice, but none come close to satisfying the plausibility requirement for federal pleading.

a)      Conclusory Assertions

Plaintiff sprinkles the FAC with conclusory assertions that Defendants acted recklessly, without any facts alleged in support.  (*See, e.g.*, FAC ¶¶ 49, 64, 72.)  These carry no weight in the required plausibility analysis: they are simply the "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  *Iqbal*, 556 U.S. at 678.

b)      Irrelevant Allegations

Plaintiff makes certain allegations in the FAC that are included solely to denigrate Al Jazeera, such as: Al Jazeera America had low ratings (FAC ¶ 26), suffered from newsroom dissension, lost employees and managers; was sued for discrimination (*id.* ¶ 27); opposed a union drive (*id.* ¶ 28); suspended its general counsel (*id.* ¶ 30); and announced in January 2016 that it was ceasing operations.  (*Id.* ¶ 31.)  Plaintiff also alleges that Al Jazeera posted the Documentary in advance of formal broadcast and provided a copy to the Huffington Post to "stir up scandal," "drum up publicity" and "increase Al Jazeera's ratings."  (*Id.* ¶¶ 1, 53.)

Even if all of these allegations were true, none would have any bearing on the only relevant inquiry for actual malice:  whether Al Jazeera published Sly's claims about plaintiff knowing they were false or recklessly disregarding a strong likelihood of falsity.  The fact that AJAM, like every other broadcaster, seeks ratings and looks for hard-hitting stories is especially irrelevant.  *See, e.g.*, *Tavoulareas,* 817 F.2d at 796-97 (en banc) (assertion that reporters were under pressure by editor to create sensationalistic stories "cannot, as a matter of law, constitute evidence of actual malice"; First Amendment "forbids penalizing the press for encouraging its reporters to expose wrongdoing by public corporations and public figures.")

Plaintiff's attack on the past of Liam Collins (FAC ¶¶ 34-36) is similarly irrelevant to the pleading of actual malice.  Collins' history in the UK was in fact reported in the Documentary itself.  (Ex. A at 5.)  Moreover, Collins' past is beside the point, because the FAC does not allege that anything Collins said is defamatory.  This suit is over Sly's affirmative claim that he provided PES to Plaintiff, who used them.  (FAC ¶ 44.)  Collins' only involvement in those statements was to ask Sly questions.  As a matter of law, Collins' asking questions was not defamation under D.C. law.  *Abbas v. Foreign Policy Group, LLC*, 783 F.3d 1328, 1338-39 (D.C. Cir. 2015) (granting motion to dismiss defamation claim against article that posed questions of whether sons of Palestinian leader had enriched themselves).

c)    Inconsequential Errors

Plaintiff asserts that Al Jazeera erred in stating that Sly was a doctor of pharmacy in the Documentary, when he was actually a pharmacy intern whose license expired in May 2013 (FAC ¶ 58); and that while Sly worked at the Guyer Institute in Indiana, he was an intern rather than an employee.  (*Id.*)[35]  Plaintiff also asserts that the news article published by Al Jazeera on the Internet on December 27, 2015, immediately after the Documentary was first aired, incorrectly stated that "Mr. Zimmerman had taken human growth hormone," and that this was corrected by Al Jazeera on the following day to say that the PED in question was Delta 2.  (FAC ¶¶ 45-46.)

Even if these statements were erroneous, the error would be inconsequential.  They would not permit an inference that Al Jazeera knew that the Documentary's statement about Plaintiff was false or seriously doubted its truth.  The statements about Sly's exact status in the world of pharmacy or his employment status at the Guyer Institute do not go to the truth of what Sly said about Plaintiff, and would not provide Defendants with any obvious reason to doubt

---

[35]    Although the Court may not consider this fact for purposes of this motion, it is true that Sly is a doctor of pharmacy: Al Jazeera confirmed that he received a Pharm.D. degree from Roseman University in Nevada.

Sly's overall veracity.  *St. Amant*, 390 U.S. at 732;  *McFarlane v. Sheridan Square Press*, 91 F.3d 150, 1508 (D.C. Cir. 1996).  Furthermore, prompt retraction of an error in a publication, such as Al Jazeera's correction of the identification of the specific PES in the news article, negates rather than confirms actual malice.  *Hoffman v. Washington Post Co.*, 433 F. Supp. 600, 605 (D.D.C. 1977).

