**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| RYAN W. ZIMMERMAN, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>AL JAZEERA AMERICA, LLC, *et al.*,<br><br>    Defendants. | No. 16–cv–0013 (KBJ) |

## <u>MEMORANDUM OPINION</u>

In any lawsuit claiming defamation of character, the status of the individual who was allegedly defamed is one key determinant of the applicable legal standard. Whereas a private individual can maintain a suit for defamation if the publisher of the allegedly false and defamatory statement has acted negligently in disseminating the falsehood, public figure plaintiffs must demonstrate that the allegedly false and defamatory statement was made with "actual malice." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964); *see Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974). In this case, there is no dispute that the plaintiffs—two Major League Baseball ("MLB") players—are public figures. The question is whether their complaint contains allegations of fact that, if true, are sufficient to permit a reasonable jury to conclude that the named defendants—a major media conglomerate, one of the company's news producers, and an independent consultant—published a false and defamatory statement about these plaintiffs, and did so with the requisite intent.

The allegedly false and defamatory statements at issue here are expressed in a documentary film called "The Dark Side," which purports to investigate the supply

chain of illicit performance-enhancing drugs ("PEDs") that exists for elite athletes. (*See* First Am. Compl. ("Compl."), ECF No. 9, ¶ 37.)  Plaintiffs Ryan Zimmerman and Ryan Howard claim that the film's producers (Al Jazeera[1] and Deborah Davies), and also Liam Collins, one of the individuals who is featured prominently in the documentary (collectively, "Defendants"), are liable for defamation and the related tort of false light invasion of privacy because of allegedly false PED-related representations that are made about Plaintiffs in the film.  Specifically, the complaint alleges that Defendants elicited from an alleged supplier of steroids false and defamatory statements about Zimmerman's and Howard's use of PEDs, captured those statements on video via a hidden camera, and then incorporated the supplier's false allegations into "The Dark Side[,]" despite Defendants' knowledge of facts that cast doubt on the truthfulness of the supplier's representations, including the fact that the supplier had recanted the allegedly defamatory accusations prior to the film's release.  (*See* Compl. ¶¶ 1, 73; Howard Compl., Dkt. No. 10, in Civ. Action No. 16-cv-0014, ¶ 1.)

Before this Court at present are two motions to dismiss:  one that Al Jazeera and Davies have filed jointly (*see* Defs. Al Jazeera and Davies' Mot. to Dismiss ("Defs.' Mot."), ECF No. 26), and another that Collins has submitted on his own behalf (*see* Def. Collins's Mot. to Dismiss ("Def. Collins's Mot."), ECF No. 24).[2]  Al Jazeera and Davies argue that "The Dark Side" does not contain actionable defamatory statements

---

[1] Three Al Jazeera-related corporate entities are named as defendants in this action:  (1) Al Jazeera America, which is a U.S.-based news channel that ceased operations as of January 2016; (2) Al Jazeera Media Network, which is the parent company of Al Jazeera America; and (3) Al Jazeera International, which is a U.S.-based subsidiary of Al Jazeera Media Network.  (*See* Compl. ¶¶ 3–5.)  For ease of reference, the Court refers to these three corporate entities collectively as "Al Jazeera."

[2] Page-number citations to documents the parties have filed refer to the page numbers that the Court's electronic filing system assigns.

about Zimmerman or Howard, because the pertinent representations are not reasonably capable of conveying a defamatory meaning, and in any event, the complaint fails to plead facts that would support an inference of actual malice.  (*See* Defs. Al Jazeera and Davies' Mem. in Supp. of Defs.' Mot. ("Defs.' Mem."), ECF No. 26-1, at 26−45.)[3] Collins—who is not an Al Jazeera employee—incorporates the arguments that Al Jazeera and Davies make into his motion by reference, and he further contends that the complaint does not adequately allege that *he* has published any defamatory statements at all, much less that he acted with actual malice pertaining to any such publication. (*See* Def. Collins's Mem. in Supp. of Def. Collins's Mot. ("Def. Collins's Mem."), ECF No. 24-1, at 6 n.1, 12−19.)  Zimmerman and Howard oppose Defendants' motions, arguing that a reasonable viewer could have understood "The Dark Side" to convey the message that Plaintiffs have used PEDs (*see* Pls.' Consolidated Opp'n to Defs.' Mot. and Def. Collins's Mot. ("Pls.' Opp'n"), ECF No. 30, at 18−21), and they further maintain that Defendants' knowledge of the supplier's recantation supports the inference that all three Defendants published the statements with actual malice (*see id.* at 21−27).

For the reasons explained below, this Court concludes that the complaint that Zimmerman and Howard have filed contains sufficient allegations to state defamation and false light claims against Al Jazeera and Davies, but only with respect to the statements contained *in the film*; the statements made in the accompanying news article do not convey a defamatory meaning.  The Court further finds that the complaint does

---

[3] Notably, in defamation cases, "actual malice" is a term of art that "focuses on what the defendant knew about the veracity of the statements," and should not "be confused with . . . ill will or 'malice' in the ordinary sense of the term."  *Montgomery v. Risen*, 197 F. Supp. 3d 219, 259 (D.D.C. 2016), *appeal docketed*, No. 16-7096 (D.C. Cir. Aug. 15, 2016).

not state a defamation claim or a false light claim against Collins, because the complaint does not contain facts from which a reasonable jury might conclude that Collins published a false and defamatory statement about Zimmerman or Howard. Accordingly, Al Jazeera's and Davies's motion will be **GRANTED IN PART** and **DENIED IN PART**, and Collins's motion will be **GRANTED** in full.  A separate Order consistent with this Memorandum Opinion shall follow.

## I.      BACKGROUND

Plaintiffs' complaints, and the exhibits attached to them, allege pertinent background facts, which are described briefly below.  Notably, although Zimmerman and Howard initially filed two separate legal actions, this Court has consolidated the cases with the parties' consent, and the instant Memorandum Opinion primarily analyzes the complaint and motions that have been filed Zimmerman's case.[4]

### A.      The Making Of "The Dark Side"

"The Dark Side: Secrets of the Sports Dopers" is a 49-minute documentary that Al Jazeera produced in 2015.  (*See* "The Dark Side: Secrets of the Sports Dopers" ("Film"), Ex. L to Compl., ECF No. 9-12; *see also* Tr. of "The Dark Side: Secrets of the

---

[4] The complaints that Zimmerman and Howard have filed are substantively identical and differ only with respect to the factual allegations regarding each Plaintiff's personal background (*compare* Compl., ECF No. 9, ¶ 2 ("Zimmerman is a citizen and resident of Virginia, and a first baseman for the Washington Nationals MLB team."), *with* Howard Compl., Dkt. No. 10, in Civ. Action No. 16-cv-0014, ¶ 2 ("Howard is a citizen and resident of Florida, and the starting first baseman for the Philadelphia Phillies MLB team.")), and the specific defamatory statements at issue (*compare* Compl. ¶ 44 (recounting accusation that Zimmerman has used performance-enhancing drugs), *with* Howard Compl., ¶ 47 (recounting accusation that Howard has used performance-enhancing drugs)).  Likewise, Defendants filed substantively identical motions to dismiss and replies thereto across both actions, which Plaintiffs responded to by filing materially identical oppositions.  Thus, while there are technically two separate complaints and four pending motions to dismiss—two filed in Zimmerman's case, and two initially filed in Howard's case—this Court has concluded that it can properly evaluate the complaints and the motions together in the context of the now-consolidated action.

Sports Dopers" ("Film Tr."), Ex. A to Defs.' Mot., ECF No. 26-4.)[5]  "The Dark Side"
purports to reveal little-known facts about the supply chain of elicit performance-
enhancing drugs in professional sports (*see* Film. Tr. at 2), and the film features an
undercover investigation that Al Jazeera producers allegedly conducted over a period of
eight months (*see id.*).  Using a combination of taped confessionals and hidden camera
footage that is intended to "capture what athletes call the dark side[; i.e.,] the secret
world of doping" (*id.*), the film primarily details and displays the producers' efforts to
"catch" on film individuals who purport to distribute PEDs to athletes—people such as
"[d]octors, chemists, [and] chiropractors"—as they talk about the substances and "the
players" they "claim[] [they've] doped to fame" (*id.*).

Deborah Davies, a British reporter employed in Al Jazeera's Investigative Unit,
served as the lead reporter of the investigation that is featured in the film (*see* Compl. ¶
33) and is also the principal narrator in the documentary (*see generally* Film Tr.).
Although much of "The Dark Side" consists of hidden camera footage of secretly-
record discussions with various alleged medical professionals, it is Davies's voice-
overs that help to explain the contours of the undercover investigation; consequently,
her remarks provide the context for the photos, video clips, and statements in the film
that expressly link certain professional athletes to the underground world of

---

[5] Plaintiffs attached to their complaint a copy of the documentary at issue (*see* Film), and Al Jazeera
and Davies attached to their motion a detailed transcript of this film (*see* Film Tr.), the accuracy of
which is not in dispute.  For the purpose of the pending motions to dismiss, this Court considers both
exhibits as incorporated into the complaint.  *See Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C.
Cir. 2013) ("[I]n determining whether a complaint states a claim, the court may consider the facts
alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it
may take judicial notice." (internal quotation marks and citation omitted)); *see also Bogie v.
Rosenberg*, 705 F.3d 603, 608–09 (7th Cir. 2013) (noting that district court reviewing motion to
dismiss properly considered video recording incorporated by reference, and physically attached to,
amended complaint).  Finally, in the interest of providing more precise citations, the Court will cite
primarily to the transcript.

performance-enhancing drugs. (*See, e.g.*, Film Tr. at 3 (during a scene depicting fans at a professional football game, Davies suggests that the investigation seeks to explore "extraordinary claims that raise questions" about whether a particular "American sporting hero"—who she mentions by name—is "linked" to PEDs).)

