**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| RYAN W. ZIMMERMAN, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>AL JAZEERA AMERICA, LLC, *et al.*,<br><br>Defendants. | Case Nos. 1:16-cv-13-KBJ<br>1:16-cv-14-KBJ<br>Redactions Made by Plaintiffs and Non-Parties |

**DEFENDANTS AL JAZEERA AMERICA, LLC, AL JAZEERA MEDIA NETWORK,
AL JAZEERA INTERNATIONAL (USA) INC., AND DEBORAH DAVIES'
MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' MOTION TO COMPEL**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF RELEVANT BACKGROUND FACTS ........................................4

   A. The Investigation ...............................................................................................4

   B. Defendants' Due Diligence...............................................................................6

   C. ███████████████████████████████████.................................9

   D. The Current Dispute........................................................................................10

ARGUMENT ...............................................................................................................12

   I. PLAINTIFFS ARE NOT ENTITLED TO DISCOVERY PRE-DATING THE INCEPTION, OR SUBSTANTIALLY POST-DATING THE BROADCAST, OF THE DOCUMENTARY ............................................................................14

   II. PLAINTIFFS ARE NOT ENTITLED TO ADDITIONAL DOCUMENTS FROM AL JAZEERA AMERICA................................................................17

   III. PLAINTIFFS ARE NOT ENTITLED TO "DISCOVERY RELATED TO MOTIVE"...18

   IV. PLAINTIFFS ARE NOT ENTITLED TO DISCOVERY RELATED TO PUNITIVE DAMAGES...........................................................................................21

   V. OTHER SPECIFIC DOCUMENT REQUESTS ...............................................23

      A. PLAINTIFFS HAVE SHOWN NO NEED FOR ORGANIZATIONAL CHARTS, GIVEN THE DISCOVERY ALREADY PRODUCED.............................................23

      B. THE COURT SHOULD DENY PLAINTIFFS' REQUEST FOR DISCOVERY INTO AL JAZEERA'S PREPARATION FOR LITIGATION..................................25

      C. THE COURT SHOULD DENY DISCOVERY INTO DEBORAH DAVIES' PERSONNEL FILE ......................................................................................27

      D. DEFENDANTS HAVE PRODUCED ALL RESPONSIVE TEXT MESSAGES......28

   VI. REQUESTS FOR ADMISSION ......................................................................29

CONCLUSION............................................................................................................34

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. F.B.I.*,
   192 F.R.D. 12 (D.D.C. 2000)................................................................................26

*AmeriPride Servs., Inc. v. Valley Indus. Servs., Inc.*,
   No. CIV 2:00-CV-0113-LKK-JFM, 2011 WL 1321873 (E.D. Cal. Apr. 1,
   2011) ................................................................................................................32, 33

*Bose Corp. v. Consumers Union of United States, Inc.*,
   466 U.S. 485, 104 S. Ct. 1949 (1984).................................................................25

*Cohen-Esrey Real Estate Servs., Inc. v. Twin City Fire Ins. Co.*,
   Civil Action No. 08-2527-KHV-DJW, 2009 WL 10675923 (D. Kan. Nov. 6,
   2009) ....................................................................................................................24

*Crocs, Inc. v. Effervescent, Inc.*,
   Civil Action No. 06-CV-00605-PAB-KMT, 2017 WL 1325171 (D. Colo. Feb.
   24, 2017) ..............................................................................................................24

*English v. Washington Metro. Area Transit Auth.*,
   323 F.R.D. 1 (D.D.C. 2017)................................................................................13

*F.T.C. v. Boehringer Ingelheim Pharm., Inc.*,
   778 F.3d 142 (D.C. Cir. 2015) ...........................................................................27

*Foretich v. American Broad. Cos.*,
   Nos. Civ. A. 93-2620, Civ. A. 94-0037(HHG), 1997 WL 669644 (D.D.C. Oct.
   17, 1997) ..............................................................................................................19

*In re Greenwood Air Crash*,
   161 F.R.D. 387 (S.D. Ind. 1995).........................................................................31

*Harris v. Koenig*,
   271 F.R.D 356 (D.D.C. 2010)........................................................................29, 30

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
   491 U.S. 657, 109 S. Ct. 2678(1989) .............................................................18, 20

*Henderson v. Turner*,
   Civil Action No. 11-0039, 2012 WL 12930838 (M.D. La. June 12, 2012)............28

*Henderson v. Turner*,
   Civil Action No. 11-0039, 2012 WL 5354616 (M.D. La. Oct. 29, 2012) ..............28

*Herbert v. Lando,
  441 U.S. 153, 99 S. Ct. 1635(1979) ........................................................12, 13, 23

Hertzberg v. Veneman,
  273 F. Supp. 2d 67 (D.D.C. 2003) ...................................................................26

Jankovic v. Int'l Crisis Grp.,
  822 F.3d 576 (D.C. Cir. 2016), cert. denied, 137 S. Ct. 1434 (2017) .............19, 21

John Does I-VI v. Yogi,
  110 F.R.D. 629 (D.D.C. 1986)...........................................................................21

In re Kemper Ins. Cos.,
  Civil Action No. 1:02-cv-1198-GET, 2003 WL 25672797 (N.D. Ga. June 17,
  2003) ..................................................................................................................24

Kendrick v. Sullivan,
  CIV. A. No. 83-3175(CRR), 1992 WL 119125 (D.D.C. May 15, 1992) ...............33

King v. E.F. Hutton & Co., Inc.,
  117 F.R.D. 2 (D.D.C. 1987)...............................................................................22

Lohrentz v. Donnelly,
  350 F.3d 1272 (D.C. Cir. 2003) ........................................................................22

*McBride v. Merrell Dow and Pharm. Inc.,
  717 F.2d 1460 (D.C. Cir. 1983) ...................................................................13, 21

Meijer, Inc. v. Warner Chilcott Holdings Co., III, Ltd.,
  245 F.R.D. 26 (D.D.C. 2007)............................................................................15

Nat'l Life Ins. Co. v. Phillips Publ'g Co.,
  793 F. Supp. 627 (D. Md. 1992)..................................................................19, 20

*New York Times Co. v. Sullivan,
  376 U.S. 254, 84 S. Ct. 710 (1964)...................................................................25

Niagara Mohawk Power Corp. v. Stone & Webster Engineering Corp.,
  125 F.R.D. 578 (N.D.N.Y.1989) .......................................................................26

ODS Techs., L.P. v. Magna Entm't Corp.,
  No. CV 07-3265-DDP(RCx), 2008 WL 11343031 (C.D. Cal. July 31, 2008)......31

Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co.,
  No. 11-CV-1049 (PLF/GMH), —— F.R.D. ——, ——, 2017 WL
  4011136(D.D.C. Sept. 11, 2017) ......................................................................13

*Parsi v. Daioleslam*,
  890 F. Supp. 2d 77 (D.D.C. 2012) ...................................................................19, 20

*Patmont Motor Werks, Inc. v. CSK Auto Inc.*,
  No. 3:04-CV-0473-BES (VPC), 2006 WL 2591042 (D. Nev. Sept. 8, 2006)........................32

*Peskoff v. Faber*,
  230 F.R.D. 25 (D.D.C. 2005).................................................................................21

*Phillips v. Hanover Insurance Company*,
  No. CIV-14-871-R, 2015 WL 1781873 (W.D. Okla. Apr. 20, 2015)....................................22

*Prasad v. George Washington Univ.*,
  Civil Action No. 1:15-CV-01779, 2018 WL 1210860 (D.D.C. Mar. 8, 2018) .....................15

*Rauh v. Coyne*,
  744 F. Supp. 1181 (D.D.C. 1990) ..........................................................................26

*Reuber v. Food Chemical News, Inc.*,
  925 F.2d 703, 715-16 (4th Cir. 1991) (en banc) ......................................................19

*Secord v. Cockburn*,
  747 F. Supp. 779 (D.D.C. 1990) ......................................................................16, 25

*St. Amant v. Thompson*,
  390 U.S. 727, 88 S. Ct. 1323 (1968)......................................................................22

*Tavoulareas v. Piro*,
  817 F.2d 762 (D.C. Cir. 1987)........................................................................20, 27

*Tequila Centinela, S.A. de C.V. v. Bacardi & Co. Ltd.*,
  242 F.R.D. 1 (D.D.C. 2007).................................................................................33

*Urena v. Earthgrains Distrib., LLC*,
  No. SA CV 16-00634-CJC, 2016 WL 9223804 (C.D. Cal. Dec. 14, 2016) ...........................25

*United States ex rel. Shamesh v. CA, Inc.*,
  314 F.R.D. 1 (D.D.C. 2016)..................................................................................15

*Wadelton v. Dep't of State*,
  208 F. Supp. 3d 20 (D.D.C. 2016) .....................................................................14, 17

*Waters v. United States Capitol Police Bd.*,
  216 F.R.D. 153 (D.D.C. 2003)..........................................................................14, 17

*Westhemeco Ltd. v. New Hampshire Ins. Co.*,
  82 F.R.D. 702 (S.D.N.Y.1979) ..............................................................................26

**Other Authorities**

Fed. R. Civ. P. 36 .................................................................................................................31

Robert D. Sack, SACK ON DEFAMATION: LIBEL, SLANDER AND RELATED
    PROBLEMS, § 10:3.5 (5th ed. 2018) ....................................................................................23

*Rule 26 ................................................................................................................... *passim*

Rule 26(b) ..........................................................................................................................13

Rule 26(b)(1) ..................................................................................................................13, 14

Rule 26(c) ...........................................................................................................................13

Defendants Al Jazeera Media Network ("AJMN"), Al Jazeera International (USA), Inc. ("AJI"), Al Jazeera, LLC ("AJAM") (collectively, "Al Jazeera"), and Deborah Davies ("Davies") (collectively, "Defendants") respectfully submit this memorandum in opposition to the Motion to Compel filed by Plaintiffs Ryan W. Zimmerman and Ryan J. Howard (collectively, "Plaintiffs") (Dkt. No. 98).