<div align="center">d)    <u>Denials By Plaintiff's Attorneys</u></div>

Plaintiff asserts that it was actual malice for Al Jazeera to publish Sly's statements about Plaintiff because, before publication, Plaintiff's lawyers denied those statements on three occasions.  (FAC ¶¶ 50-52.)  However, allegations that a plaintiff denied a charge and the defendant still published after receiving the denial have no bearing on actual malice.  It has long been settled that "the press need not accept such denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge, in themselves they hardly alert the conscientious reporter to the likelihood of error."  *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 692 n. 37 (1989) (citation omitted); *see also Lohrenz*, 350 F.2d at 1285; *McFarlane*, 91 F.3d at 1511.

Al Jazeera was also entitled to take into account that athletes who have been reported in the press as having used PES in violation of league or organization rules or the law commonly deny the reports.  However, many athletes have also ultimately been forced to admit that they used PES in violation of their league or organization rules, and that their earlier denials were false.  Appendix A to this brief lists 29 athletes (including Alex Rodriguez, Andy Pettitte, Jason Giambi and Jose Canseco from MLB) who first denied, then were forced to admit, to PES use (although some athletes continued to claim that they did not know the substances they were taking were banned PES).

<div align="center">35</div>

e)     Alleged Failure to Corroborate or Obtain Further Details

Plaintiff alleges that Al Jazeera did not attempt to corroborate Sly's statements about Plaintiff from another source before broadcasting the Documentary.[36]  (FAC ¶ 61.)  Even if true, this would not make out a plausible assertion of actual malice.  A press organization may base a story on information provided by a single source, and if the organization does not subjectively doubt the truth of the source's statement, it has no duty to corroborate that source's information or to probe beyond the information provided by the source.  *McFarlane*, 91 F.3d at 1509; s*ee also Harte-Hanks Commc'ns, Inc*., 491 U.S. at 688 ("Failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard."); *Liberty Lobby, Inc. v. Anderson*,  Civ. Act. No. 81-2240, 1991 WL 186998, at *5 (D.D.C. May 1, 1991) ("[R]eliance on a single source does not alone indicate actual malice, particularly where that source has no apparent motive for misleading the reporter.")  From all apparent evidence, Sly knew about PES, possessed large quantities of PES, and from all appearances was supplying PES to professional athletes, such as MLB player Taylor Teagarden (who has since been suspended by MLB for violating league drug policy).  This cannot be plausibly characterized as Al Jazeera "willfully blinding" itself to the truth.  *McFarlane*, 91 F.3d. at 1510.

f)     Sly's Alleged Self-Interest

Plaintiff asserts that Al Jazeera should have doubted the veracity of Sly because he was making "a sales pitch attempting to sell his services, his drugs, and his business to Collins." (FAC ¶ 56).  However, the Documentary did not hide Sly's involvement in the business:  it noted

---

[36]     In fact, another source contacted Al Jazeera before the Documentary was aired and provided information that corroborated certain statements made by Sly in the hidden camera footage.  While this information did not involve Plaintiff, it bolstered Al Jazeera's belief in Sly's overall veracity.  However, because the second source was not referred to in the Documentary or the FAC, Al Jazeera does not rely on it for purposes of this motion to dismiss.

that Sly and his partners in Vancouver were involved in a start-up, ProMed, that already had

contacted U.S. football players, and that Sly's Vancouver partners had asked Collins to put them

in touch with European soccer players.  (Ex. A at 11.)  Moreover, the allegation is irrelevant:

even if Sly was trying to sell his services, drugs and business to Collins, this does not plausibly

suggest that Sly was lying when he said he supplied Plaintiff with PES.  *See Reuber v. Food*

*Chem. News, Inc.*, 925 F.2d 703, 715 (4th Cir. 1991) (*en banc*) ("Actual malice cannot be proven

simply because a source of information might also have provided the information to further the

source's self-interest.").[37]

### F.     Al Jazeera's Reporting of Plaintiff's Denials and Sly's Disavowals Negates Actual Malice

Finally, the Documentary and Al Jazeera's news articles substantially undermine

Plaintiff's conclusion that Defendants published with actual malice, and tends to establish the

contrary proposition.  Well before the broadcast date, Al Jazeera sought comment from the

people shown or identified in the Documentary: Plaintiff, other athletes that Sly claimed he had

supplied with PES, Sly's partners in Vancouver and the doctors Collins met in Bermuda, and Sly

himself.  (*See supra* at 17; Ex. A at 8, 17, 20, 22, 28, 31, 33, 35.)  Al Jazeera then included the

denials within the Documentary itself.  (*Id.*)

Regarding Plaintiff, Al Jazeera included a statement in the Documentary that Plaintiff

"emphatically denies taking Delta 2 or any PED and say that whoever claims that is lying," (Ex.