At the outset of the film, Davies asserts that "[t]he best way to understand the dark side of sport is to meet an athlete who's been there—and back." (*Id.*)  Davies then introduces the audience to a former track star who had been banned from his sport for using PEDs, and who claims that he first obtained PEDs from a particular Bahamian doctor. (*Id.* at 4–5.)  In order to investigate this claim, Al Jazeera's producers decided to "[w]ork[] with a British athlete" to "infiltrate a network [of suppliers] who claim their scientific expertise can cheat the system." (*Id.* at 2.)  Plaintiffs' complaint alleges that the athlete Al Jazeera and Davies enlisted—Liam Collins—is "a former hurdler, would-be bobsledder, and bankrupt real-estate promoter" who has "no known news reporting training or experience." (Compl. ¶¶ 8, 40.)  However, Davies explains in the film that Al Jazeera's producers considered Collins to be "perfectly placed to go undercover" (Film Tr. at 6), and that the producers approached him with a "proposal": "help us to investigate doping in sport . . . by claiming to be an athlete desperate to qualify for the Rio Olympics." (*Id.*)

After Collins agreed to participate in Al Jazeera's investigation, the producers helped to "test out [his] cover story" by connecting him with the Bahamian doctor previously mentioned. (*Id.*; *see also id.* at 7.)  From there, Collins spent six months in an undercover capacity, chasing leads and trying to contact various alleged suppliers of PEDs in the Bahamas, Canada, and Texas. (*See* Compl. ¶ 40.)  According to the

complaint, Collins's modus operandi generally involved "[f]alsely claiming to be a potential client[,]" and "induc[ing] people he came into contact with to discuss the topic of performance-enhancing substances and to provide him with [such substances]," all while he was secretly recording the interactions with a hidden camera.  (*Id.*)  Collins solicited the allegedly defamatory statements at issue in the instant case when he was speaking with a central figure in the documentary:  a purportedly notorious supplier of PEDs named Charlie Sly.  (*See* Film Tr. at 27–28.)

The broad investigatory narrative that Davies presents in "The Dark Side" focuses in large part on Sly.  He is featured and discussed at multiple points in the film, and Davies repeatedly comments on her impressions of him, mostly casting him in a favorable light.  For example, Davies characterizes Sly as a "doctor of pharmacy" when he is first introduced (*see id.* at 15),[6] and when Sly is heard discussing a particular banned substance (growth hormone) at one point in the film, Davies states, "Charlie Sly appeared knowledgeable about the drug—he knows it's severely restricted even as legal medication."  (*Id.* at 33; *see also id.* at 33–34 (Davies comments that "[w]e checked [Sly's claim regarding growth hormones] with one of America's leading experts. Professor Alan Rogol is an endocrinologist . . . He confirmed [Sly's claim].").)  The documentary also includes several comments from Davies indicating that her investigatory team had confirmed certain details regarding Sly's background.  (*See, e.g.*, *id.* at 33 ("We've confirmed Charlie Sly worked in their pharmacy in 2011.").)

Davies's voice-over also makes clear that Sly's reputation as a "chemical mastermind" (*id.* at 2) precedes him:  Collins contacts Sly precisely because two other

---

[6] The complaint disputes this contention.  (*See* Compl. ¶ 58.)

suppliers are captured on tape calling Sly "a genius at outwitting" the World Anti-Doping Agency, and someone who's "taken smart drugs to a whole new level." (*Id.* at 14, 15; *see also id.* at 15 (Davies remarks that "[s]omeone who's taken drugs to a new level—was someone we needed to meet")).)

Davies explains in the film that, after Collins established contact with Sly, Al Jazeera set up hidden cameras at a café and in a hotel room to capture Collins's initial meeting with him. (*See id.* at 15.) During the ensuing exchange, which is shown in the film, Sly offers Collins "[o]ne anabolic," and says that he can "give [Collins] something to use right now" that will be "great for . . . strength gains." (*Id.*) Sly also says that "[t]here's a bunch of football players who take this. And a bunch of baseball players who take it too . . . [,]" and he adds that "it was recently added to the MLB banned list." (*Id.*) In the film, this conversation between Collins and Sly continues inside Sly's apartment, where, according to Davies's voiceover, Collins "discovers [Sly's] fridge is full of drugs[,] [i]ncluding a half filled syringe—which Sly offers for immediate use." (*Id.* at 16; *see also id.* (Davies asserts that Collins "declines the offer, saying he wants to read up on Delta 2[,]" which Davies describes as the "designer steroid" that Sly handed to Collins).) Collins then "takes the syringe away" (*id.*), and in a confessional spoken directly to the camera, Collins asserts that Sly had talked to him about a famous professional football player (by name), and had told him that the player "buys all [the] stock" of Delta 2 from the only company that sells it on the internet (*id.* at 16–17).

"The Dark Side" proceeds to feature other aspects of Collins's investigation into doping, but Collins's multiple meetings with Sly are a central component of the film. Recorded hidden-camera footage of several conversations between Collins and Sly are

shown at various points, and in nearly every video clip, Sly brags about his connections to famous players, who he names specifically in the course of promoting his services, drugs, and business to Collins.  (*See, e.g.*, *id.* at 17, 19, 28, 29.)  Eventually, Davies states that the producers "wanted to test [Sly's] doping expertise and his level of connections" (*id.* at 23), and a video clip of the foyer of Sly's apartment follows (*see id.*).  Then, as viewers gaze upon the entry to Sly's residence, Davies remarks that Sly "proved his link to one sportsman very quickly[,]" because "[w]aiting at his building is a baseball player, Taylor Teagarden."  (*Id.*; *see also id*. at 23–24 (Davies comments that Teagarden has played on professional teams "in Chicago, Texas, New York, and Baltimore[,]" and that Sly has "guided him on a mix of clean and banned substances—including the steroid Delta 2").)[7]

Significantly for present purposes, at one point about 35 minutes into the film, Sly is shown driving in a car with Collins.  According to Davies's narration, during this drive, Sly casually started to "name[] more sportsmen he claims are linked to Delta 2—in baseball and football[,]" and then asserted that "he coached them on what to take and how to avoid testing positive."  (*Id.* at 27.)  Davies notifies the audience that her production team had "primed Liam [Collins] with questions to dig into the claims" (*id.*), and the subsequent discussion between Sly and Collins is captured by Collins's hidden camera.  It is in response to Collins's questions that Sly maintains that Howard and Zimmerman use PEDs.  (*See id.* at 27–28.)

---

[7] In the hidden camera video footage that follows, Teagarden admits to his use of banned steroids.  He states: "I used it last year" and "I was scared to be honest with you. I took it for like two weeks, and I had a test four weeks after my last administration of it."  (Film Tr. at 24.)

**B.      The Film's Allegedly Defamatory Statements About Plaintiffs**

The following is a description of the segments in "The Dark Side" that feature a

specific conversation between Collins and Sly about Howard, with background

narration by Davies:

> Davies [*off-screen narration over video clip of Sly and Collins driving*]:  Back in
> Texas, the pharmacist Charlie Sly names more sportsmen that he claims are
> linked to Delta 2, in baseball and football.  He says he coached them on what to
> take and how to avoid testing positive.  In a series of conversations crisscrossing
> Texas, we primed Liam [Collins] with questions to dig into the claims.
>
> [*The video then cuts to a stylized clip of Howard running the bases in his Phillies
> uniform, with voiceover as follows.*]
>
> Sports Announcer:  That is well hit, it is way back, 50 home runs for Ryan
> Howard.
>
> [*The shot then rests on a backdrop of a stylized Howard baseball card. Against
> this backdrop, the following recorded conversation is played while the text of the
> speakers' words appear in subtitle-like fashion.*]
>
> Collins:  So with the likes of Howard, once you've set him off is there like a
> maintenance thing?
>
> Sly:  He is somebody that you cannot overwhelm with stuff.  You just make sure
> you have everything in bags.  He knows to take stuff twice a day.  Usually I just
> have him like teach it back to me.
>
> Collins:  What did he notice in his hitting?
>
> Sly:  With the D2?
>
> Collins:  Yeah.
>
> Sly:  I think maybe some more explosiveness.  He had a couple of years where he
> had just a ton of home runs.

(Film; *see also* Film Tr. at 27–28.)

A discussion of Zimmerman follows immediately; it features a conversation

between Collins and Sly during this same road trip:

> [*The video cuts to a stylized clip of Zimmerman batting in his Nationals uniform,
> with voiceover as follows*:]

> [Sports] Announcer:  That's a seeing-eye single for Ryan Zimmerman.  3 for 4
> on the day.

> [*The shot then rests on a backdrop of a stylized Zimmerman baseball card.
> Across this backdrop, the following conversation is played while text of the
> conversation scrolls across the screen*.]

> Collins:  How long have you known Zimmerman?

> Sly:  Probably six years . . . I worked with him in the off-season.  That's how I
> get him to change some stuff.

> Collins:  Is he on the D2 as well?

> Sly:  Yeah.

> Collins:  What does he think of the D2?

> Sly: It does its job.

> Collins:  Does he notice a lot more power or not?

> Sly:  Yeah, I think some guys have just kinda gotten used to it.

> Collins:  Yeah[.]

> Sly:  It's the new normal.

(Film Tr. at 28; *see also* Film.)

After a short clip in which Sly and Collins discuss another professional athlete (a

football player who is also purportedly "in the D2 club"), Davies's voice states that

Zimmerman, Howard, and the football player "each . . . emphatically denies taking Delta 2 or any PED and say whoever claims that, is lying." (Film Tr. at 29.) While these denials are being referenced, the film features graphics of Zimmerman, Howard, and the football player over the stylized words "Emphatically denies[.]" (*Id.*; *see also* Film.)

> **C.     Sly's Recorded Recantation, And Al Jazeera's Unstinting Efforts To Disseminate And Publicize The Film**

In the complaint, Zimmerman and Howard assert that "[a]ll of [Sly's] statements concerning [them] are categorically untrue." (Compl. ¶ 47; *see also* Howard Compl. ¶ 50 (alleging that,"[b]ut for the reference to Mr. Howard's prowess as a home run hitter," the statements about Howard that Sly makes in the film are false).) Moreover, and importantly, the complaint alleges that, before the documentary was distributed, Al Jazeera was *aware* of certain facts that cast doubt on Sly's credibility, and this knowledge demonstrates that the film's producers either knew Sly's statements were false, or recklessly disregarded the falsity of the statements. (*See* Compl. ¶¶ 50–6l, 73.) In this regard, the complaint makes various assertions regarding problems with the quality of the reporting underlying the film. (*See, e.g.*, *id.* ¶ 57.) However, the primary fact that Plaintiffs say was known to Al Jazeera and that should have undermined the producers' confidence in Sly's statements was the fact that Sly later expressly rescinded the remarks that he had made about athletes in "The Dark Side." (*See id.* ¶¶ 1, 54.)