## PRELIMINARY STATEMENT

This litigation involves a well-documented news investigation by Al Jazeera's Investigative Unit, carried out over the course of almost a year, that brought to light important new facts about a serious public issue:  how professional athletes obtain performance-enhancing drugs and substances ("PES") notwithstanding state and federal criminal and regulatory sanctions, as well as worldwide prohibitions on PES use by sports organizations, including Major League Baseball ("MLB").  The investigation formed the basis of a documentary, *The Dark Side: Secrets of the Sports Dopers* (the "Documentary"), which was broadcast on AJAM and made available on Al Jazeera's website on December 27, 2015.

The truth, which was shown in the Documentary and continues to be bolstered by discovery in this case, is that athletes obtain PES through underground networks of dealers who often pose as "performance consultants" or "therapists."  Using undercover journalistic techniques, including use of an athlete/reporter whose cover story was that he was looking to improve his performance, Al Jazeera's Investigative Unit was able to obtain information from numerous sources.  These sources explained how professional athletes obtain PES, cover their tracks by destroying evidence, use PES in a manner that evades the testing programs administered by sports leagues, and feign ailments as a way to explain PES use if questioned.

1

One of these sources, Charlie Sly, was a key member of such a doping network.  Over the course of twenty-seven hours of recorded conversations with the undercover reporter, Sly showed a deep knowledge of PES, explained his work in supplying PES to athletes, and provided details about some of the professional athletes he supplied.  On camera, he confirmed his possession of PES, and even provided PES to a then-active MLB player (Taylor Teagarden), who was later suspended by MLB based on evidence derived from the Documentary.  Plaintiffs were among many professional athletes Sly identified as having used PES; only these two, however, have brought claims based on the Documentary.

Plaintiffs contend that the Documentary should not have been broadcast because they have never used PES of any kind, and because, after learning his PES peddling was about to be aired, Sly created a short, homemade video in which he recanted every word he had ever said to Al Jazeera's undercover reporter.  Sly's recantation rang hollow.  As explained in Defendants' Motion to Compel against Gibson Dunn & Crutcher LLP, Sly's last-minute denials followed a visit to his family's home by investigators hired by lawyers for National Football League ("NFL") player Peyton Manning, another professional athlete identified in the Documentary, which prompted Sly's sister to call 911.[1]  *See* Dkt. No. 84, at 4.  On the video, Sly appeared to be reading a statement that was prepared for him while sweating profusely, and his statements about Liam Collins' character were clearly based on information that had been supplied to Sly.[2]  On top of that, the Mannings (through counsel) had already corroborated Sly's most explosive

---

[1] *See* Will Hobson, Justin Wm. Meyer, *Inside Peyton Manning's secret investigation into Al Jazeera documentary*, Washington Post, Feb. 4, 2016, *available at* https://www.washingtonpost.com/sports/inside-peyton-mannings-secret-investigation-into-al-jazeera-documentary/2016/02/04/d0da2f04-cb05-11e5-a7b2-5a2f824b02c9_story.html?utm_term=.4ba14ba20cd3.

[2] Sly's statement is available at https://www.youtube.com/watch?v=sf2-8V0K3oM.

claims, making his denials all the less believable.  Further, Defendants' discovery efforts have

███████████████████████████████████████████████████████████████ and apparent

spoliation of evidence.[3]  *See* Dkt. No. 84, at 4–5, 7.  Moreover, just since Plaintiffs' Motion was

filed, Taylor Teagarden was deposed and ███████████████████████████████████

████████████████████████████████████████████  In such

circumstances, it is no wonder that Defendants refused to take Sly's recantation at face value.

Plaintiffs nonetheless seek to punish Al Jazeera for having, in the best tradition of the First

Amendment, exposed important truths about wealthy and powerful people seeking to place

themselves above the law.  Indeed, Plaintiffs' motion to compel is part of an oft-used strategy by

the powerful to bully a free press.

As part of its strategy, Plaintiffs attempt to mislead the Court by claiming that it is the

Defendants—not the Plaintiffs—that are resisting discovery.  Not so.  The truth is that

Defendants have produced all non-privileged and relevant documents, including 12,329

documents spanning 47,230 pages, and two hard drives containing all 9.05 terabytes of the video

footage recorded in the course of the investigation.  Defendants have also responded to forty

interrogatories and forty requests for admission.  Unsatisfied with this extensive discovery,

Plaintiffs nonetheless demand material that is completely irrelevant to a public figure libel suit

like this one, including:  information created before any work on the Documentary began and

---

[3] *See* HOWARD-0004783 at 810 (Ex. 1) ███████████████████████████████

██████████████████████████████████████████████████ HOWARD-0004158

(Ex. 2) ███████████████████████████████████████████████████████████

████████████ ZIMMERMAN-0005857 (Ex. 3) █████████████████████████

ZIMMERMAN-0005866 (Ex. 4) (Dec. 9, 2011 Email from Zimmerman to Sly); HOWARD-

0005136 at 142-143 (Ex. 5) ██████████████████████████████████████

██████████████████████████████████

well after it was broadcast; Defendants' financial books and records; and human resource files. For the reasons expressed below, the Court should deny the motion in its entirety.

## STATEMENT OF RELEVANT BACKGROUND FACTS

The documents already produced to Plaintiffs show that the Documentary was the result of a long and careful factual investigation, that Al Jazeera obtained credible evidence from Sly through hidden camera recordings, that it was able to confirm important aspects of Sly's recorded statements (including through his on-camera distribution of PES), and that at the time the Documentary was broadcast, Al Jazeera not only believed Sly's statements about the Plaintiffs to be true, but had no obvious reason to believe that he was lying about them.

### A. The Investigation

The idea for the investigation came almost a year before the Documentary was broadcast. In December 2014, members of the Al Jazeera Investigative Unit noted that "[e]ight Jamaican athletes failed dope tests last year—including two world champion athletes. The entire program is clearly tainted." They therefore proposed investigating doping by world-class athletes.[4] Importantly, there was *no* targeting of Plaintiffs, or even Major League Baseball, when the project was launched.

Recognizing the issue as one of international import, the Investigative Unit began reaching out to potential sources in January 2015.[5] By February, they had started conducting interviews and conversations with experts in the field of sports doping, including investigators as well as former athletes who had been exposed as using PES.[6] Given the illegality of sports

---

[4] AJ-HZ_0045431 (Ex. 6).

[5] *See e.g.*, AJ-HZ_0008127 (Ex. 7); AJ-HZ_0018063 (Ex. 8).

[6] *See* Defendants' Supp. Response to Plaintiffs' Interrogatory No. 31 (Ex. 9).

doping, the Investigative Unit realized that PES dealers would not voluntarily speak to the press. In April 2015, they contacted former UK track star Liam Collins to discuss the possibility of his working as an undercover reporter.[7]  Collins agreed and was engaged in May 2015.[8]

Al Jazeera equipped Collins with hidden cameras and recording devices.[9]  Collins subsequently recorded meetings with individuals suspected of dealing PES to athletes in France, the Bahamas, Canada, and the United States.[10]  In Vancouver, Canada, Collins met a pharmacist, Chad Robertson, and his partners, naturopath Brandon Spletzer and chiropractor Gerry Ramogida (who worked with the NFL's Seattle Seahawks).  They told Collins about Charlie Sly, a business partner of theirs who was a "genius" at evading PES testing programs, had "taken smart drugs to a whole new level," "takes care of Mike [Tyson] and a few other . . . big athletes," and who had "still to this day built the best NFL athlete who ever existed athletically" (referencing Sly's longtime friend and NFL tight end, Dustin Keller).[11]

As he achieved access to a growing web of dealers and professional athletes, Collins made arrangements to meet with Sly.  Over seven days in October and November 2015, Collins recorded over twenty-seven hours of video footage and/or audio of his conversations with Sly in Sly's Austin, Texas home and car, and other locations.  During these conversations, Sly explained his vast experience with PES and how professional athletes used them.  Sly also invited Collins to his apartment to meet then-active MLB player Taylor Teagarden.[12]  As shown

---

[7] *See* AJ-HZ_0011552 (Ex. 10).

[8] *See* AJ-HZ_0001198 (Ex. 11).

[9] *See*, *e.g.*, Defendants' Response to Plaintiffs' Interrogatory No. 9 (Ex. 12).

[10] *See* Supplemental Response to Interrogatory No. 31 (Ex. 9).

[11] Documentary transcript, Dkt. No. 26-4, at 13-14.

[12] Documentary transcript, Dkt. No. 26-4, at 22-23.

in the Documentary, Teagarden confirmed that Sly had provided him with PES, including a banned steroid called Delta-2.[13] Teagarden was subsequently suspended by MLB for 80 games for PES use as a result of video evidence furnished by Al Jazeera to MLB in cooperation with MLB's investigation.[14] Sly further explained to Collins that he had also provided PES to a number of other professional athletes, including Plaintiffs.