A at 28), along with a graphic of Plaintiff's photograph over the words "Emphatically denies."

In addition, Al Jazeera disclosed that Sly himself, when confronted, said that "his statements

---

[37]      In this respect, Plaintiff cites a New York Times story published after the Documentary was broadcast
which also may have concluded that Sly was self-interested.  (FAC ¶ 56).  The Court should disregard this reference,
because events or facts that do not occur until after a publication is completed have no relevance to the publisher's
state of mind on the date of publication.  *Secord v. Cockburn*, 747 F. Supp. 779, 792 (D.D.C. 1990); *see also*, *Bose
Corp. v. Consumers Union of United States, Inc*., 466 U.S. 485, 512 (1984) *New York Times Co. v. Sullivan*, 376
U.S. 254, 286 (1964) (malice must be shown "at the time of publication").

about athletes were false and incorrect."  (Ex. A at 37.)  The follow-up Al Jazeera article posted to the Website was equally candid, stating that "[t]he athletes and professionals who responded to requests for comment denied any wrongdoing," "Charlie Sly has disavowed his statements to Collins that were caught on hidden camera," and noted that in a follow-up e-mail, Sly said that when he spoke with Collins, he "was in no state of mind to be making any coherent statements as I was grieving the death of my fiancée."[38]  In fact, Al Jazeera even provided a direct link in this article (the word "disavowed" is hyperlinked) to Sly's recantation video.

Al Jazeera's candid disclosures of Plaintiff's and Sly's denials strongly suggest that Defendants did *not* publish the Documentary with actual malice.  *See, e.g.*, *Lohrenz*, 350 F.3d at 1286 ("[R]eporting perspectives at odds with the publisher's own, "tend[] to rebut a claim of malice, not to establish one.'") (citing *McFarlane*, 74 F.3d at 1304).  This conclusion is bolstered by First Amendment concerns.  As the Eleventh Circuit recently stated in *Michel*, 2016 WL 860647, at *13:

> Where a publisher gives readers sufficient information to weigh for themselves the likelihood of an article's veracity, it reduces the risk that readers will reach unfair (or simply incorrect) conclusions, even if the publisher itself has. Moreover, discouraging the inclusion of such contrary sources for fear of fueling a defamation lawsuit would run counter to the constitutional goal of promoting the free and robust discussion of public events. Thus, reporting perspectives contrary to the publisher's own should be interpreted as helping to rebut, not establish, the presence of actual malice.

---

[38]      http://america.aljazeera.com/articles/2015/12/27/al-jazeera-investigates-secret-world-of-sports-doping.html (a non-hyperlinked version of this article appears at Ex. M to the FAC).

**CONCLUSION**

*The Dark Side* is an important story on a newsworthy subject, and is in the best traditions of investigative reporting.  Defendants performed a public service by exposing hidden wrongdoing.  The Documentary deserves the full protection of the First Amendment as embodied in the actual malice standard.

Plaintiff has failed in every conceivable respect to show that Al Jazeera's statements about him were published with actual malice.  Any continuation of this lawsuit would be an offense to the press freedoms that our Constitution protects, and the action should be evicted from the Court's docket as soon as possible.  The Court should therefore dismiss the First Amended Complaint with prejudice.

Dated: April 8, 2016

Respectfully submitted,

/s/ *Andrew L. Deutsch*
Anthony Gill
DLA PIPER LLP
500 Eighth Street, NW
Washington, DC 20004\
Office: (202) 799-4562
Fax: (202) 799-5562
anthony.gill@dlapiper.com

Andrew L. Deutsch *(admitted pro hac vice)*
Rachel Stevens *(admitted pro hac vice)*
DLA PIPER LLP
1251 Avenue of the Americas
New York, NY 10020
Office: (212) 335-4500
Fax: (212) 335-4501
andrew.deutsch@dlapiper.com
rachel.stevens@dlapiper.com

Charles Scheeler
DLA PIPER LLP
The Marbury Building
6225 Smith Avenue

Baltimore, MD 21209-3600
Phone: (410) 580-3000
Fax: (410) 580-3001
charles.scheeler@dlapiper.com

*Counsel for Al Jazeera America, LLC,*
*Al Jazeera Media Network, Al Jazeera*
*International (USA), Inc., and*
*Deborah Davies*

40