Specifically, the complaint points to a television interview of Davies that was recorded shortly after "The Dark Side" was publicly released; in the interview, Davies both "admitted that Al Jazeera heard from Sly '48 hours ago'"—i.e., before "The Dark Side" was made available to the public—and reported "that 'Charlie Sly now says that

anything he said to us wasn't true.'"  (*Id.* ¶ 60; *see also* Dec. 27, 2015 Al Jazeera

Interview With Davies ("Davies Interview"), Ex. V. to Compl., ECF No. 9-22.)  The

recantation statement of Sly's that Davies references in the interview was itself

videotaped (*see* Sly Recantation Video, Ex. R to Compl., ECF No. 9-18), and in the

taped remarks, Sly faces the camera directly and says:

> The statements on any recordings or communications that Al
> Jazeera intends to air are absolutely false and incorrect.  To be
> clear, I am recanting any such statements and there is no truth to
> any statement of mine that Al Jazeera plans to air.  Under no
> circumstances should any of those statements, communications,
> or recordings be aired.

(Compl. ¶ 54.)[8]

Thus, Davies's recorded interview confirms the complaint's contention that Al

Jazeera was aware of Sly's recantation prior to releasing the film.  (*See id.* ¶ 1

("Defendants knew full well that their 'source' had recanted his scandalous and untrue

allegations[.]").)  But Al Jazeera did not forego its planned distribution of "The Dark

Side" or investigate further after receiving word of the recantation; instead, it appears

that Davies makes a reference to Sly's recantation in one narrated sentence at the end of

the film, in which she mentions that one other purported supplier of PEDs had failed to

comment, and that Sly had disavowed his own statements.  (*See* Film Tr. at 36 (Davies

remarks that "Dr. Guyer didn't respond to our request for a comment" and "Charlie Sly

said his statements about athletes were false and incorrect[,]" while the film displays a

graphic of Sly next to the words "false and incorrect").)

---

[8] Sly's "55-second long video recantation" is quoted in its entirety in the complaint (*see* Compl. ¶ 54)
and referenced as an exhibit (*see* Sly Recantation Video).  The complaint alleges that Al Jazeera
provided an advance copy of "The Dark Side" to The Huffington Post, and that that media company
published an online story about "The Dark Side" that contained a link to the video of Sly recanting.
(*See* Compl. ¶ 53.)

When Zimmerman and Howard learned that Al Jazeera was planning to disseminate a film that accused them of taking illegal supplements—which they say happened on December 9, 2015—they immediately contacted Al Jazeera's counsel, through their own lawyer, to inform Al Jazeera that they "unequivocally and emphatically de[ny] using or having used Delta 2 or any other performance-enhancing drug[.]" (Compl. ¶ 50 (internal quotation marks omitted).)  Plaintiffs' counsel again reiterated Plaintiffs' denials to Al Jazeera on December 23, 2015 (*see id.* ¶ 51), and three days later, Plaintiffs allegedly learned that "Sly had unequivocally advised Davies and Al Jazeera's counsel, in writing, that the purported statements were false" (*id.* ¶ 52 (emphasis omitted)).  Plaintiffs' counsel then wrote to Al Jazeera's counsel again, this time on December 26, 2015, emphasizing that, in light of Sly's recantation, "[t]here can be no conclusion but that the sources for Al Jazeera's statements regarding [Plaintiffs'] use of performance enhancing drugs are patently unreliable[.]"  (*Id.* ¶ 52 (first alteration in original) (internal quotation marks omitted).)  Nevertheless, Al Jazeera posted the full documentary to YouTube at 9:01 p.m. on December 26, 2015 (*see id.* ¶ 53), and it formally aired the documentary on its television network the next day (*see id.* ¶ 61).

Meanwhile, Al Jazeera also posted on its website a news article that described "The Dark Side" and included an embedded link to the film.  (*See id.* ¶¶ 37, 38; *see also* "The dark side: The secret world of sports doping" ("Print Article"), Ex. M to Compl., ECF No. 9-13, at 2.)  The brief article describes the investigation and highlights some of the pharmacists and doctors that Al Jazeera's Investigative Unit encountered.  It also states that the investigation "exposed the crucial role of pharmacists and doctors in creating and prescribing programmes of performance-enhancing drugs[,]" and that the

film "raises questions about some well-known athletes in American football and baseball who the medical professionals claim to work with." (Print Article at 3.)

With respect to Zimmerman and Howard specifically, the article makes the following statement:

> Sly also named baseball players Ryan Zimmerman, of the Washington Nationals, and Ryan Howard, of the Philadelphia Phillies, raising questions about whether they use the hormone supplement Delta 2. Both have denied the allegations. In a statement to the Philadelphia Inquirer on Sunday, Zimmerman and Howard's lawyer William Burck said: 'The extraordinarily reckless claims made against our clients in this report are completely false and rely on a source who has already recanted his claims.' The Nationals also issued a statement in support of Zimmerman. The Phillies subsequently issued a statement supporting Howard[.]

(*Id.* at 3–4.)

### D.   Procedural History

Plaintiffs filed the instant two-count complaint against Defendants on January 20, 2016, alleging that Defendants had recklessly published false and defamatory statements concerning Plaintiffs when Defendants aired "The Dark Side" on Al Jazeera's television network and posted the aforementioned news article describing the documentary on Al Jazeera's website. (*See* Compl. ¶ 37.)[9]  Plaintiffs contend that the documentary and news article "state outright and also carry the unmistakable message that [Plaintiffs have] taken or [are] taking illegal performance-enhancing substances," an allegation that Plaintiffs claim "[is] *per se* defamatory, as [it] falsely accuse[s]

---

[9] Count One of Plaintiffs' complaint claims "Libel" (Compl. at 21); however, this Memorandum Opinion refers to this claim by the generic term "defamation." *See* 1 Rodney A. Smolla, *Law of Defamation* § 1:10 (2016) ("Defamation is the generic term for the twin torts of libel and slander."); *see also Tagliaferri v. Szulik*, No. 15 Civ. 2685, 2015 WL 5918204, at *3 (S.D.N.Y. Oct. 9, 2015) ("Generally, spoken defamatory words are slander; written defamatory words are libel." (internal quotation marks and citation omitted)).  Count Two makes the closely-related claim that "The Dark Side" and the news article "place [Plaintiffs] in a false light highly offensive to a reasonable person[.]" (Compl. ¶ 80.)

[Plaintiffs] of illegal acts, as well as acts injurious to [their] professional and business reputation[.]"  (*Id.* ¶¶ 48, 69.)  Plaintiffs further allege that Defendants knew that the underlying allegations were "based on uncorroborated accusations by a third party that had been unequivocally recanted *prior* to Defendants' publication."  (*Id.* ¶ 1 (emphasis in original).)

Al Jazeera and Davies filed a motion to dismiss Plaintiffs' complaint on April 11, 2016; Collins filed a separate motion to dismiss on April 8, 2016.  (*See generally* Defs.' Mot.; Def. Collins's Mot.)  In their motion to dismiss, which is brought under Federal Rule of Civil Procedure 12(b)(6), Al Jazeera and Davies argue that "The Dark Side" as a whole is not reasonably capable of conveying the message that Plaintiffs have used PEDs, and that the complaint fails to state a plausible claim that Defendants published the allegedly defamatory statement with actual malice.  (*See* Defs.' Mem. at 26–45.)  Defendant Collins incorporates these arguments into his own motion, in which he further argues that Plaintiffs have failed to allege plausible facts from which one could infer that he published the documentary or news article, or did so with actual malice.  (*See* Def. Collins's Mem. at 6, 12–20.)

In their opposition, Plaintiffs maintain that a reasonable viewer could have understood "The Dark Side" to convey the message that Plaintiffs have used PEDs, and furthermore, that Defendants' knowledge of Sly's recantation prior to publication supports the inference that Defendants published the statements with actual malice.  (*See* Pls.' Opp'n at 18–24.)  With respect to Collins, Plaintiffs contend that they have adequately alleged that Collins participated in the publication of the defamatory statements based on his extensive role in the eight-month investigation, and in addition,

that they have proffered sufficient facts to suggest that Collins acted with the same degree of recklessness as Al Jazeera and Davies.  (*See id.* at 27–30.)

Both motions are ripe for this Court's review.  (*See* Defs.' Mem.; Def. Collins's Mem.; Pls.' Opp'n; Defs. Al Jazeera and Davies' Reply Mem. in Supp. of Defs.' Mot. ("Defs.' Reply"), ECF No. 31; Def. Collins's Reply Mem. in Supp. of Def. Collins's Mot. ("Def. Collins's Reply"), ECF No. 32.)  The Court held a hearing on the motions on September 13, 2016.

## II.   LEGAL STANDARDS

### A.   Motions To Dismiss Under Rule 12(b)(6)

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a complaint by raising the question of whether or not the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015) (internal quotation marks omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

When evaluating a Rule 12(b)(6) motion, the "court must accept as true all of the allegations contained in a complaint[,]" *Harris*, 791 F.3d at 68 (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678), and "grant plaintiff the benefit of all inferences that can be derived from the facts alleged," *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal quotation marks and citation omitted).  However, this tenet "is inapplicable to legal conclusions."  *Harris*, 791 F.3d at 68 (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678).  This means

that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678).

## B.   Defamation And False Light Invasion Of Privacy Claims

The defamation and false light invasion of privacy claims in this case are both common law tort claims that have been brought under District of Columbia law.[10]  To state a claim for defamation under District of Columbia law, a plaintiff must allege "(1) that he was the subject of a false and defamatory statement; (2) that the statement was published to a third party; (3) that publishing the statement was at least negligent; and (4) that the plaintiff suffered either actual or legal harm."  *Farah v. Esquire Magazine*, 736 F.3d 528, 533–34 (D.C. Cir. 2013) (citations omitted).  Relately, under District of

---

[10] The parties appear to agree, without much elaboration, that District of Columbia law applies to this legal action.  (*See* Defs.' Mem. at 32 ("For purposes of this motion, Defendants agree that the Court should apply the substantive law of the District of Columbia."); Pls.' Opp'n at 17–18 (citing District of Columbia case law for the substantive law that governs Plaintiffs' claims).)  To determine which jurisdiction's laws govern Plaintiffs' claims, this Court applies the choice-of-law rules of the jurisdiction in which it sits.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  The District of Columbia's choice-of-law rules "require that [courts] apply the tort law of the jurisdiction that has the most significant relationship to the dispute[,]" taking into account the jurisdiction "where the injury occurred, where the conduct causing the injury occurred, the domicile, residence, nationality, place of incorporation and place of business of the parties[.]"  *Abbas v. Foreign Policy Grp., LLC* (*Abbas II*), 783 F.3d 1328, 1338 n.6 (D.C. Cir. 2015).  With respect to Plaintiff Zimmerman, who plays for the Washington Nationals and arguably experienced reputational harm in the District of Columbia, it is reasonable to assume that District of Columbia law should apply.  But the same cannot be said for Plaintiff Howard, who formerly played for the Philadelphia Phillies and presumably experienced reputational harm predominantly in Pennsylvania.  Although the parties have not addressed this discrepancy, this Court has examined Pennsylvania defamation law and discerns no meaningful difference between the defamation law of that jurisdiction and the defamation law of the District of Columbia.  *Compare Tucker v. Fischbein*, 237 F.3d 275, 281 (3d Cir. 2001) ("Under Pennsylvania law, a defamation plaintiff bears the burden to show:  (1) The defamatory character of the communication[;] (2) Its publication by the defendant[;] (3) Its application to the plaintiff[;] (4) The understanding by the recipient of its defamatory meaning[; and] (5) The understanding by the recipient of it as intended to be applied to the plaintiff."), *with Farah v. Esquire Magazine*, 736 F.3d 528, 533–34 (D.C. Cir. 2013) (naming substantially similar elements).  Accordingly, this Court will embrace the parties' agreement and apply District of Columbia law to this matter.  *See, e.g.*, *Abbas II*, 783 F.3d at 1338 n.6 ("[The plaintiff] alleges that the conduct that caused his injury took place in the District of Columbia.  The defendants agree that D.C. law should govern.  The parties relied on D.C. defamation law in briefing this appeal.  We conclude that D.C. defamation law governs this dispute.").