### B. Defendants' Due Diligence

Even though the Investigative Unit had recorded evidence of Sly's experience with PES, his access to professional athletes, and his provision of PES to a professional athlete, the Investigative Unit took additional steps to confirm Sly's credibility.[15] This was, of course, challenging given the illicit nature of what Sly was doing and the reality that professional athletes have consistently denied using PES in the face of positive tests and other compelling evidence to the contrary.[16] On camera, Sly claimed that he was a pharmacist who had trained at

---

[13] *See id.*; *see also* Dep. Tr. of Taylor Teagarden, May 10, 2018, at 73:18-74:17 (Ex. 14).

[14] *See, e.g.*, Nick Martin, *MLB suspends Taylor Teagarden 80 games after investigating Al Jazeera report*, Washington Post, Apr. 1, 2016, *available at* https://www.washingtonpost.com/news/early-lead/wp/2016/04/01/mlb-suspends-taylorteagarden-80-games-after-investigating-al-jazeera-report/?utm_term=.0cb30ee784fc.

[15] Plaintiffs allege that Al Jazeera decided to "sacrifice the details on the processes [and] protocols" of a robust investigation. *See* Mot. at 8 (quoting Ex. 12). In Exhibit 12, however, Collins merely offered his opinion that Al Jazeera should broaden the Documentary to include a more fulsome discussion of scientific "processes" and "protocols" of doping. His statement had nothing to do with the sufficiency of the investigation into the use of PES by professional athletes.

[16] *See, e.g.*, Mac Engel, *MLB players made it impossible to believe Robinson Cano*, Star-Telegram, May 15, 2018, *available at* http://www.star-telegram.com/sports/spt-columns-blogs/mac-engel/article211194779.html (Robinson Cano suspended by MLB for drug violations after denying drug use); Tim Brown, *Robinson Cano latest to play the 'I didn't know' card after testing positive for banned substance*, Yahoo! Sports, May 15, 2018, *available at* https://sports.yahoo.com/innocent-guilty-robinson-cano-latest-mlb-player-deny-ped-use-201751127.html ("Cano issued a statement claiming he'd been felled by technicality, that he'd been administered the drug by a licensed physician in the Dominican Republic for a 'medical

the Guyer Institute in Indiana.  To vet this claim, the Investigative Unit spoke with an employee

at Guyer, who confirmed that Sly had worked at the Guyer Institute; indeed, she said she knew

Sly personally, and provided the dates that he interned at the clinic.[17]  Defendants also confirmed

Sly's pharmacist credentials.[18]

> Sly stated that during his time at the Guyer Institute:

>> [Peyton Manning] and his wife would come in after hours and get IVs and
>> s***. …  So one thing that Guyer does is he dispenses drugs out of his
>> office which physicians can do in the United States it's just not very many
>> of them do it. …

>> And all the time we would be sending Ashley Manning drugs.  Like
>> growth hormone, all the time, everywhere, Florida.  And it would never be
>> under Peyton's name, it would always be under her name. …[19]

> Prior to airing the Documentary, Al Jazeera contacted Peyton Manning's agent about

Sly's allegations (without identifying Sly as the source) to provide Manning with an opportunity

---

ailment,' and that he – Cano – was unaware the substance was banned."); Bruce Nichols, *Roger Clemens to deny steroid use to Congress*, Reuters, Jan. 7, 2008, *available at* https://www.reuters.com/article/us-baseball-steroids-clemens/roger-clemens-to-deny-steroid-use-to-congress-idUSN0743665020080108; Associated Press, *Government: Roger Clemens covered up his steroid use*, Politico, Jun. 12, 2012, *available at* https://www.politico.com/story/2012/06/government-roger-clemens-covered-up-his-steroid-use-077330 ("Clemens is charged with lying to Congress in 2008 when he denied using steroids or human growth hormone."); Stephen McMillan, *Lance Armstrong's doping denials – in quotes*, The Guardian, Jan. 18, 2013, *available at* https://www.theguardian.com/sport/2013/jan/18/lance-armstrong-doping-denials-quotes (listing numerous instances where Armstrong denied using PEDs before finally admitting to their use).  Even the players don't buy these denials.  *See* Hannah Withiam, *Justin Verlander isn't buying Robinson Cano's PED 'excuse'*, New York Post, May 15, 2018, *available at* https://nypost.com/2018/05/15/justin-verlander-isnt-buying-robinson-canos-ped-excuse/ (quoting Verlander's tweet relating to Cano's denials "Aaaand excuse coming in 3….. 2…… 1……"); *see also* Appendix A to Defendants' April 11, 2016 Motion to Dismiss, identifying nearly thirty athletes who initially denied and subsequently admitted PES use, Dkt. No. 26-2.

[17] *See* AJ-HZ_0036588 (Ex. 15).

[18] *See* AJ-HZ_0043243 (Ex. 16); AJ-HZ_0043245 (Ex. 17); AJ-HZ_0043247 (Ex. 18).

[19] Documentary transcript, Dkt. No. 26-4, at 32.

to respond on- or off-camera.[20]   In response, Theodore Olson and Matthew McGill of Gibson

Dunn & Crutcher LLP ("GDC"), attorneys for the Mannings, contacted Al Jazeera's outside pre-

publication counsel at Davis Wright & Tremaine ("DWT").[21]   In their communications with

DWT, the Mannings' lawyers confirmed much of what Sly had said.[22]   For example, ███

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████.[24]   In short, the Mannings, not DWT, as Plaintiffs have

alleged elsewhere, emerged as a second source for the Documentary with the Mannings' lawyers

corroborating much of what Sly had said on camera, further confirming his credibility.[25]

     Sly's experience with PES and access to professional athletes was independently

corroborated by Robertson, Spletzer, and Ramogida, all of whom Collins met in Vancouver

---

[20] *See* AJ-HZ_0025123 (Ex. 19).

[21] Declaration of Robert Corn-Revere, Esq. in Support of Petitioners' Motion to Compel Discovery from Gibson, Dunn & Crutcher, LLP, and in Opposition To Respondent's Cross-Motions to Quash Petitioners' Subpoenas and for Protective Order ("Corn-Revere Decl."), Mar. 29, 2018, at ¶ 7, at Dkt. No. 91-3; *see also* AJ-HZ_0044725 (Ex. 13).

[22] *See* AJ-HZ_0043672 (Ex. 20); AJ-HZ_0043344 (Ex. 21) (Dec. 18, 2015 e-mail repeating ████████████████████████████████████████████████████████ ██████████████████████████████████; Corn-Revere Decl. at ¶ 12.

[23] Corn-Revere Decl. at ¶¶ 7, 8-9, and 12.

[24] AJ-HZ_0043344 (Ex. 21).

[25] In their continuing quest to mislead the Court and the public, Plaintiffs continue to push the fallacy that the Defendants' reporting was "sole-sourced" or that its second source was its own outside counsel.  Nonsense.  The second source is and always has been the Mannings; DWT lawyer simply relayed to Al Jazeera what the Mannings' lawyers had told it.

before visiting Sly.[26]   Indeed, Plaintiffs themselves highlighted an email showing that Al Jazeera

had video, not used in the Documentary, from Ramogida "talking up Charlie and how he was

such a genius."  Mot. at 14 (citing Pl. Ex. 37).  Sly also told Collins about a pharmacy in

Louisiana that would ship Delta-2, the steroid banned by MLB.  Al Jazeera ordered and received

a shipment of Delta-2 from that pharmacy, which proved that Sly had the ability and means to

acquire PES.[27]

C.  

Although Plaintiffs have consistently (even in the face of compelling evidence to the

contrary) denied Sly's claims, neither has categorically denied having a relationship with Sly.[28]

[REDACTED]

[REDACTED] [29]  These

connections are no surprise:  the Investigative Unit independently confirmed before the

---

[26] *See* Documentary transcript, Dkt. No. 26-4, at 13-14 (Of Sly, Robertson claims "[h]e still to
this day built the best NFL athlete that ever existed athletically[,]" and Spletzer states that"[h]e is
so bright, it's scary."); *Undercover Video Raises Questions: Did Seattle Seahawks Chiropractor
Have Business Link With Individuals in Al Jazeera Doping Documentary?*, Kevin Hirten, Feb. 7,
2016, *available at* https://www.huffingtonpost.com/kevin-hirten/undercover-video-raises-
q_b_9171620.html (Ramogida says of Sly that "[h]e's one of these kinds of genius types that
he's so deep into things that he forgets where the baseline normal is for everybody else.").

[27] *See* AJ-HZ_0026174 (Ex. 22); AJ-HZ_0025651 (Ex. 23).

[28] In his Amended Complaint, Zimmerman states "Mr. Zimmerman has not known Charles
David Sly for six years, and Charles David Sly has not gotten '[Mr. Zimmerman] to change some
stuff.'  Mr. Zimmerman has never received any banned substances from Charles David Sly and
has never 'been coached [by Charles David Sly] on what to take and how to avoid testing
positive."  Zimmerman FAC, ¶ 47, Dkt. No. 9.  Similarly, Howard states "Mr. Howard has never
received any banned substances from Charles David Sly or 'taught anything back to' Charles
David Sly.  Mr. Howard has never 'been coached [by Charles David Sly] on what to take and
how to avoid testing positive.'"  Howard FAC, ¶ 50, Dkt. No. 44.

[29] *See* ZIMMERMAN-0005857 (Ex. 3); ZIMMERMAN-0005866 (Ex. 4); HOWARD-0005136
at 142-143 (Ex. 5).

Documentary was aired that Sly had close ties to Jason Riley, a personal trainer who has long

worked for both Plaintiffs.[30]  The Investigative Unit learned that Sly and Riley ██████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████[31]  Indeed, both Plaintiffs Howard and Zimmerman were listed in Elementz Nutrition's

advertising materials as members of the company's "Pro Athlete Counsel," along with Sly's

long-time friend Dustin Keller.[32]  Similarly, ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████[35]

**D.  The Current Dispute**

Plaintiffs' brief spends fourteen pages attacking Defendants' journalistic practices and

ethics, then accuses Defendants of frustrating Plaintiffs' discovery efforts.  The opposite is true.