Columbia law, "[a] false light claim . . . requires a showing of: (1) publicity; (2) about a false statement, representation or imputation; (3) understood to be of and concerning the plaintiff; and (4) which places the plaintiff in a false light that would be offensive to a reasonable person." *Doe v. Bernabei & Wachtel, PLLC*, 116 A.3d 1262, 1267 (D.C. 2015) (alteration in original) (internal quotation marks and citation omitted).  These two torts share similar elements, and are often "analyzed in the same manner[,]" at least "where the plaintiff rests both his defamation and false light claims on the same allegations[.]" *Blodgett v. Univ. Club*, 930 A.2d 210, 223; *see also id.* at 222. Nevertheless, they are two different claims, as the D.C. Circuit has recognized.  *See Weyrich v. New Republic, Inc.*, 235 F.3d 617, 628 (D.C. Cir. 2001).

      1.   <u>Defamation</u>

     "When confronted with a motion to dismiss [a defamation claim], a court must evaluate '[w]hether a statement is capable of defamatory meaning,'" which is a threshold "question of law[,]" *Jankovic v. Int'l Crisis Grp.* (*Jankovic I*), 494 F.3d 1080, 1091 (D.C. Cir. 2007) (second alteration in original) (quoting *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 627 (D.C. Cir. 2001)), and must also determine whether the statement is false, *see White v. Fraternal Order of Police*, 909 F.2d 512, 520 (D.C. Cir. 1990) ("Defamatory meaning and falsity are distinct elements of the tort of defamation and are considered separately.").  To evaluate whether a statement is capable of defamatory meaning, courts employ a two-part framework that asks:  "'(a) whether a communication is capable of bearing a particular meaning, and (b) whether that meaning is defamatory.'  The jury then determines whether the communication was in fact so understood by its recipient." *Moldea v. N.Y. Times Co.* (*Moldea I*), 15 F.3d 1137, 1142 (D.C. Cir. 1994) (quoting Restatement (Second) of Torts § 614 (1977)),

*modified on reh'g on other grounds*, 22 F.3d 310 (D.C. Cir. 1994) (*Moldea II*).

"[T]he defamatory meaning inquiry focuses only on whether a reasonable reader *could* understand a statement as tending to injure a plaintiff's reputation." *Moldea I*, 15 F.3d at 1142 (emphasis added). "Assuming a statement is reasonably capable of a defamatory meaning, the trier of fact must determine if it was actually understood by the recipient in that sense." *Id.* (internal quotation marks and citation omitted). Ultimately, then, "[i]t is only when the court can say that the publication is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense that it can rule as a matter of law, that it was not libelous." *White*, 909 F.2d at 518 (quoting *Levy v. Am. Mut. Ins. Co.*, 196 A.2d 475, 476 (D.C. 1964)); *see also Jankovic I*, 494 F.3d at 1091.

The next element of a defamation claim—publication—requires a defendant to have "*published* or knowingly participated in publishing the defamation." *Tavoulareas v. Piro* (*Tavoulareas I*), 759 F.2d 90, 136 (D.C. Cir. 1985) (emphasis in original), *vacated in part on other grounds on reh'g*, 763 F.2d 1472 (D.C. Cir. 1985) (*Tavoulareas II*), *and on reh'g*, 817 F.2d 762 (D.C. Cir. 1987) (*Tavoulareas III*) (en banc). "Publication" is the communication of defamatory matter "intentionally or by a negligent act to one other than the person defamed." Restatement (Second) of Torts § 577(1) (1977); *see also id.* cmt. a ("Any act by which the defamatory matter is intentionally or negligently communicated to a third person is a publication."). A valid claim for defamation also requires a showing of legal harm (i.e., defamation per se) or special harm as a result of the publication. As relevant here, a statement constitutes defamation per se when it "imput[es] to a person a . . . matter affecting adversely a

person's fitness for trade, business, or profession[.]"  *Carey v. Piphus*, 435 U.S. 247, 262 n.18 (1978).

Another significant element of a defamation claim is the defendant's state of mind, that is, if the defendant publishes a statement that is capable of a defamatory meaning and that causes the plaintiff legal or special harm, the court must next determine whether the defendant made the defamatory statement with the requisite intent.  The state of mind element is one the "[v]arious doctrinal protections [that] preserve 'the breathing space which freedoms of expression require in order to survive[,]'" *Farah*, 736 F.3d at 534 (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 (1990)), and the Supreme Court has managed to "reshape the common-law landscape to conform to the First Amendment[,]" *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775 (1986), by enunciating two circumstances in which a heightened level of intent will be required.  "The first is whether the plaintiff is a public official or figure," and "[t]he second is whether the speech at issue is of public concern."  *Id.*

Courts have long held that, if the subject of the defamatory statement is a public official or figure, the complaint must allege fault in the making of the defamatory statement that rises to the level of "actual malice," rather than mere negligence, *see Sullivan*, 376 U.S. at 279–80; *see also Gertz*, 418 U.S. at 345, which means that the defendant must have "knowledge that [the statement] was false or [must act] with reckless disregard of whether it was false or not[,]" *Sullivan*, 376 U.S. at 280.[11]  The actual malice standard is subjective; it is satisfied only when there is "sufficient

---

[11] Plaintiffs—two MLB players—do not contest that they are public figures and that the appropriate standard of fault in this matter is therefore actual malice (*see* Sept. 16, 2016 Hr'g Tr. ("Hr'g Tr."), ECF No. 36, at 13:15), and this Court agrees, *see Tavoulareas III*, 817 F.2d at 772 (characterizing well-known athletes as the "archetypes of the general purpose public figure").

evidence" to suggest that "the defendant in fact entertained serious doubts as to the truth of his publication."  *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).  In addition, when the speech at issue is of public concern and the defendant is a media member, there is no common law presumption that the defamatory speech is false, and the plaintiff instead bears the burden of demonstrating both falsity and fault before recovering damages.  *Hepps*, 475 U.S. at 776–77.

### 2.   False Light Invasion Of Privacy

Notably, "[t]hough invasion of privacy false light is distinct from the tort of defamation, the same First Amendment protections apply."  *Weyrich*, 235 F.3d at 627 (internal quotation marks and citation omitted).  This means that "[a] false light claim involving a public figure, like a defamation claim, requires proof of actual malice."  *Parsi v. Daioleslam*, 890 F. Supp. 2d 77, 92 (D.D.C. 2012).  The publicity element of a defamation claim also exists in the false light context; that is, "a false light claim . . . [requires] knowledge of or . . . reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."  *Weyrich*, 235 F.3d at 628 (internal quotation marks and citations omitted); *see also Moldea I*, 15 F.3d at 1151 ("Publicity that is actionable in a false light claim generally will be actionable in defamation as well.").

Thus, because the elements of a false light claim are similar to those of a defamation claim, courts often analyze the two claims in the same manner, particularly where a plaintiff rests both claims on the same underlying allegations.  However, what is being remedied is at least conceptually distinct:  "a defamation tort redresses damage to *reputation* while a false light privacy tort redresses *mental distress* from having been

exposed to public view." *White*, 909 F.2d at 518 (emphasis added).  Moreover, the

character of the statements that are actionable with respect to the two torts is also

different.  To state a false light claim, a plaintiff must demonstrate that the false

statement, representation, or imputation at issue "places the plaintiff in a false light that

would be offensive to a reasonable person."  *Doe*, 116 A.3d at 1267 (internal quotation

marks and citation omitted).  This requirement is satisfied if a plaintiff "is given

unreasonable and highly objectionable publicity that attributes to him characteristics,

conduct or beliefs that are false, and so is placed before the public in a false position."

Restatement (Second) of Torts § 652E cmt. b (2016); *see also Moldea I*, 15 F.3d at

1150–51.

## III.   ANALYSIS

Zimmerman and Howard claim that the statements about their use of PEDs in

"The Dark Side" and in Al Jazeera's promotional article constitute actionable

defamation and false light invasion of privacy, and that all three defendants should be

held accountable for committing these common law torts.  In their separate motions to

dismiss, Al Jazeera, Davies, and Collins respond that the statements at issue do not

qualify as defamatory and were not published with the requisite intent, and Collins

further maintains that he has not published any statements at all.  For the reasons

explained below, this Court concludes that the complaint that Zimmerman and Howard

have filed states defamation and false light claims as to Al Jazeera and Davies, but only

with respect to the statements contained in the documentary itself, and that the

complaint does not contain sufficient allegations of fact to support any defamation or

false light claim against Collins.  Accordingly, the motion to dismiss that Al Jazeera

and Davies have filed will be granted in part and denied in part, and Collins's motion to dismiss will be granted in full.