In contrast to Defendants' extensive productions, Plaintiffs have sought at every turn to obstruct

Defendants from obtaining relevant discovery into Plaintiffs' use of PES.  Plaintiffs' Amended

---

[30] See KRUMS-0001038 (Ex. 24); see also Michael Powell, *Finding a Common Thread in the Al Jazeera Doping Report*, New York Times, Jan. 5, 2016, *available at* https://www.nytimes.com/2016/01/06/sports/baseball/al-jazeera-peyton-manning-derek-jeter-charles-sly.html (photograph of Riley with Howard at the Performance Compound, posted to Facebook on Mar. 28, 2013).

[31] See KRUMS-0000852 (Ex. 25); AJ-HZ_0037710 (Ex. 26).

[32] See KRUMS-0000816 (Ex. 27).

[33] See AJ-HZ_0037713 (Ex. 28).

[34] See Mar. 17, 2014 Google+ post from Dini Rucker, *available at* https://plus.google.com/+DiniRucker/posts/huj9ZSZVDr1 (picture of Howard in Rucker's office).

[35] See May 12, 2017 Instagram post from @ruckerozone, *available at* https://www.instagram.com/p/BUAJFXBF6Fz/?taken-by=ruckerozone (picturing Zimmerman's jersey prominently on Rucker's office wall).

Complaints assert that they have "never taken Delta 2, human growth hormone, or any other steroid or other performance-enhancing substance banned by MLB."[36]  Yet, when Al Jazeera sought to test these assertions by demanding discovery from Plaintiffs concerning their use of any banned PES, Plaintiffs limited their responses to their use or nonuse of a single PES, Delta-2, and objected to providing any evidence relating to any other PES.[37]  Only after Al Jazeera sought permission from the Court to file a motion to compel this information did Plaintiffs finally produce additional documents ███████████.[38]  This is not the only example of Plaintiffs' intentional obstruction of discovery.  Discovery has revealed that both Howard and Zimmerman discarded their personal iPhones *after* threatening to sue Al Jazeera over the Documentary.[39]

---

[36] *See* Zimmerman FAC, ¶ 47, Dkt. No. 9; Howard FAC, ¶ 50, Dkt. No. 44.

[37] See Plaintiff Howard's Response to Defendants' Requests for Production Nos. 1-14, 17, 28-51, 58, 62, 64, and 73-83 (Ex. 29) ("Howard . . . objects to this Request on the grounds that it seeks information that is not relevant to the Parties' claims or defenses insofar as the Request seeks documents and communications that do not pertain to Delta-2); Plaintiff Zimmerman's Responses to Defendants' Requests for Production Nos. 1-13, 26-51, 58, 62, 64, and 73-82 (Ex. 30) ("Zimmerman . . . objects to this Request on the grounds that it seeks information that is not relevant to the Parties' claims or defenses insofar as the Request seeks documents and communications that do not pertain to Delta-2.").

[38] *See* Email from R. Stevens to Magistrate Judge Meriweather, Mar. 6, 2018 (Ex. 31); Email from S. Lerner to Magistrate Judge Meriweather, Mar. 7, 2018 (Ex. 31); Email from E. Dew to Magistrate Judge Meriweather, Mar. 15, 2018 (Ex. 32).

[39] *See* Plaintiffs' Response to Interrogatory No. 12 (Ex. 33) ("[B]etween January 1, 2012 and December 31, 2015 . . . .  Plaintiff Howard [] used various iPhones with a service plan through Verizon Wireless. . . .  Plaintiff Howard no longer possesses these devices."); Plaintiffs' Supplemental Response to Interrogatory No. 12 (Ex. 34) ("[F]rom January 1, 2012 through December 31, 2015 . . . .  Plaintiff Zimmerman used an iPhone with a service plan through AT&T.  Plaintiff Zimmerman no longer possesses this device, which, to the best of his recollection, he gifted to his brother in 2016.").  To date, Zimmerman's brother has refused to provide the phone in response to Defendants' subpoena and Plaintiffs' counsel have stated that they never searched the phone for relevant information.

In addition to this clear narrative of obstruction, Plaintiffs now demand information that is irrelevant to the issues raised in Plaintiffs' complaints and that Defendants should not be compelled to produce.

## ARGUMENT

Plaintiffs' discussion of the scope of relevant discovery omits an essential point: relevance should be narrowly construed in media libel cases, in light of the important countervailing First Amendment protections necessary to a free press. Here, the discovery that Plaintiffs seek to compel falls well outside the issues that are germane to a libel claim by a public figure. Indeed, much of this discovery appears designed to harass Defendants rather than to enable Plaintiffs to meet their burden of proof, and none of it satisfies Rule 26.

In *Herbert v. Lando*, the Supreme Court, addressing discovery from media defendants by public figure plaintiffs in libel cases, said that "the requirement of Rule 26(b)(1) *that the material sought in discovery be 'relevant' should be firmly applied,* and the district courts should not neglect their power to restrict discovery where 'justice requires [protection for] a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . .' Rule 26(c). With this authority at hand, judges should not hesitate to exercise appropriate control over the discovery process." 441 U.S. 153, 177, 99 S. Ct. 1635, 1649 (1979) (emphasis added). Justice Powell, in a frequently-quoted concurrence in *Herbert*, explained that in libel discovery, relevance considerations must be balanced against the principle of protecting against intrusion into the press' First Amendment protections:

> Whatever standard may be appropriate in other types of cases, when a discovery demand arguably impinges on First Amendment rights a district court should measure the degree of relevance required in light of both the private needs of the parties and the public concerns implicated..... [T]he District Court must ensure that the values protected by the First

Amendment, though entitled to no constitutional privilege in a case of this kind, are weighed carefully in striking a proper balance.

*Id.* at 179-80, 99 S. Ct. at 1650-51.

Because libel is a creature of state law, each state (and the self-governing District of Columbia) is permitted to determine its own balance between relevance and the First Amendment, and to prohibit or limit libel plaintiffs' right to take discovery of information held by a media defendant, consistent with the Supreme Court's guidance in *Herbert*.  Citing the First Amendment implications of libel suits and Justice Powell's concurrence in *Herbert*, the District of Columbia Circuit has directed that to protect the media against the burden of discovery, in libel cases "discovery [should] be limited initially to the extent feasible to those questions that may sustain summary judgment."  *McBride v. Merrell Dow and Pharm. Inc.*, 717 F.2d 1460, 1467 (D.C. Cir. 1983).

These principles, as well as controlling D.C. authorities that Plaintiffs have failed to cite, should themselves lead this Court to deny Plaintiffs' motion to compel.  Even without these important First Amendment considerations, Plaintiffs' demands for additional information are inconsistent with Rule 26.  *See English v. Washington Metro. Area Transit Auth.*, 323 F.R.D. 1, 17 n.13 (D.D.C. 2017) (quoting *Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co.*, No. 11-CV-1049 (PLF/GMH), —— F.R.D. ——, ——, 2017 WL 4011136, at *3 (D.D.C. Sept. 11, 2017)).  Rule 26(b)(1) was amended in December 2015 specifically to "reinforce[] the . . . obligation of the parties to consider these factors in making discovery requests, responses, or objections," and to prevent the sort of broad fishing expedition that Plaintiffs embark on with their motion to compel.  Advisory Committee Notes, Rule 26(b).  Since the information Plaintiffs seek is part of a broad fishing expedition, the additional demands should be rejected.

13

I.     **PLAINTIFFS ARE NOT ENTITLED TO DISCOVERY PRE-DATING THE INCEPTION, OR SUBSTANTIALLY POST-DATING THE BROADCAST, OF THE DOCUMENTARY**

Defendants have conducted a reasonable search for documents responsive to Plaintiffs' requests (subject to objections) for the time period of December 1, 2014[40] through February 29, 2016.  This time period begins two weeks before the original idea for the Documentary was floated and ends 54 days after this litigation was commenced and over two months after the Documentary was aired.  Plaintiffs claim that this date range is "arbitrary" and "far too narrow," Mot. at 15-16, and that Defendants should be compelled to accept an expanded date range of August 1, 2013 through at least April 20, 2018.  Plaintiffs are wrong.  Defendants' time frame is reasonable, as it includes the entire investigation, production, and broadcasting of the Documentary, as well as the period of public discussion of the Documentary that followed the broadcast.  Consequently, Defendants have more than satisfied their discovery obligations in this regard.  *See, e.g., Wadelton v. Dep't of State*, 208 F. Supp. 3d 20, 30 (D.D.C. 2016) ("The reasonableness of the temporal limitation is a case-by-case inquiry, and the court finds that given the Defendant's second search using a later date than it had used previously, as well as the lack of any information that could give rise to an inference that the scope of the search was inadequate, the search was reasonable."); *Waters v. United States Capitol Police Bd.*, 216 F.R.D. 153, 159 (D.D.C. 2003) (noting that temporal scope limitations should "strike a fair balance between plaintiff's need for comparative information and the burden upon the defendant to find information I [sic] am ordering it to produce").

---

[40] Plaintiffs claim that the date range applied began at December 14, 2014, but this is incorrect. In fact, Defendants searched documents as far back as December 1, 2014, but the earliest responsive document is dated December 14, 2014.  *See* AJ-HZ_0045431 (Ex. 6).