### A. The Complaint States A Defamation And A False Light Claim Against Al Jazeera And Davies With Respect To "The Dark Side," But Not The News Article

As explained above, to survive Defendants' motions to dismiss, the complaint that Zimmerman and Howard have filed must allege facts that are sufficient to support the elements of that pleading's defamation and false light claims.  This Court has determined that a methodical march through an analysis of the facts relating to each of the elements of both claims is not required here, because there is substantial overlap between the elements of a defamation claim and a false light claim, as explained above (*see also* Sept. 16, 2016 Hr'g Tr. ("Hr'g Tr."), ECF No. 36, at 44:7–8) (concession by Plaintiffs' counsel that the defamation and false light claims rise and fall together), and also because Al Jazeera and Davies (in contrast to Collins) do not challenge the adequacy of the instant complaint with respect to the elements of publication or defamation per se.[12]  Thus, the key questions to be resolved with respect to the motion that Al Jazeera and Davies have filed are:  (1) whether the complaint adequately alleges that Al Jazeera and Davies have made a false and defamatory statement, and (2) whether the complaint contains sufficient facts to suggest that Al Jazeera and Davies published any such false and defamatory statement with actual malice.  This Court answers "yes" to the first question, but only insofar as the statements in the film are

---

[12] This concession on the part of Al Jazeera and Davies appears to be a wise one.  *See* Restatement (Second) of Torts § 577 cmt. a ("Any act by which the defamatory matter is intentionally or negligently communicated to a third party is a publication."); *see also Carey*, 435 U.S. at 262 n.18 (explaining that defamation per se consists of statements "imputing to a person a . . . matter affecting adversely a person's fitness for trade, business, or profession").

concerned, and although actual malice is a close question, the Court sees sufficient

allegations in the complaint and the accompanying exhibits to support a jury finding

that Al Jazeera and Davies published the statements in the film with the required intent.

> 1.   Plaintiffs Have Adequately Alleged That Al Jazeera And Davies
> Made A False And Defamatory Statement In "The Dark Side"

In order for a challenged statement to be actionable as defamation, "it must at a

minimum express or imply a verifiably false fact about [an individual]." *Weyrich*, 235

F.3d at 624; *see also Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1292

(D.C. Cir. 1988).  In addition, the falsehood must be "capable of bearing" a particular

meaning as a "reasonable reader" would understand the communication.  *Moldea I*, 15

F.3d at 1142.  A false statement that "'tends to injure plaintiff in his trade, profession

or community standing, or lower him in the estimation of the community,'" *id.* (quoting

*Afro-Am. Publ'g Co. v. Jaffe*, 366 F.2d 649, 654 n.10 (D.C. Cir. 1966) (en banc)), when

"both the words themselves and the entire context in which the statement occurs" are

taken into account, *Tavoulareas III*, 817 F.2d at 779, qualifies as defamation.  "Context

is critical because 'it is in part the *settings* of the speech in question that makes their

. . . nature apparent, and which helps determine the way in which the intended

audience will receive them.'"  *Farah*, 736 F.3d at 535 (emphasis and alteration in

original) (quoting *Moldea II*, 22 F.3d at 314); *see also id.* ("'Context' includes not only

the immediate context of the disputed statements, but also the type of publication[.]").

The complaint that Zimmerman and Howard have filed alleges that the

statements made in "The Dark Side" regarding their use of PEDs are false, and that

when viewed in context, the statements are also defamatory.  (*See, e.g.,* Compl. ¶¶ 68–

69 (asserting that the statements at issue "state outright and also carry the unmistakable

25

message that Mr. Zimmerman has taken or is taking illegal performance-enhancing substances, including Delta 2, in contravention of the MLB ban on such substances").) Notably, it is clear beyond cavil that if the documentary's producers had *directly* accused Zimmerman and Howard of using PEDs, that accusation would constitute a defamatory statement. *See Pacquiao v. Mayweather*, 803 F. Supp. 2d 1208, 1213 (D. Nev. 2011) ("[D]efendants' alleged statements are actionable defamatory statements because they falsely assert an objective fact; namely that Pacquiano was using and had used PEDs."). (*See also* Pls.' Opp'n at 18 (observing that Defendants "do not contend that an accusation that Zimmerman used performance-enhancing drugs is not defamatory").) The argument that Al Jazeera and Davies make is more nuanced; they maintain that because *it is Sly* who has made the accusations as reported in the film, a reasonable viewer would not interpret "The Dark Side" to convey a defamatory message. (*See* Defs.' Mem. at 26–30; *see also id.* at 29 ("The Documentary makes clear that the statements that Sly and his partners made about working with professional athletes are only 'claims[.]'"); Defs.' Reply at 6 (asserting that, in the film, "Al Jazeera does not endorse any of Sly's statements but repeatedly states that they are only what he has 'claimed' or 'said.'").)

In this Court's view, the argument that the challenged statements are not capable of conveying a defamatory meaning because the film establishes that *Sly* is the messenger, and that Al Jazeera and Davies are merely reporting that message, is unpersuasive, because a reasonable viewer could certainly have understood the documentary as a whole to be an endorsement of Sly's claims. When the Court looks beyond "the immediate context of the disputed statements," *Farah*, 736 F.3d at 535, it

is readily apparent that the film includes many scenes that are capable of communicating not only that Sly made the disputed allegations, but also that Sly's statements are credible and should be believed.  This implicit endorsement occurs at various points during Davies's narration, such as when she contends approximately 29 minutes into the film that the producers undertook "to test [Sly's] doping expertise and his level of connections[,]" and then immediately states that "[h]e proved his link to one sportsman very quickly."  (Film Tr. at 23.)  Similarly, at the 43-minute mark, Davies endorses Sly as "knowledgeable" about certain drugs (*id.* at 33), and she repeatedly suggests that the production team independently researched Sly's background and various claims he made about certain drugs, and that the details checked out (*see id.* at 33–34 ("We checked [Sly's claim regarding growth hormones] with one of America's leading experts. . . . He confirmed [Sly's claim]."); *id.* at 33 ("We've confirmed Charlie Sly worked in their pharmacy in 2011.").)  Thus, the film does more than merely report that Sly made certain allegations; rather, it provides contextual clues that could lead a reasonable viewer to believe that Sly is credentialed and trustworthy, and that his statements—including those regarding Plaintiffs' use of illegal PEDs—are true.

For these reasons, Defendants' reliance on *Abbas v. Foreign Policy Group, LLC* (*Abbas I*), 975 F. Supp. 2d 1 (D.D.C. 2013), is misplaced.  The court in that case was reviewing several allegedly defamatory statements that were published in a magazine article, including a statement that "several Palestinians" had made to the author, and also the contention that the plaintiff had "socked away $100 million in ill-gotten gains." *Id.* at 18.  The *Abbas* court concluded that the first statement was "not an assertion of false fact, or indeed of *any* fact" because the author "is reporting on what people in the

region have said to him, and does not otherwise take any position on what he has heard." *Id.* at 21 (emphasis in original). Similarly, the court reasoned that the second statement also could not be considered defamatory, because it "is not reported as fact, and is instead put in context, making it clear to the reader that [the] statement is merely the latest in an ongoing exchange of charge and countercharge." *Id.* at 19 (internal quotation marks omitted).

"The Dark Side" does much more than that. Rather than simply reporting third-party allegations without "otherwise tak[ing] any position on" the statements, *id.* at 21, the film weaves Sly's statements into a broader narrative about doping in sports that the producers themselves have purportedly confirmed through their own investigation. (*See* Film Tr. at 6 ("[W]e had a proposal [for Collins], help us to investigate doping in sport." (statement of Davies)).) And the narrative that is presented also contains statements that seem aimed at burnishing Sly's "chemical mastermind" credentials and bolstering his credibility (*id.* at 2; *see also, e.g., id.* at 23), which makes it even more likely that a reasonable viewer would be left with the impression that the filmmakers believe that what he says in the film is accurate.

It is also significant that, unlike in *Abbas I*, the statements at issue in the instant case were published as part of an editorialized *documentary* that features a discernable theme and a story line—circumstances that, together, more readily imply that the reported statements represent the tested positions of the investigators. *Cf. White*, 909 F.2d at 526 ("Television touches more senses than does the print media, and the standards for finding defamation cannot be woodenly applied without taking into account the kind of medium by which the message was delivered."). And in further

contrast to *Abbas I*, "The Dark Side" does not place Sly's allegations in the context of any comparable "exchange of charge and countercharge[,]" 975 F. Supp. 2d at 19; instead, the bulk of the documentary is aimed at airing the allegations made by Sly and other purported suppliers of PEDs regarding specific athletes who allegedly use these substances.  (*See* Film Tr. at 2 (explaining that, by "[w]orking with a British athlete[,]" Al Jazeera's producers were able to "catch the chemical mastermind and hear about players he claims he's doped to fame").)

Thus, when the allegations in the complaint and the statements in the documentary itself are viewed in the light most favorable to Plaintiffs, *see Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994), a reasonable viewer could perceive "The Dark Side" *itself* to convey the message that Zimmerman and Howard used PEDs, which constitutes a defamatory statement and unquestionably places Plaintiffs in a "light that would be offensive to a reasonable person."  *Doe*, 116 A.3d at 1267.  Furthermore, the complaint unequivocally alleges that "[a]ll of these statements concerning [Plaintiffs] are categorically untrue[,]" because Plaintiffs have "never taken Delta 2, human growth hormone, or any other steroid or other performance-enhancing substance banned by the MLB."  (Compl. ¶ 47.)  Therefore, the complaint's allegations as to the message conveyed by the "The Dark Side," if in fact so understood by a jury, are sufficient to give rise to actionable defamation and false light claims.[13]

---

[13] At this stage of the litigation, the Court is called upon only to test the sufficiency of the complaint's allegations, and thus, it expresses no opinion regarding whether a jury would ultimately conclude that "The Dark Side" actually does convey the message that Zimmerman and Howard in fact used PEDs.  It suffices to say here that the documentary is at least reasonably *capable* of communicating such a message, and that this message would be defamatory.  *See Klayman v. Segal*, 783 A.2d 607, 613 (D.C. 2001) ("If it appears that the statements are at least capable of a defamatory meaning, whether they were defamatory and false are questions of fact to be resolved by the jury." (internal quotation marks and citation omitted)).  Moreover, this Court does not perceive Defendants to be making any argument that the complaint is insufficient with respect to its allegations of falsity.  *See White*, 909 F.2d at 520

2.      The Statements Contained In The News Article Cannot Reasonably Be Understood To Convey A False And Defamatory Message

Whereas the statements in the film regarding Zimmerman's and Howard's alleged use of PEDs are capable of conveying a defamatory meaning, this Court concludes that similar statements made in the context of Al Jazeera's film-related promotional news article do not carry with them the same defamatory message.  The short article, which an unidentified member of the "Al Jazeera Staff" authored, describes the overall premise of Al Jazeera's investigation—i.e., to "expose[] the crucial role of pharmacists and doctors in creating and prescribing programmes of performance-enhancing drugs"—and also recounts some of the statements that various pharmacists and doctors made to Collins in the film.  (Print Article at 3.)  According to the article, the suppliers' statements "raise[] questions about some well-known athletes in American football and baseball who the medical professionals claim to work with." (*Id.*)  Charlie Sly is described as a "pharmacist" who names certain athletes he purportedly supplied with PEDs.  (*Id.*)  But the very first mention of any athlete by name appears in a sentence that reports that athlete's *denial* of the doping allegations. (*See id.*)  Indeed, the article states both that "[t]he athletes and medical professionals who responded to requests for comment denied any wrongdoing" and also that Sly himself "has disavowed his statements" that were "caught on hidden camera" *before* the article names either of the plaintiffs.  (*Id.*)  And this sequence is significant because, as explained above, it helps to provide context for the subsequent mention of Zimmerman

―――――――――――――――

("Defamatory meaning and falsity are distinct elements of the tort of defamation and are considered separately.").  In light of this apparent concession, the Court assumes that Plaintiffs have sufficiently alleged the falsity of the accusations on the face of the complaint (*see* Compl. ¶ 47); it remains to be seen whether Plaintiffs can put forward sufficient evidence to demonstrate the falsity of the statements. *See Liberty Lobby*, 838 F.2d at 1293 ("[It is the] plaintiff's burden of proving falsity[.]").

and Howard that the complaint characterizes as a defamatory statement.