14

Despite the generous time frame Defendants applied, Plaintiffs ask this Court to order Al Jazeera to search files going back sixteen months before the idea for the Documentary was even conceived, and stretching through the entire life of this litigation.  Plaintiffs' proposal goes far beyond the reasonable bounds of relevancy under Rule 26.  *See Prasad v. George Washington Univ.*, Civil Action  No. 1:15-CV-01779 (ABJ/GMH), 2018 WL 1210860, at *1 (D.D.C. Mar. 8, 2018) ("'[T]he relevance standard of Rule 26 is not without bite,' and will not allow 'explor[ation] [of a] matter which does not presently appear germane on the theory that it might conceivably become so.'"); *see also United States ex rel. Shamesh v. CA, Inc.*, 314 F.R.D. 1, 8 (D.D.C. 2016) (citing *Meijer, Inc. v. Warner Chilcott Holdings Co., III, Ltd.*, 245 F.R.D. 26, 30 (D.D.C. 2007)) ("In cases where a relevancy objection has been raised, the party seeking discovery must demonstrate that the information sought to be compelled is within the scope of discoverable information under Rule 26.").

Indeed, Plaintiffs have failed to provide any rational basis for their contention that Defendants are required to search files prior to the conception of the idea that led to the Documentary and files that post-date the litigation.[41]  Instead, Plaintiffs claim that the date range should start at August 1, 2013 because that is when the Al Jazeera America network was first launched.  However, Plaintiffs have shown no connection between AJAM's launch and the Documentary, because there is none.  In fact, the idea for the Documentary was not conceived until more than a year after AJAM's launch, and AJAM was not involved in the development of

---

[41] Plaintiffs also try to argue that Defendants' date range is unreasonable because Plaintiffs produced from a broader date range.  But the two situations are not symmetrical.  As one example, Plaintiffs have alleged that the Documentary defames them because they never used PES *at any time in their career*s.  Discovery into these allegations entitles Al Jazeera (at a minimum) to documents regarding Plaintiffs' potential PES use from the beginning of their major league careers, which was 2004 for Ryan Howard and 2005 for Ryan Zimmerman.

the Documentary.[42]  On the back end, Plaintiffs demand that Al Jazeera conduct an additional

review for information dated from February 29, 2016 (two months after the Documentary aired)

to at least April 20, 2018 (the date Plaintiffs filed their motion).  Attempting to support this

demand, Plaintiffs claim without any proof that Defendants were engaged in "Documentary

related projects well past February 29, 2016," Mot. at 17, and that Defendants have produced

documents dated after the airing of the Documentary that constitute evidence of Defendants'

state of mind before the Documentary was aired.  These arguments miss the mark for two

reasons.

First, the suggestion that Defendants conducted certain activities related to the

Documentary after it aired does not justify Plaintiffs' demand that Defendants search for

responsive documents indefinitely into the future.[43]  For example, the fact that the Documentary

spawned multiple investigations by others, including the Canadian Centre for Ethics, is in no

way relevant to Plaintiffs' claims.  *See, e.g., Secord v. Cockburn*, 747 F. Supp. 779, 792 (D.D.C.

1990) (events post-dating broadcast are irrelevant to broadcaster's state of mind at time of

broadcast).  Second, Plaintiffs claim that the time period needs to be expanded several years

because Defendants produced an email chain, dated February 27-29, 2016, that discusses the

unfortunate death of one of Sly's loved ones.  *See* Mot. at 16 (citing Pl. Ex. 26).  Plaintiffs,

however, never explain how this document suggests that other relevant non-privileged

documents were created after February 29, 2016.  Accordingly, the Court should conclude that

---

[42] Declaration of Phil Rees in Support of Defendants' Opposition to Plaintiffs' Motion to Compel, dated May 20, 2018 ("Rees Decl."), at ¶ 8.

[43] Plaintiffs' Exhibits 40–44 prove nothing; they merely show that other media had a continuing interest in the facts disclosed in the Documentary and that Al Jazeera has pursued more stories related to sports doping.

the time period applied by Defendants—December 1, 2014 through February 29, 2016—was

appropriate, reasonable, and proportional to the needs of this litigation, and deny Plaintiffs'

attempt to enlarge production to irrelevant time periods.  *See Wadelton*, 208 F. Supp. 3d at 30;

*Waters* 216 F.R.D. at 159.

## II.    PLAINTIFFS ARE NOT ENTITLED TO ADDITIONAL DOCUMENTS FROM AL JAZEERA AMERICA

In compliance with its discovery obligations, Defendants have produced 12,329

documents spanning 47,320 pages from 10 custodial files, including from every member of the

Investigative Unit responsible for the creation of the Documentary.  Unsatisfied, Plaintiffs ask

the Court to compel Defendants "to collect and produce documents and communications from at

least the six individuals from [AJAM] who have been identified as having worked on the

documentary."[44]  Mot. at 18.  Plaintiffs assert that these six individuals were "key employees of a

named defendant who were actively involved in the production and publication of the

Documentary."  *Id.*  There is no evidence to support this claim because it is not true.

The Documentary was investigated and prepared by the Investigative Unit, which is and

always was independent from AJAM, and AJAM did not have any input into the final version of

the Documentary.  Rather, AJAM's sole involvement was that it was one of the outlets that

carried the Documentary.[45]  Defendants disclosed in their discovery responses that five former

AJAM employees viewed the Documentary before it was broadcast, and a sixth helped

---

[44] The six individuals are Amjad Attallah (Regional Director of the Americas), Gordon Robison (Senior Executive Producer, AJAM), Al Anstey (Chief Executive Officer, AJAM), Kim Bondy (Senior Vice President, AJAM), Kate O'Brian (President, AJAM), and Terry Baker (Senior Vice President, AJAM), and were referenced in Defendants' supplemental response to Interrogatory No. 3.  *See* Mot. at 18; Plaintiffs' Ex. 40.

[45] *See* Rees Decl. at ¶ 8.

determine the day and time on which AJAM aired the Documentary.[46]  The documents produced

in discovery confirm this to be case.  For example, Kate O'Brien appears on a total of only 9 of

the 7,705 emails that have been produced.  Similarly, the other AJAM custodians were merely

copied on the majority of the emails on which they appear.  Plaintiffs have failed to show a

single relevant email that was authored by any of these custodians.  This is, of course, consistent

with the fact that AJAM employees played no role in the investigation or preparation of the

Documentary and only a limited role in the timing of its broadcast on AJAM, and therefore a

search of their custodial files would be unnecessary and inconsistent with Rule 26.

### III.    PLAINTIFFS ARE NOT ENTITLED TO "DISCOVERY RELATED TO MOTIVE"

Plaintiffs seek to compel discovery from Defendants concerning:  (1) AJAM's "low

ratings and poor financial performance;" (2) its "financial investment in the Documentary;" and

(3) "the steps it took to promote and sensationalize the Documentary."[47]  Under controlling case

law, however, such financial "motive"-based discovery is completely irrelevant to actual malice

or any other element of a libel plaintiff's burden of proof, and therefore Plaintiffs' demands

should be rejected.  The leading case establishing the irrelevance of a publisher seeking profit,

readers, or viewers to defamation liability is *Harte-Hanks Commc'ns, Inc. v. Connaughton*.  In

*Harte-Hanks Communications*, the Supreme Court held that:

> The fact that the defendant published the defamatory material in order to
> increase its profits [cannot] suffice to prove actual malice.  The allegedly
> defamatory statements at issue in the *New York Times* case were
> themselves published as part of a paid advertisement.  If a profit motive
> could somehow strip communications of the otherwise available

---

[46] *See* Mot. at 18; Supp. Rog. Responses at No. 3 (Ex. 9).

[47] This includes the following discovery requests:  RFP Nos. 92-94, 105-107, 113, and 121, and
Interrogatory No. 39.  *See* Mot. at 20, 21–22.

> constitutional protection, our cases from *New York Times* to *Hustler Magazine* would be little more than empty vessels.

491 U.S. 657, 667, 109 S. Ct. 2678, 2685-86 (1989) (citations omitted).

Consistent with the Supreme Court's guidance, the District of Columbia Circuit Court has recently held that actual malice cannot be proven through showing that the publisher had some "ulterior motive—whether a profit motive, a motive to produce the most interesting stories, or a personal desire to harm the subject of a story…." *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 596 (D.C. Cir. 2016), *cert. denied,* 137 S. Ct. 1434 (2017); *see also Parsi v. Daioleslam*, 890 F. Supp. 2d 77, 90 (D.D.C. 2012) ("[A] newspaper's motive in publishing a story—whether to promote an opponent's candidacy *or to increase its circulation*—cannot provide a sufficient basis for finding actual malice.") (emphasis added); *Foretich v. American Broad. Cos.*, Nos. Civ. A. 93-2620, Civ. A. 94-0037(HHG), 1997 WL 669644, at *8 (D.D.C. Oct. 17, 1997) ("All broadcasters and publishers—at some level—must have economic goals in mind, and this Court refuses to hold that such considerations would indicate actual malice on the part of these entities.").[48]  Consequently, financial or profit "motive-based" discovery is outside the bounds of relevant discovery.  In other words, Plaintiffs' conspiracy theory that the Documentary was broadcast to improve AJAM's ratings or make money (which it was not) is irrelevant and cannot be used to justify an unwarranted fishing expedition into Defendants' books and records.