Near the end of the article, long after Sly is introduced and his recantation is noted, the article states:  "Sly also named baseball players Ryan Zimmerman, of the Washington Nationals, and Ryan Howard, of the Philadelphia Phillies, raising questions about whether they use the hormone supplement Delta 2.  Both have denied the allegations."  (*Id.*)  The article then proceeds to quote an emphatic statement of denial from Plaintiffs' counsel.  (*See id.* at 3–4 (counsel William Burke stating that "[t]he extraordinarily reckless claims made against our clients in this report are completely false and rely on a source who has already recanted his claims").)  Thus, this Court is persuaded that, when read in context, the statements in the news article regarding PED use by Zimmerman and Howard are not reasonably capable of conveying a false and defamatory message, unlike the similar statements made in the film itself.

As an initial matter, the contention that Sly "named" Plaintiffs as users of PEDs is not false; Sly unquestionably states that Zimmerman and Howard use PEDs in the videotaped conversations that he has with Collins.  (*See* Film Tr. at 27–28.)  And as was true in *Abbas I*, the article's statement about what Sly said reads as the mere reporting of an occurrence rather than the endorsement of a stated fact.  *See Abbas I*, 975 F. Supp. 2d at 19 (the contention that an accusation was made "is not an assertion of false fact, or indeed, of *any* fact" if the media is merely reporting on what was said without otherwise taking any position on those claims).

Nor can the alleged defamation claim rest on the article's contention that Sly's allegations "rais[e] questions about whether [Plaintiffs] use" PEDs.  (Print Article at 3.)  The phrase "raising questions"—as it appears in the context of the news article, *see*

*Tavoulareas III*, 817 F.2d at 779—does not naturally imply that Plaintiffs actually used PEDs, especially when the "raising questions" statement is sandwiched between Al Jazeera's acknowledgment that Sly has "disavowed" his original allegations, on the one hand, and Plaintiffs' emphatic denials, on the other. (Print Article at 3.) To be sure, the comment that an accusation "rais[es] questions" might suffice in some contexts, such as those in which it is clear from the surrounding narrative that the doubts being expressed contribute to derogatory insinuations being made about the subject. But such is not the case with respect to Al Jazeera's article, because, in stark contrast to the film, the print article does not purport to carry a message of truth or falsity regarding the information that is being conveyed, and contains no background narration, graphic images, or sounds that are capable of bolstering or otherwise endorsing Sly's claims of wrongdoing in the mind of a reasonable reader. *See White*, 909 F.2d at 526.

All things considered, then, and taking into account the entire context of the article in which the statement appears, this Court concludes that the passage at issue in Al Jazeera's written article cannot reasonably be read to imply the assertion of the false and defamatory fact of which Plaintiffs complain. *See Klayman v. Segal*, 783 A.2d 607, 614 (D.C. 2001) ("[A] statement in an article may not be isolated and then pronounced defamatory, or deemed capable of a defamatory meaning. Rather, any single statement or statements must be examined within the context of the entire article."). And for these same reasons, the facts about the article alleged in the complaint fail to demonstrate that the article places Zimmerman and Howard in a false light that would be highly offensive to a reasonable person. (*See also* Hr'g Tr. at 44:6−8 (Plaintiffs' counsel acknowledging that Plaintiffs' defamation and false light claims rise and fall

together).)  Consequently, Plaintiffs have not adequately alleged a defamation or false light claim against Al Jazeera and Davies with respect to the statements contained in the news article.

        3.        <u>Plaintiffs Have Alleged Sufficient Facts To Support An Inference That Al Jazeera And Davies Published The Defamatory Statements In "The Dark Side" With Actual Malice</u>

Because Zimmerman and Howard are public figures, their defamation and false light action can only survive Defendants' motions to dismiss if it adequately alleges facts that support an inference that Defendants published the defamatory statements in "The Dark Side" with actual malice.  (*See supra* Part II.B.)  Not surprisingly, Plaintiffs maintain that the complaint's allegations adequately address the actual malice inquiry; in this regard, Plaintiffs point to a variety of stated circumstances that were allegedly known to these Defendants and, in Plaintiffs' view, demonstrate that Defendants acted with actual malice with respect to the allegedly defamatory statements at issue.  (*See* Pls.' Opp'n at 21–27.)  Defendants strenuously respond that none of Plaintiffs' allegations permit a plausible inference that they published the defamatory statements with knowledge of falsity or with reckless disregard as to probable falsity, which is what "actual malice" means in this context.  (*See* Defs.' Mem. at 35–44.)  *See also Montgomery*, 197 F. Supp. 3d at 259.

This Court fully acknowledges that the actual malice hurdle is a high bar that public-figure plaintiffs rarely surmount in cases such as this one, as Defendants fervently maintain.  (*See, e.g.*, Hr'g Tr. at 55–57.)  However, for the reasons explained below, the Court concludes that it cannot dismiss the instant complaint on actual malice grounds, because, when considered in the aggregate, the complaint's allegations can

support a reasonable inference that Al Jazeera and Davies in fact entertained serious

doubts as to the truth of Sly's allegation.

> a.   *The Actual Malice Standard Can Be Satisfied With Proof Of*
> *Reckless Disregard For The Statement's Truth, Which Can Take*
> *The Form Of Obvious Reasons To Doubt A Source's Veracity*

A public figure plaintiff may prevail on a defamation claim only if he offers

proof that the statement was made with actual malice—that is, with "knowledge that

[the statement] was false or with reckless disregard of whether it was false or not."

*Sullivan*, 376 U.S. at 280; *see also Gertz*, 418 U.S. at 334.  A defendant acts with

reckless disregard if "the defendant in fact entertained serious doubts as to the truth of

his publication[,]" or acted "with a high degree of awareness of probable falsity."  *St.*

*Amant*, 390 U.S. at 731 (internal quotation marks omitted).

"It is well established that the 'serious doubt' standard requires a showing of

subjective doubts by the defendant." *Tavoulareas III*, 817 F.2d at 789; *see also St.*

*Amant*, 390 U.S. at 731 (explaining that "reckless conduct is not measured by whether a

reasonably prudent man would have published, or would have investigated before

publishing" the statement); *Jankovic v. Int'l Crisis Grp.* (*Jankovic II*), 822 F.3d 576,

589 (D.C. Cir. 2016) ("[I]t is not enough to show that defendant should have known

better; instead, the plaintiff must offer evidence that the defendant in fact harbored

subjective doubt.").  And it is clear beyond cavil that "[t]he plaintiff can prove the

defendant's subjective state of mind through the cumulation of circumstantial evidence,

as well as through direct evidence." *Jankovic II*, 822 F.3d at 589 (internal quotation

marks and citation omitted).

Notably, although "the 'serious doubt' inquiry enunciated by the Supreme Court

is too fact-bound to be resolved on the basis of any single factor or mechanical test[,]"

*Tavoulareas III*, 817 F.2d at 788, several principles gleaned from binding case law help to guide the analysis.  First, it is clear that the defendant's "failure to investigate will not *alone* support" the required degree of recklessness, *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989) (emphasis added), nor will "an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers[,]" *id.* at 666 (internal quotation marks and citation omitted).  Of course, these clear boundaries only illuminate the types of conduct that do *not* suffice to show recklessness; the closest the Supreme Court has gotten to defining the affirmative contours of the recklessness inquiry is the non-exhaustive list in *St. Amant* of three examples of the types of circumstantial evidence that may support an inference of subjective recklessness.  *See* 390 U.S. at 732.  Those are:  (1) evidence that indicates the defendant "fabricated" the story, or (2) evidence that suggests the allegedly defamatory statements are "so inherently improbable that only a reckless man would have put them in circulation[,]" or (3) evidence that demonstrates that "there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Id.*; *see also Tavoulareas III*, 817 F.2d at 790 ("The examples provided [in *St. Amant*] . . . constitute useful benchmarks for lower courts to employ in determining whether a record is sufficient to sustain a finding of constitutional malice.").

This all means that the reckless disregard standard for establishing actual malice can be satisfied where the defendant "in fact entertained serious doubts as to the truth of his publication[,]" and, significantly for present purposes, a plaintiff can demonstrate this by proffering evidence that indicates that the defendant had "obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant*, 390 U.S.

at 731, 732.  And, fortunately, case law from the Supreme Court and the D.C. Circuit provides further guidance—albeit in a different context—as to the types of evidence that might supply a defendant with an obvious reason to doubt his source.  *See also id.* at 730 (remarking that the "outer limits" of this inquiry "will be marked out through case-by-case adjudication," rather than "one infallible definition").[14]

For example, the D.C. Circuit has suggested that facts that cast doubt on the source's reliability may be probative of actual malice, assuming such facts are known to the defendant at the time of publication.  *Cf. Tavoulareas III*, 817 F.2d at 791 (concluding that a reporter's reliance on a particular source did *not* constitute actual malice, where the reporter knew that the source had also given the same statement to congressional investigators and had repeatedly demonstrated his "consistency as a source" (internal quotation marks and citation omitted)); *see also St. Amant*, 390 U.S. at 733 (finding that the record was insufficient to support actual malice, due in part to the plaintiff's failure to offer "evidence to demonstrate a low community assessment of [the source's] trustworthiness or unsatisfactory experience with him by [the defendant]"). In this same vein, the case law suggests that the fact that a defendant undertakes to verify all or part of a source's contentions cuts against a finding of actual malice.  *See Tavoulareas III*, 817 F.2d at 790 (finding significant that "much of [the source's] information was independently verified by other sources whose credibility even the plaintiff does not now challenge" (internal quotation marks and citation omitted)); *see also St. Amant*, 390 U.S. at 733 (reasoning that verification of part of a source's

---

[14] The following opinions regarding the sufficiency of the evidence do not arise at the motion-to-dismiss stage; however, in this Court's view, these cases provide useful guidance as to the types of evidence that can support an actual malice finding, and thus are instructive regarding the types of facts that a complaint must allege to state a defamation claim where the plaintiff must show actual malice.

information was probative of the defendant's lack of actual malice in relying on the source for other, uncorroborated information).