Plaintiffs' distorted citation to *Jankovic* (Pl. Br. at 19-20) is misplaced.  In *Jankovic*, the plaintiff sued a non-profit organization over a report claiming that he financially benefited from

---

[48]  The Fourth Circuit, writing *en banc* in *Reuber v. Food Chemical News, Inc.*, similarly rejected the argument that "actual malice can be inferred because a profit motive drove the [publisher]," noting that "[t]he cases from *New York Times v. Sullivan* onward teach that evidence of a defendant printing material to increase its profits does not suffice to prove actual malice."  925 F.2d 703, 715-16 (4th Cir. 1991) (en banc); *see also Nat'l Life Ins. Co. v. Phillips Publ'g Co.*, 793 F. Supp. 627, 649 (D. Md. 1992) ("[Defendant's] desire to make a buck is irrelevant.").

association with the regime of former Serbian president Milosevic.  Among other allegations, the

plaintiff asserted that the reporter had said that he would stop writing negative stories about the

plaintiff if he paid him one to two million dollars, and argued that this "motive to extort . . .

offered an incentive for [the reporter to write untrue reports]."  The *Jankovic* court soundly

rejected this motive-based argument, noting that "*ill will toward the plaintiff or bad motives* are

not elements of actual malice," and "such evidence is insufficient by itself to support a finding of

actual malice."  *Jankovic*, 822 F.3d at 590 (quoting *Tavoulareas v. Piro*, 817 F.2d 762, 795

(D.C. Cir. 1987)) (emphasis added).  The *Jankovic* court went on to explain, in the truncated

passage quoted by Plaintiffs, that "[o]nly when the evidence of ill will or bad motive is also

probative of a 'willingness to publish *unsupported allegations*'" is it suggestive of actual malice.

*Jankovic*, 822 F.3d at 590-91 (emphasis in original), quoting *Tavoulareas,* 817 F.2d at 796.  At

most, therefore, *Jankovic* teaches that motive may be relevant where (1) the evidence shows that

the defendant acted with "classic" malice—a direct intention to harm the plaintiff, as through

extortion, *and* (2) that evidence is strong enough to suggest that the defendant would willingly

publish lies in order to harm the plaintiff.  *Jankovic* did not hold, or even suggest, that evidence

that a defendant had a *profit-based*, as opposed to a classically malicious, motive for publishing a

story is relevant to proof of actual malice.  This omission is consistent with the statements in

*Harte-Hanks* and the later cases cited above that no actual malice can be inferred from a

publisher's desire to "make a buck," *National Life Ins. Co.,* 793 F. Supp. at 649, or to increase

circulation, *Parsi*, 890 F. Supp. 2d at 90.[49]

---

[49] Unwilling to address the binding case-law of this Circuit, Plaintiffs attempt to rely upon Ninth Circuit cases.  *See* Mot. at 21, 23.  To the extent these cases hold that a publisher's financial motives or a desire to increase circulation are relevant considerations in determining actual malice, they are contrary to the law of this Circuit, as expressed in *Janovic*.

In short, the law of this Circuit soundly rejects the notion that Plaintiffs are entitled to conduct a fishing expedition to support a conspiracy theory for which there is not a shred of evidence among the 47,230 pages of documents and 9.05 terabytes of video footage produced in this case already.  The Court should therefore deny Plaintiffs' motion to compel production of documents and evidence relating to AJAM's ratings and financial performance, AJMN's investment in the Documentary, and efforts made to promote viewership of the Documentary.[50]

## IV.   PLAINTIFFS ARE NOT ENTITLED TO DISCOVERY RELATED TO PUNITIVE DAMAGES

Plaintiffs justify much of the discovery they seek to compel as relating to their assertion that if they prove liability at trial, they may be able to seek punitive damages.  *See* Mot. at 23-24 (discovery relating to sale of advertisements associated with Documentary), 24 (discovery of prior threatened and actual lawsuits against Al Jazeera).  Beyond its other shortcomings, discovery related to punitive damages in a public figure libel case is impermissible until, and unless, summary judgment is denied.  *McBride*, 717 F.2d at 1467 (D.C. Cir. 1983).  This principle is consistent with a body of cases in this District which have denied discovery of a defendant's finances until the trier of fact has found liability for punitive damages.  *See, e.g.*, *Peskoff v. Faber*, 230 F.R.D. 25, 30 (D.D.C. 2005) (denying "attempt to discover the defendant's personal financial information" that was sought on the basis of "its relevance to punitive damages"); *John Does I-VI v. Yogi*, 110 F.R.D. 629, 633 (D.D.C. 1986) ("[D]iscovery

---

[50] The promotional activities undertaken in relation to the Documentary were limited to social media and journalistic outreach activities, and relevant documents have been produced.  *See* Defendants Response to Plaintiffs' First Set of Interrogatories, Response to Interrogatory No. 22 (detailing promotional and advertising efforts related to the Documentary, including links to news interviews and advertisements); *see also* Rees Decl. at ¶¶ 13-15.

concerning defendants' financial status . . . should not be revealed until necessary to prove up punitive damages.").

Since Plaintiffs themselves acknowledge many of their discovery demands are driven by their claim for punitive damages, those demands should be rejected as premature at best.[51] For example, Plaintiffs demand documents relating to any "actual or threatened defamation actions" against Al Jazeera.  First, other lawsuits against Al Jazeera have no bearing on any issue in this case.  *See St. Amant v. Thompson*, 390 U.S. 727, 732, 88 S. Ct. 1323, 1326 (1968); *Lohrentz v. Donnelly*, 350 F.3d 1272, 1283 (D.C. Cir. 2003).  Plaintiffs cite no authority in which the publisher's state of mind in publishing a *different* story about a *different* subject at a *different* time was found to be relevant evidence of actual malice in a public figure libel suit.  The two decisions on which Plaintiffs rely in support of their requests for information about other, unidentified cases are inapposite.  *King v. E.F. Hutton & Co., Inc.* involved allegations that the securities broker defendants violated civil RICO, which requires proof of a "pattern" of racketeering activity, by "churning" not only the plaintiffs' fiduciary accounts but also those of other customers.  117 F.R.D. 2, 3 (D.D.C. 1987).  There, the court held that "'to establish a true "pattern" of related but distinct schemes of fraud,' evidence of activities as to other accounts and how they were handled would be highly relevant and discoverable to establish a civil RICO claim."  *Id.* at 8 n.11 (internal citation omitted).  Similarly, in *Phillips v. Hanover Insurance Company*, a case asserting a claim for bad faith denial of insurance coverage based on asserted vacancy of a property, the court stated that "a pattern of denial of claims based on the policy's vacancy provision [would] support [plaintiff's] bad faith claim."  No. CIV-14-871-R, 2015 WL

---

[51] *See* Plaintiffs' Requests for Production Nos. 105, 106, 107; Plaintiffs' Second Set of Interrogatories, Interrogatory Nos. 38, 39.  *See* Mot. at 23–24.

1781873, at *3 (W.D. Okla. Apr. 20, 2015).  In contrast, neither "pattern" nor "bad faith" is an element of the Plaintiffs' libel claims, and accordingly other lawsuits threatened or brought against Al Jazeera are irrelevant to the issues of *this* case.

Second, the "firmly applied" concept of relevancy in libel cases and important First Amendment considerations, *Herbert*, 441 U.S. at 177, 179-80, 99 S. Ct. at 1649, 1650-51, bar the discovery Plaintiffs seek.  Threats and filings of libel lawsuits do not mean or imply that a publisher previously committed an actionable defamation, much less that it has done so in the present case.  Nor, under the First Amendment, can such discovery into past lawsuits be justified because a plaintiff seeks punitive damages.  "If punitive damages may reflect the jury's dim view of the defendant's previous publications, themselves presumptively protected by the First Amendment, the jury is effectively being permitted to evade the constitutional safeguards and punish that previous, protected speech."  Robert D. Sack, SACK ON DEFAMATION: LIBEL, SLANDER AND RELATED PROBLEMS, § 10:3.5, p. 10-18 (5th ed. 2018).

## V.   OTHER SPECIFIC DOCUMENT REQUESTS[52]

### A.   PLAINTIFFS HAVE SHOWN NO NEED FOR ORGANIZATIONAL CHARTS, GIVEN THE DISCOVERY ALREADY PRODUCED

Plaintiffs seek "Organization charts for Al Jazeera America, Al Jazeera Media Network, and Al Jazeera International USA from 2015 through 2016."  Plaintiffs explain that they need this information to understand both the relevant personnel for depositions, and to "understand the reporting structure" within AJAM and the Al Jazeera Investigative Journalism Unit.  Defendants have, through their initial disclosures and otherwise, provided Plaintiffs all of the information

---

[52] Plaintiffs also seek an order directing Defendants to produce the ███████ documents in its possession, custody, or control.  All such documents have been, or are in the process of, being produced, and such an order is therefore moot.

necessary to identify relevant persons, and Plaintiffs can explore additional questions at deposition.[53]   It is unnecessary for this Court to compel production where, as here, such production would be duplicative, overbroad, and burdensome.  *See In re Kemper Ins. Cos.*, Civil Action No. 1:02-cv-1198-GET, 2003 WL 25672797, at *3 (N.D. Ga. June 17, 2003) (declining to compel production of organizational chart where defendant "already has identified all persons with knowledge of the facts related to this lawsuit"); *Cohen-Esrey Real Estate Servs., Inc. v. Twin City Fire Ins. Co.*, Civil Action No. 08-2527-KHV-DJW, 2009 WL 10675923, at *6 (D. Kan. Nov. 6, 2009) (declining to compel production of organizational charts where Plaintiff had other means of obtaining names of relevant individuals); *Crocs, Inc. v. Effervescent, Inc.*, Civil Action No. 06-CV-00605-PAB-KMT, 2017 WL 1325171, at *3-4 (D. Colo. Feb. 24, 2017) (declining to compel production of organizational charts when Defendant already identified relevant personnel).