Most recently, the D.C. Circuit in *Jankovic v. International Crisis Group* (*Jankovic II*), 822 F.3d 576 (D.C. Cir. 2016), held that the plaintiff—a Serbian businessman—had failed to demonstrate that the defendant (a non-profit organization) acted with actual malice when it published a report that linked the plaintiff to the Slobodan Milosevic regime.  *Id.* at 582.  Although the author of the report at issue relied upon multiple sources to support the allegedly defamatory statement, *see id.* at 591–92, the plaintiff proffered evidence at summary judgment to suggest that only *some* of those sources were unreliable, and "nowhere suggest[ed] there was any reason for [the author] to doubt [the other sources], each of which support[ed] the defamatory statement[,]" *id.* at 593.  The panel thus rejected the plaintiff's argument that the author had an obvious reason to doubt his sources.  *Id.* at 597; *see also id.* ("[D]espite weaknesses in some sources on which [the defendant] relied . . . , [the plaintiff] has failed to establish that the defendant actually possessed subjective doubt about the statement published[.]" (internal quotation marks and citation omitted)).  The *Jankovic II* court also suggested that "evidence showing that [the defendant's] report underwent multiple internal reviews by knowledgeable staff" undermined any conclusion that the defendant actually harbored subjective doubts about the report's sources.  *Id.* at 597.

Finally, it appears from this Court's review of the case law that, while evidence establishing obvious reasons to doubt the veracity of a defendant's source can support a finding of reckless disregard on its own, *see St. Amant*, 390 U.S. at 732, such evidence also gives rise to an additional inquiry that may be quite significant with respect to the

overall actual malice inquiry.  As it turns out, if there is evidence that a defendant had an obvious reason to doubt the veracity of a source, then the defendant's failure to investigate the source's allegation prior to publication can be probative of actual malice.  *See, e.g.*, *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1507 (D.C. Cir. 1996) (holding that "a publisher has no duty to investigate *unless* he has 'obvious reasons' to doubt the veracity of his source" (emphasis added)).  In other words, notwithstanding the general rule that a defendant "has no duty to corroborate [or investigate] the defamatory allegation[,]" once "a plaintiff offers evidence that a defendant has reason to doubt the veracity of its source[,]" then the defendant's "utter failure to examine evidence within easy reach or to make obvious contacts in an effort to confirm a story demonstrate[s] reckless disregard." *Jankovic II*, 822 F.3d at 590 (internal quotation marks and citations omitted); *see also id.* at 594–95 ("[The author] had not discovered anything that caused him to doubt his conclusion about [the plaintiff], and therefore was under no obligation to investigate further.").

> b.    *The Instant Complaint Alleges Facts Known To Al Jazeera And Davies That, In The Aggregate, Are Sufficient To Support A Finding That Al Jazeera And Davies Entertained Serious Doubts As To Sly's Claims*

Although actual malice is, admittedly, a close question on the facts presented in this case, this Court concludes that Plaintiffs' complaint contains sufficient facts to support an inference that Al Jazeera and Davies had obvious reasons to doubt Sly's claims, and that they proceeded to publish "The Dark Side" with reckless disregard as to the truth of those claims.

There are a number of alleged facts that point in this direction.  The complaint says, for example, that Al Jazeera and Davies knew that Sly had "questionable"

motivations, since he made his allegations "in the context of his sales pitch attempting to sell his services, his drugs, and his business to Collins." (Compl. ¶ 56.)  In addition, Plaintiffs allege that Al Jazeera and Davies knew Sly's allegations lacked any specificity, because Sly did "not identify when [Plaintiffs are] alleged to have started taking [PEDs] or for how long, or how [they] received and paid for the drugs." (*Id.* ¶ 57.)  These allegations regarding Sly's reliability are particularly striking given the fact that Al Jazeera and Davies neither relied upon on multiple sources to support the statements at issue, *see Jankovic II*, 822 F.3d at 591–92, nor "independently verified" Sly's allegations regarding Howard and Zimmerman with "other sources whose credibility" is not in question, *Tavoulareas III*, 817 F.2d at 790; instead, Sly was the "*sole* source of the allegations[.]" (Compl. ¶ 52 (emphasis added).)[15]

But the primary support for Plaintiffs' assertion that Al Jazeera and Davies subjectively doubted Sly's trustworthiness was the fact that they were indisputably aware of Sly's pre-publication recantation. (*See id.* ¶ 1.)  Plaintiffs allege that, prior to publication, Sly "unequivocally advised Davies and Al Jazeera's counsel, in writing, that the purported statements were false." (*Id.* ¶ 52.)  In addition, Davies herself confirmed during a subsequent interview that Al Jazeera had "heard from Sly" regarding his recantation 48 hours before publication (*see id.* ¶ 60), and during that same interview, Davies "admit[ted] that Sly is untrustworthy," stating "[y]ou have to say, well, is he lying now, [or] was he lying during day upon day upon day of

---

[15] Nothing in the complaint or the film (which is incorporated into the complaint by reference) indicates that Al Jazeera or Davies undertook an independent investigation to verify Sly's allegations about Zimmerman and Howard, despite Davies's expressions of intent regarding a broader effort to "test" Sly's credibility. (*See* Film Tr. at 23 ("We wanted to test his doping expertise and his level of connections." (statement of Davies)).)

undercover filming, because obviously the two don't square" (*id.* ¶ 60 (second alteration in original) (internal quotation marks and citation omitted)).

The substance of Sly's unequivocal recantation further supports an inference that Al Jazeera and Davies had reason to doubt their sole source.  (*See id.* ¶ 54 (Sly states: "[t]o be clear, I am recanting any such statements and there is no truth to any statement of mine that Al Jazeera plans to air.").)  Construing these facts in the light most favorable to Plaintiffs, *see Kowal*, 16 F.3d at 1276, this Court can hardly conceive of a more "obvious reason[] to doubt the veracity of the informant or the accuracy of his reports[,]" *St. Amant*, 390 U.S. at 732, than a taped statement by the sole source of the statements in question unequivocally recanting those statements prior to the defendant's publication of them.  And when Plaintiffs are also afforded "the benefit of the aggregate of the evidence[,]" this Court finds that Sly's unequivocal recantation—taken together with other facts known to Al Jazeera and Davies—gives rise to at least a plausible inference that Al Jazeera and Davies in fact entertained serious doubts as to Sly's credibility.  *Jankovic II*, 822 F.3d at 589.

Notably, Plaintiffs' complaint also contains allegations regarding Al Jazeera's and Davies's failure to investigate or corroborate Sly's story, and as explained above, given the alleged facts that support the inference that Al Jazeera and Davies had reasons to doubt Sly's veracity, their alleged failure to investigate may be further proof of reckless disregard.  *See Jankovic II*, 822 F.3d at 590.  In this regard, Plaintiffs allege that Al Jazeera and Davies "failed to uncover a single reported piece of evidence corroborating Sly's outlandish claims[,]" notwithstanding their "six months of undercover work[.]"  (Compl. ¶ 57.)  Additional investigative failures purportedly

include "contradictions as to even easily verifiable facts[,]" such as Sly's employment

status.  (*Id.* ¶ 58; *see also id.* ("While Davies refers to him as a 'doctor of pharmacy'

and 'pharmacist,' and 'The Dark Side' credits him with working at the Guyer Institute

in Indiana in 2011, public records reveal that in 2011 Sly was not licensed in Indiana as

either a doctor of pharmacy or a pharmacist, but rather as a pharmacy intern[.]").)  And

Plaintiffs also contend that Al Jazeera and Davies purportedly "refused to further

investigate the sole source of these allegations[,]" notwithstanding Plaintiffs' repeated

insistence (through counsel and prior to publication) that Sly's allegations were false.

(*Id.* ¶ 73d; *see also id.* ¶¶ 50–52.)

To be sure, the "standard of actual malice is a daunting one," *Jankovic II*, 822

F.3d at 590 (internal quotation marks and citation omitted), as it should be, because

defamation claims necessarily implicate a defendant's First Amendment rights.  *See*

*Sullivan*, 376 U.S. at 279–80.  But when this Court grants these Plaintiffs "the benefit

of all inferences that can be derived from the facts alleged," *Sparrow*, 216 F.3d at 1113

(internal quotation marks and citation omitted), as it must at this stage of the litigation,

it concludes that their complaint survives the preliminary obstacle that a motion to

dismiss constructs, because the complaint's allegations of fact support the inference

that Al Jazeera and Davies entertained serious doubts as to Sly's claims and failed to

investigate these claims adequately, which, together, suffice to support a plausible

finding of actual malice.

      c.      *Neither Defendants' Questions About Sly's Recantation, Nor*
               *Their Disclosure Of It In The Film, Eviscerates The Inference*
               *Of Actual Malice That A Jury Might Otherwise Draw*

Undaunted, Al Jazeera and Davies argue that no actual malice conclusion could

be reasonably reached based on the facts as alleged in Plaintiffs' complaint, because, in fact, there was no obvious reason to doubt Sly's veracity.  To underscore this point, Al Jazeera and Davies emphasize that Sly's recantation was not credible, and that various scenes from the documentary actually buttressed Sly's contention that he supplied PEDs to professional athletes.  (*See* Defs.' Mem. at 38 (emphasizing that Sly spoke knowledgeably and accurately about drugs, and that Sly's colleagues referred to Sly as someone who takes care of "a few other big, like really big athletes" (internal quotation marks and citation omitted)); *see also id.* at 39 (emphasizing that Sly appeared nervous in his recantation video, which was created only *after* Sly learned that his conversations had been recorded and would be aired, thus potentially exposing him to civil and criminal liability).)