Regarding the relevant reporting structure, Plaintiffs have not shown that Defendants' corporate structure, other than the makeup of the investigative team responsible for the Documentary, is relevant to any claim or defense in this case.  The same is true for Plaintiffs' demand for further discovery from AJAM.  As explained by Acting Director Phil Rees in his accompanying Declaration, the Al Jazeera Investigative Unit is organized under Defendant AJMN, and never had any financial or organizational ties to AJAM.[54]  Further, AJAM never had any input into the investigative activities and documentaries undertaken or created by the

---

[53] *See*, *e.g.*, Defendants' Responses to Plaintiffs' First Set of Interrogatories, Responses to Interrogatory Nos. 1, 3 (Ex. 12).

[54] *See* Rees Decl. at ¶¶ 6, 8.

investigative teams, including *The Dark Side*.[55]  That being the case, AJAM's corporate structure

is irrelevant in this case, and so not subject to discovery.  *See Urena v. Earthgrains Distrib.,*

*LLC*, No. SA CV 16-00634-CJC (DFMx), 2016 WL 9223804, at *1 (C.D. Cal. Dec. 14, 2016)

(denying a motion to compel unredacted organizational charts that would reveal irrelevant sales

figures).  If Plaintiffs remain unsatisfied, they are free to explore this subject at deposition of

those who worked on the Documentary.

### B.   THE COURT SHOULD DENY PLAINTIFFS' REQUEST FOR DISCOVERY INTO AL JAZEERA'S PREPARATION FOR LITIGATION

Plaintiffs further demand that Al Jazeera produce documents regarding an investigation

undertaken by Investigative Group International ("IGINT") at the direction of DWT, one of the

outside law firms that represent Al Jazeera, despite the fact that the investigation occurred *after*

the Documentary aired and *after* Plaintiffs threatened suit.  *See* Mot. at 26-27.  The Court should

deny these requests both because such discovery is irrelevant and because the documents and

information sought are unquestionably privileged work product.

Actual malice focuses on the subjective state of the mind of the publisher at the time of

publication and not afterwards.  *See New York Times Co. v. Sullivan,* 376 U.S. 254, 286, 84 S.

Ct. 710, 729 (1964).  Events and facts that played no role in the publication and/or do not occur

until after publication have no relevance to the publisher's state of mind on the day of

publication.  *See Secord*, 747 F. Supp. at 792; *Bose Corp. v. Consumers Union of United States,*

*Inc.*, 466 U.S. 485, 512, 104 S. Ct. 1949, 1966 (1984).  A *post-broadcast* investigation conducted

at the direction of Al Jazeera's outside counsel, DWT, in order to address already-threatened

---

[55] *See* Rees Decl. at ¶ 8.

litigation from Plaintiffs and others plainly is not probative of Defendants' state of mind in broadcasting the Documentary on the day of broadcast.

Second, this information is protected from discovery under the work-product privilege. IGINT was engaged by DWT on or about December 28, 2015.[56]  This was not only after the Documentary aired but also after counsel for Plaintiffs publicly threatened litigation against Al Jazeera.[57]  Any and all information related to IGINT is quintessential work-product that is protected from discovery.  *See Hertzberg v. Veneman*, 273 F. Supp. 2d 67, 77 (D.D.C. 2003) (protecting documents prepared by an investigator because "'materials prepared by any representative of the client are protected, regardless of whether the representative is acting for the attorney,' so long as they were clearly prepared in anticipation of litigation") (citing *Niagara Mohawk Power Corp. v. Stone & Webster Engineering Corp.*, 125 F.R.D. 578, 586–87 (N.D.N.Y.1989) (work product protection exists for work of consultants acting as representative of a party); *Westhemeco Ltd. v. New Hampshire Ins. Co.*, 82 F.R.D. 702, 708 (S.D.N.Y.1979) (work product doctrine protects material prepared by a party's surveyor and investigator)).

This Court has previously confirmed that documents relating to private investigations are protected by the work-product privilege.  *See Alexander v. F.B.I.*, 192 F.R.D. 12, 17 (D.D.C. 2000) (denying plaintiffs' request for documents produced by a private investigative firm when there was "no doubt, and plaintiffs make no claim to the contrary, that the investigative work done by Potts and IGI was done on behalf of the attorneys working for the President in

---

[56] Declaration of Robert Corn-Revere in Support of Defendants' Opposition to Plaintiffs' Motion to Compel, dated May 21, 2018, at ¶ 6.

[57] *See, e.g., Ryan Howard's agent calls doping report 'inexcusable and irresponsible'*, Philly Voice, Dec. 27, 2015, *available at* http://www.phillyvoice.com/ryan-howards-agent-callsdoping-report-inexcusable-and-irresponsible/ (stating Plaintiffs "will go to court to hold Al Jazeera and other responsible parties accountable for smearing [Plaintiffs'] good names").

anticipation of litigation."); *Rauh v. Coyne*, 744 F. Supp. 1181, 1185 (D.D.C. 1990) ("[T]he

Court rejects plaintiffs' request based on the assertion that they have a 'compelling need' for the

documents.  Plaintiffs are free to question all the individuals who were interviewed by Ms.

Ochsman.  While it might be more convenient for plaintiffs to rely on the work of defendants'

counsel, that element of convenience is not sufficient to overcome either the attorney-client or

the work product privilege.").  Plaintiffs have not, and cannot, make a showing sufficient to

overcome this privilege, and their request should therefore be denied.[58]

### C.  THE COURT SHOULD DENY DISCOVERY INTO DEBORAH DAVIES' PERSONNEL FILE

Plaintiffs ask this Court to compel the production of the personnel file for Defendant

Davies based solely on the claim that this file is "plainly relevant to Plaintiffs' claims and central

to her credibility."  Mot. at 27.  On yet another fishing expedition, Plaintiffs make no factual

showing to justify this request, nor do they explain how the contents of her personnel file could

have any relevance to Plaintiffs' claims or Defendants' defenses in this case.  And for good

reason, as there is none.  A similar demand was rejected in *Tavoulareas v. Piro*, where the libel

---

[58] The protected nature of this investigation contrasts with the information Defendants have moved to compel from Phenix Investigations, the investigators hired by the Mannings to intimidate Charlie Sly.  In that motion, Defendants seek information that is plainly *not* protected work product:  Phenix's communications with Sly and other third parties that relate to the homemade video Sly created shortly after Phenix visited his family's home.  *See F.T.C. v. Boehringer Ingelheim Pharm., Inc.*, 778 F.3d 142, 156 (D.C. Cir. 2015) ("Of course, this interest in liberal discovery must be balanced against the key goal underlying the protection for fact work product: that each side must undertake its own investigation of the relevant facts and not simply freeload on opposing counsel.  But neither of these competing interests is served when unique, relevant information is withheld from a party that never had an opportunity to obtain the information on its own.") (internal citations omitted).  The non-disclosure of the Phenix documents would impair the truth-seeking function of discovery because of the intimidation tactics that Phenix investigators used on Sly and his family.  Here, Plaintiffs seek discovery related to steps DWT took to prepare for this litigation.  There is simply no legitimate comparison between the two requests.

plaintiff sought access to "[t]he Post defendants' personnel files." 93 F.R.D. 35, 44 (D.D.C. 1981). The court granted a protective order, finding the request "objectionable," and observing that "[t]he information sought is not only of dubious, if any, relevancy, but also of a highly personal and confidential nature," which, if produced, "would constitute an unwarranted invasion of the individual defendants' privacy." *Id.* Plaintiffs' demand for Davies' file is no less invasive and objectionable, and the Court should deny it.[59]

### D. DEFENDANTS HAVE PRODUCED ALL RESPONSIVE TEXT MESSAGES

Plaintiffs request that this Court "order Al Jazeera to produce text messages from" its identified custodians. Mot. at 28. In fact, Defendants have produced 966 text messages from all of the custodians who have responsive text messages.[60] Therefore, Defendants have already complied with Plaintiffs' demands. Plaintiffs further request that, "[t]o the extent Al Jazeera contends that all such text messages have been produced, the Court should order Al Jazeera to describe, in detail, the steps it took to preserve its custodians' text messages." Mot. at 28. Plaintiffs base this request on the false statement that "Al Jazeera has produced only a handful of

---

[59] Unable to find relevant case law, Plaintiffs cite *Henderson v. Turner*, Civil Action No. 11-0039, 2012 WL 5354616 (M.D. La. Oct. 29, 2012). In that case, plaintiff asked the court to conduct an *in camera* review of the entire personnel file of a prison guard who was alleged to have beaten an inmate. Here, of course, Plaintiffs are seeking direct access to Davies' file, not *in camera* review by this Court. Furthermore, the *Henderson* court *denied* the plaintiffs' motion for blanket production of the guard's personnel file without a specific showing of relevance. *Id.* at *4. That court cited its prior ruling, which held that the only discoverable aspect of the personnel file was the training courses taken or facilitated by the guard. *Henderson v. Turner*, Civil Action No. 11-0039, 2012 WL 12930838, at *4 (M.D. La. June 12, 2012). Nothing in *Henderson* states or even suggests that a defendant's personnel file is discoverable merely because the plaintiff speculates that it may contain something that might be relevant, as Plaintiffs assert here.