Boiled to bare essence, this line of argument is really nothing more than a rebuttal to the complaint's allegations of fact, which cannot carry the day at the motion-to-dismiss stage because this Court must accept the complaint's allegations as *true*.  Put another way, even if one could interpret the various Sly-related scenes in "The Dark Side" and Sly's recantation video as evidence that Al Jazeera and Davies had reason to trust Sly's contentions, as these defendants insist, "[a]t this stage of the litigation, [the court] must accept as true all material allegations of the complaint, drawing all reasonable inferences from those allegations in *plaintiffs'* favor[.]"  *LaRoque v. Holder*, 650 F.3d 777, 785 (D.C. Cir. 2011) (emphasis added) (internal quotation marks and citations omitted).  This standard means that, when faced with two, equally plausible interpretations of the record facts—that Sly's credibility was doubtful given his unequivocal recantation, on the one hand, and that there was no reason to doubt Sly's

veracity because his assertions were generally corroborated, on the other—"[t]he court must view the complaint in a light most favorable to the plaintiff." *Mizell v. SunTrust Bank*, 26 F. Supp. 3d 80, 85 (D.D.C. 2014) (first alteration in original) (internal quotation marks omitted).

Al Jazeera's and Davies's stronger argument is that their inclusion of Zimmerman's and Howard's denials, along with Sly's denial, in "The Dark Side" actually *negates* any finding of actual malice. (*See* Defs.' Mem. at 44–45.)  It is generally true that "reporting perspectives at odds with the publisher's own, 'tend[s] to rebut a claim of malice, not to establish one[,]'" *Lohrenz v. Donnelly*, 350 F.3d 1272, 1286 (D.C. Cir. 2003) (quoting *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1304 (D.C. Cir. 1966)), but Al Jazeera's and Davies's argument overlooks two pertinent facts.  First, it is not clear to this Court that "The Dark Side" clearly communicates Sly's repudiation of the accusations that he makes throughout the film, because the documentary references Sly's denial immediately following a reference to another alleged male supplier, Dr. Guyer, and this hybrid assertion takes the form of the following cryptic statement by Davies:  "Dr. Guyer didn't respond to our request for a comment.  Charlie Sly said his statements about athletes were false and incorrect." (Film Tr. at 36.)  In this Court's view, it is not immediately apparent from this hodgepodge of contentions whether Sly's reported assertion—that "his statements about athletes were false and incorrect"—refers to the falsity of the statements made *by Dr. Guyer* (who Davies says did not comment) or the statements previously made by Sly himself.

Second, even if the documentary clearly communicates Sly's subsequent

recantation, the inclusion of references to the statements of denial by Zimmerman, Howard, and Sly does not unequivocally absolve Al Jazeera and Davies of liability for defamation; rather, it simply "tend[s] to rebut a claim of malice[.]" *Lohrenz*, 350 F.3d at 1286.  Again, the sole question at this point is whether the facts alleged, when construed in the light most favorable to Plaintiffs, adequately state a claim for defamation, and if the evidence the parties amass on either side of this issue is legally sufficient, it is a question that a jury will ultimately have to decide.

Consequently, this Court concludes that Plaintiffs' complaint adequately pleads actual malice, and thus, their complaint contains allegations of fact that are sufficient to state a claim for defamation against Al Jazeera and Davies for the statements regarding Plaintiffs that are contained in "The Dark Side."

**B.    The Complaint Fails To State A Defamation Or A False Light Claim Against Collins Because It Does Not Allege Facts That Suggest Collins Published The Defamatory Statements In "The Dark Side"**

For all its talk about what Defendants did and what was known to them, Plaintiffs' complaint makes clear that Collins is situated quite differently than Al Jazeera and Davies vis-à-vis the defamatory statements that "The Dark Side" contains. Unlike Al Jazeera—the news network responsible for producing the film (*see* Compl. ¶¶ 37, 38)—and Davies—the lead reporter on the production team and the narrator (*see id.* ¶ 33)—Collins is described as a former athlete with no known news reporting experience, who was tapped to aid the investigation precisely because he was an outsider to the investigative journalism world (*see id.* ¶ 40).  In light of Collins's unique role in the overall production of the film, there have to be sufficient facts in the complaint to support an inference that Collins actually "published or knowingly participated in publishing" the defamatory statements in the documentary. *Tavoulareas*

*I*, 759 F.2d at 136 (emphasis omitted).  This Court concludes that Plaintiffs' complaint

falls short in this regard, because there are no factual allegations in the complaint that,

if true, come anywhere close to establishing that Collins had the level of responsibility

for the film's production that would be necessary to demonstrate that he "published or

knowingly participated in publishing the defamation" at issue.  *Tavoulareas I*, 759 F.2d

at 136 (emphasis omitted).[16]

        Publication "is an infrequent issue in defamation cases, because normally it is

fairly clear who wrote, edited, or published the statement in question." *Id.*  But when

analyzing publication-related facts in a case that is similar to this one, the D.C. Circuit

concluded that a special correspondent for *The Washington Post* (Golden) was *not*

sufficiently responsible for the publication of an allegedly defamatory article in that

newspaper, where he was not involved in the *writing* of the article or the final editorial

processes, even though he had initially approached the newspaper with the idea for the

story, had conferred with the paper during the course of its investigation, and was

ultimately designated a "Special Correspondent[.]" *Id.* at 101; *see also id.* at 136 ("The

plaintiffs do not seriously argue that Golden himself took any part in the *actual* writing

or editing of the . . . article, or that he exercised any influence or control over the *Post*

defendants' handling of the material." (emphasis in original)).  The D.C. Circuit

affirmed the district court's judgment notwithstanding the verdict in Golden's favor,

after distinguishing between participation in the *investigation* and participation in the

---

[16] Because this Court has already determined that the only actionable defamatory statements at issue in this case are the statements about Zimmerman and Howard that appear in the film, as opposed to the news article, *see supra* Part III.A.2, it only assesses here whether the complaint's contentions regarding Collins's role in the publication of the film are sufficient to sustain the claims that Plaintiffs have brought against him.

actual *preparation* of the story.  *See id.* at 136 ("While [Golden] participated in the investigation" he "played no role in the actual preparation of the story.").  And at the end of the day, after twice rehearing the case, *see Tavoulareas II*, 763 F.2d 1472; *Tavoulareas III*, 817 F.2d 762, the Circuit eventually affirmed the initial panel's conclusion that liability for defamation was not appropriate with respect to Golden due to his "limited involvement in the ultimate publication" of the defamatory statements. *Tavoulareas III*, 817 F.2d at 770 n.7.

So it is here.  Despite the complaint's allegations that Collins, like Golden, was involved in the initial *investigation* that was featured in the film, the complaint that Zimmerman and Howard have filed fails to allege any facts that, if true, support an inference that Collins took any steps to publish "The Dark Side."  Nothing in the complaint suggests, for example, that Collins was involved in the production (i.e., editing) of the footage that he filmed with the hidden camera that Al Jazeera provided, nor does the complaint speak to his role in the distribution of the allegedly defamatory documentary.  To the contrary, the factual allegations in Plaintiffs' complaint actually tend to suggest that *Davies*, as opposed to Collins, coordinated the production of the film (*see, e.g.,* Compl. ¶ 33 (alleging that Davies worked in Al Jazeera's Investigative Unit and "was the lead reporter involved in ['The Dark Side']")), and the complaint also strongly implies that Al Jazeera and Davies, rather than Collins, were responsible for the public dissemination of the defamatory statements at issue (*see, e.g.*, *id.* ¶ 38 ("[I]n advance of its televised airing of 'The Dark Side,' *Al Jazeera* posted a video of the full program on YouTube, and provided the full program to The Huffington Post[.]" (emphasis added)); *id.* ¶ 53 ("*Al Jazeera* posted the full program on YouTube and

provided The Huffington Post with an advance copy[.]" (emphasis added)); *id.* ¶ 57 ("*Al Jazeera* published its report despite its inability to gather any corroborating evidence[.]" (emphasis added)); *id.* ¶ 62 ("*Davies* appeared on NBC's *The Today Show* for an interview about 'The Dark Side.'").)  Furthermore, Plaintiffs point to no objective facts—such as a producer credit at the end of the documentary—that would give rise to a reasonable inference that Collins was involved in the editorial preparation of "The Dark Side," and this Court is aware of none.

In an attempt to salvage their claims against Collins, Plaintiffs argue that Collins's active collaboration with Al Jazeera and Davies throughout their eight-month investigation renders it "at least plausible that he was participating in the publication[.]"  (Hr'g Tr. at 92:7–10; *see also* Pls.' Opp'n at 27–29.)  But in this Court's view, it is not plausible that an individual with no news reporting training or experience would be participating in the editorial processes of a major media company, even if that individual was recruited to participate in the investigatory phase of the production in an undercover capacity.  Thus, although Plaintiffs' complaint alleges that Collins worked with Al Jazeera producers to "catch" PED suppliers on video (*see* Film Tr. at 2), this fact alone is not enough to support any inference that Collins subsequently served as an editor or a producer of the film, and in the absence of any such facts, Plaintiffs' defamation and false light claims against Collins cannot proceed.  *See Farah*, 736 F.3d at 533 ("To meet the requirements for defamation under District of Columbia law, a plaintiff must prove . . . that the statement was published to a third party[.]"); *see also Doe*, 116 A.3d at 1267.

## IV.    CONCLUSION

This Court has carefully reviewed the complaint and the exhibits that have been submitted in this case, including the documentary that Plaintiffs say has defamed them and has cast them in a false light.  While it is far from clear that Plaintiffs will ultimately be able to prove the defamation and false light claims they seek to advance in this action, the Court finds that their complaint alleges facts that would permit a reasonable jury to find that Al Jazeera and Davies published false and defamatory statements about Plaintiffs in "The Dark Side," but not in the news article, and that these two defendants published such statements with actual malice.  With respect to Collins, the Court concludes that nothing in the complaint suggests that he was involved in the publication of the film's allegedly false and defamatory statements, and therefore, Plaintiffs cannot maintain their claims against him. Accordingly, as set forth in the Order accompanying this Memorandum Opinion, Davies's and Al Jazeera's Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART**, and Collins's Motion to Dismiss is **GRANTED** in full.

DATE:  March 31, 2017                         *Ketanji Brown Jackson*
                                                    KETANJI BROWN JACKSON
                                                    United States District Judge