[60] *See* Declaration of Rachel V. Stevens in Support of Defendants' Opposition to Plaintiffs' Motion to Compel, dated May 21, 2018 ("Stevens Decl."), at ¶ 5.

text messages from just two (2) of the nine (9) custodians from whom Al Jazeera has collected documents." *Id*. Plaintiffs are wrong. Defendants have produced 966 text messages from the three custodians—all members of the Investigative Unit—who had responsive text messages.[61] Unsatisfied, Plaintiffs strangely cite an email in which a reporter instructs Liam Collins not to delete messages from a shared email account because "[w]e need to preserve everything in there." Pls. Ex. 46. This clearly does not support Plaintiffs' demand, but instead is simply more evidence that Defendants have satisfied their discovery obligations and the demands that Plaintiffs make related to text messages should be denied.

## VI.   REQUESTS FOR ADMISSION

Plaintiffs also contend that Defendants have not adequately responded to over a dozen Requests for Admission ("RFAs"). Plaintiffs are mistaken. *First*, Plaintiffs complain that in response to RFA Nos. 2,-4, 8-11, 13-18, 22, and 28, Defendants "refer[] Plaintiffs to other documents or materials, without admitting or denying the RFA as written." Mot. at 29-30. Plaintiffs claim that this is impermissible and that Defendants "must admit or deny" the RFAs as written. Plaintiffs are incorrect.

As the Court recognized in *Harris v. Koenig*:

> There is … nothing in [Fed. R. Civ. P. 36] that divides the legitimate responses to a Request for Admission into watertight compartments of utter admissions and utter denials. To the contrary, given that it is unreasonable to expect that one party can always accept the other party's characterization of an event, the rule permits a party to qualify its answer, which is exactly what [was] done.

271 F.R.D 356, 374 (D.D.C. 2010). As an indicative example, consider RFA No. 17: "Admit that on December 27, 2015, in an interview on Al Jazeera, Davies admitted that the Defendants

---

[61] *Id*.

29

heard from Sly '48 hours ago' and acknowledged that 'Charlie Sly now says that anything he said to us wasn't true.'" In response, Defendants "admit[ted] that Davies was interviewed on December 27, 2015 on Al Jazeera America and the quotations contained in this Request are contained within that interview." Defendants then refer the Court to the full interview for its contents, and provide the hyperlink to that interview. This is hardly a refusal to admit or deny the RFA; indeed, Defendants explicitly admitted that Defendant Davies was interviewed and that the specific statements identified by Plaintiffs were contained within that interview.

As noted by *Harris*, "it is unreasonable to expect that one party can always accept the other party's characterization of an event," but this expectation is exactly what Plaintiffs appear to have. Plaintiffs' insistence that Defendants say "admit" or "deny" and nothing more is not supported by the Federal Rules, and Defendants should not be bound to answer exactly in the way Plaintiffs desire.

*Second*, Plaintiffs complain that, in response to RFA No. 19, Defendants responded they could not admit or deny because the Request calls for a hypothetical. Mot. at 31-32. Plaintiffs are not entitled to the response of "Defendants," as broadly defined by Plaintiffs themselves, to RFA No. 19. RFA No. 19 seeks an admission that "if a Major League Baseball player is accused of doping, it can have a negative impact on that player's reputation." As an initial matter, Plaintiffs acknowledge that this Request calls for Defendants' opinion. *See* Mot. at 32 (when referring to Request No. 19, stating that "an RFA is not objectionable if it asks for an opinion about a hypothetical situation that relates to the facts of the case"). Plaintiffs have defined "Defendants" to include "AJA, AJMN, AJI, and Davies, and all directors, officers, agents, employees, attorneys, and other Persons acting or purporting to act on behalf of the

foregoing."[62]   It would be impossible for Defendants to provide an accurate admission as to the

opinion of each corporation and individual—including agents, employees, attorneys, and

others—from whom Plaintiffs demand such an admission.   Moreover, AJA, AJMN, and AJI are

media companies, and, even to the extent that they can form corporate opinions, they are not in

the business of assessing the positive or negative "impact," or lack thereof, that could result from

hypothetical accusations about "doping."   Defendants therefore should not be compelled to

provide a response.

   *Third*, Plaintiffs complain that two of Defendants' responses are "hyper-technical and

unproductive."   Mot. at 32-34.   In RFA 21, Plaintiffs seek an admission "that [Al Jazeera

America] ceased its operations on or around April 30, 2016," but this entity is defined to include

"Al Jazeera America, LLC and all *current and former subsidiaries, parents, successors,*

*predecessors,* affiliates, joint ventures, associated organizations, directors, officers, employees,

agents, consultants, staff members or other representatives thereof."[63]   Obviously, AJAM's

"current and former subsidiaries, parents, [and] successors" did not cease their operations by

April 30, 2016.   Further, AJAM itself continued to wind-up its operations well past April 30,

2016, despite that April 30 was the last broadcast date.[64]   Therefore, Defendants appropriately

denied the RFA.

   While Plaintiff gripes that this reading is "hyper-technical and unproductive," Defendants

have responded to the only plausible plain-meaning interpretation of the RFA as written, which

they were entitled to do.   *See In re Greenwood Air Crash*, 161 F.R.D. 387, 391 (S.D. Ind. 1995)

---

[62] Plaintiffs' First Set of RFAs, at 2 (Ex. 35).

[63] *Id.* (emphasis added).

[64]   *See* Letter from R. Stevens to W. Burck, dated Feb. 16, 2018, at 10 (explaining Defendants' response to Plaintiffs' Request For Admission No. 21) (Ex. 36).

(party was "entitled to rely on the plain meaning" of the discovery request); *ODS Techs., L.P. v. Magna Entm't Corp.*, No. CV 07-3265-DDP(RCx), 2008 WL 11343031, at *2 (C.D. Cal. July 31, 2008) (giving discovery request its plain meaning); *Patmont Motor Werks, Inc. v. CSK Auto Inc.*, No. 3:04-CV-0473-BES (VPC), 2006 WL 2591042, at *3 (D. Nev. Sept. 8, 2006) ("The court cannot speculate what may or may not seem obvious to the parties during discovery, and a party responding to discovery requests is entitled to respond to the plain meaning of the request."). Defendants cannot be expected to know, much less admit to, the "underlying gist" of RFA No. 21. Mot. at 33. In any event, Defendants have explained the basis for this denial to Plaintiffs in meet and confers, and offered to consider a revised RFA, should Plaintiffs choose to serve one; Plaintiffs declined to do so. In such circumstances, Plaintiffs have no ground to complain.

Similarly, RFA No. 39 states, "[a]dmit that You considered it a network imperative to broadcast the Documentary in 2015." Plaintiffs explicitly define "You" for purposes of their RFAs as "Defendants, individually and collectively, including all current and former subsidiaries, parents, successors, predecessors, affiliates, joint ventures, associated organizations, directors, officers, employees, agents, consultants, staff members, or other representatives thereof."[65] Therefore, the only logical interpretation of RFA No. 39 is that it seeks an admission on behalf of individual Defendant Davies and the several corporate defendants—including their employees and staff—that there was a "network imperative" to broadcast the Documentary in 2015. Relying on that interpretation, Defendants appropriately denied RFA No. 39, notwithstanding the existence of one email exchange in which a single employee—not

---

[65] Plaintiffs' First Set of RFAs, at 4 (Ex. 35).

empowered to speak for the network, much less the full Al Jazeera organization—used that phrase.

The cases cited by Plaintiffs in challenging these "hyper-technical" responses are readily distinguishable.  In *AmeriPride Servs., Inc. v. Valley Indus. Servs., Inc.*, No. CIV 2:00-CV-0113-LKK-JFM, 2011 WL 1321873, at *1 (E.D. Cal. Apr. 1, 2011), the responding party failed to either admit or deny certain requests for admission.  Here, Defendants have denied RFA Nos. 21 and 39.  Furthermore, unlike in *AmeriPride*, this is not a situation in which Defendants are "unable to agree with the exact wording of the request for admission" and "should agree to an alternate wording or stipulation."  *Id.* at *3.  Defendants, rather, have responded to the plain meaning of Plaintiffs' words.  Defendants also are not making "hair-splitting disingenuous distinctions."  *Tequila Centinela, S.A. de C.V. v. Bacardi & Co. Ltd.*, 242 F.R.D. 1, 14 (D.D.C. 2007).  In *Tequila Centinela*, the defendant failed to give complete answers to the plaintiff's requests for admissions, which asked about promotion in general, by "den[ying] that it directly sells its goods."  *Id.* at *13.  Here, by contrast, Defendants have directly and fully responded to RFA Nos. 21 and 39 as worded by Plaintiffs and, furthermore, have explained to Plaintiffs specifically why.  Similar to the responding party in *Kendrick v. Sullivan*, CIV. A. No. 83-3175(CRR), 1992 WL 119125, at *5 (D.D.C. May 15, 1992), Defendants have "made a diligent, good faith effort to inform [Plaintiffs] of what facts they [can] fairly admit and what facts they [cannot] concede."

33

## **CONCLUSION**

For the reasons set forth above, the Court should deny Plaintiffs' motion to compel, and grant all reasonable relief.

Dated: May 21, 2018

By: /s/ Charles Scheeler

Andrew L. Deutsch (admitted *pro hac vice*)
Michael Hynes (admitted *pro hac vice*)
Rachel Stevens (admitted *pro hac vice*)
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, NY 10020
Telephone:  212.335.4500
Facsimile:   212.335.4501

Anthony D. Gill
DLA PIPER LLP
500 Eighth Street, NW
Washington, DC  20004
Telephone:  202.799.4562
Facsimile:   202.799.5562

Charles P. Scheeler
DLA PIPER LLP (US)
The Marbury Building
6225 Smith Avenue
Baltimore, MD  21209-3600
Telephone:  410.580.3000
Facsimile:   410.580.3001
*Attorneys for Defendants*